—1—

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3

AF HOLDINGS LLC,        )    Civil Action No.
4                          )    12-00048-BAH
           Plaintiff.      )
5                          )
     v.                    )
6                          )
DOES 1-1058,              )    April 27, 2012
7                          )    11:42 a.m.
           Defendants.     )
8    -----------------------

                                Washington, D.C.
9

10

11

12                  TRANSCRIPT OF MOTION HEARING

13

14           BEFORE THE HONORABLE BERYL A. HOWELL
                UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

COURT REPORTER:    PATRICIA A. KANESHIRO-MILLER, RMR
21                   Certified Realtime Reporter
                     Official Court Reporter
22                   Room 4704B, U.S. Courthouse
                     Washington, D.C. 20001
23                   202-354-3243

24

25

```
 1                          APPEARANCES

 2

 3      FOR THE PLAINTIFF:
        JOHN L. STEELE, ESQ.
 4      Prenda Law Inc.
        161 North Clark Street
 5      Suite 3200
        Chicago, Illinois  60601

 6

 7      FOR COX COMMUNICATIONS, INC.,
        VERIZON ONLINE LLC, BRIGHT HOUSE
 8      NETWORKS LLC:
        BENJAMIN JONATHAN FOX, ESQ.
 9      Morrison & Foerster, LLP
        555 West 5th Street
10      Los Angeles, CA  90013

11

        FOR SBC INTERNET SERVICES, INC.,
12      DOING BUSINESS AS AT&T INTERNET
        SERVICES:
13      BART W. HUFFMAN, ESQ.
        Locke Lord LLP
14      100 Congress
        Suite 300
15      Austin, Texas  78701

16      FOR COMCAST CABLE COMMUNICATIONS LLC:
        JOHN DAVID SEIVER, ESQ.
17      Davis Wright Tremaine, LLP
        1919 Pennsylvania Avenue, N.W.
18      Suite 800
        Washington, D.C.  20006

19
        FOR ELECTRONIC FRONTIER FOUNDATION:
20      MITCHELL L. STOLTZ, ESQ.
        Electronic Frontier Foundation
21      454 Shotwell Street
        San Francisco, California  94110

22

23

24

25
```

1                          CONTENTS

2


3     WITNESS                                        PAGE

4        STEVEN W. SMOOT
              Direct Examination                    7, 14
5             Voir Dire                             10
              Cross-Examination by Mr. Huffman      41
6             Cross-Examination by Mr. Seiver       49
              Cross-Examination by Mr. Fox          54
7
         SETH SCHOEN
8             Direct Examination                    62
              Cross-Examination                     83
9

10

11                         EXHIBITS

12

      Plaintiff's Exhibit 1          Page 14
13    Plaintiff's Exhibit 2          Page 24
      Plaintiff's Exhibit 3          Page 24
14    Plaintiff's Exhibit 5          Page 30
      Plaintiff's Exhibit 6          Page 33
15    Plaintiff's Exhibit 7          Page 37

16

17

18

19

20

21

22

23

24

25

```
 1                          PROCEEDINGS

 2              THE CLERK:  Civil Action 12-48, AF Holdings, LLC

 3      versus Does, et al.

 4              Counsel, please step forward to the podium and state

 5      your appearances for the record.

 6              MR. STEELE:  Good morning, Your Honor.  John Steele

 7      here on behalf of plaintiff, AF Holdings.

 8              THE COURT:  Good morning.

 9              MR. FOX:  Good morning, Your Honor.  Benjamin Fox for

10      Verizon, Bright House Communications, and Cox Communications.

11              THE COURT:  Oh, all in one body.  How pleasant.

12              MR. HUFFMAN:  Good morning, Your Honor.  Bart Huffman

13      for SBC Internet Services, doing business as AT&T Internet

14      Services.

15              THE COURT:  Good morning.

16              MR. STOLTZ:  Good morning.  Mitchell Stoltz, the

17      Electronic Frontier Foundation for amicus and for the witness,

18      Mr. Seth Schoen.

19              MR. SEIVER:  Good morning, Your Honor.  John Seiver,

20      Davis, Wright, Tremaine, for non-party Comcast.

21              THE COURT:  Okay.  Thank you.  Could you all please

22      get seated.  My court reporter is going to make a seating

23      chart with your names, so I can keep track of who's who, as

24      can she.

25              All right.  We are here on the plaintiff's motion to
```

1    compel Comcast.  And who is for Comcast?

2              MR. SEIVER:  I am, Your Honor.  John Seiver.

3              THE COURT:  John Seiver, great.

4              Mr. Fox, you're here for all the other four or five

5    ISPs?

6              MR. FOX:  Except for AT&T, who is Mr. Huffman.

7              THE COURT:  For AT&T?

8              MR. HUFFMAN:  Yes, Your Honor.

9              THE COURT:  And Mr. Stoltz, you're here for EFF and

10   the amici?

11             MR. STOLTZ:  Yes, Your Honor.

12             THE COURT:  Got it.  All right.

13             Let me just start by understanding who has a witness

14   that they think they need to present here.  I think you have

15   two witnesses that you would like to present, is that correct?

16             MR. STEELE:  We have just one witness, Your Honor.

17             THE COURT:  One witness.  And who is that?

18             MR. STEELE:  Our witness is Steve Stoltz, Your Honor.

19             THE COURT:  Steve?

20             MR. STEELE:  Stoltz, Your Honor.

21             THE COURT:  Oh, another Stoltz?

22             MR. STEELE:  Smoot, Your Honor.  I'm sorry.  Smoot,

23   S-M-O-O-T.

24             THE COURT:  Okay.  That would have been unusual.

25             MR. STEELE:  Yes.  I apologize.

1          THE COURT:  I have received the declarations from the

2    ISPs.  Do you have any witnesses that you plan to present oral

3    testimony from today?

4          MR. HUFFMAN:  Yes, Your Honor.  We intend to present

5    as a witness Mr. Seth Schoen, from the Electronic Frontier

6    Foundation, who has submitted a declaration in this case, as

7    well.

8          THE COURT:  And is he going to add something to that

9    declaration?

10         MR. HUFFMAN:  We could explore further some of the

11   topics with respect to geolocation, if it is of interest to

12   the Court.

13         THE COURT:  And nothing on undue burden?

14         MR. HUFFMAN:  No, Your Honor, except insofar as the

15   proceeding, we believe the discovery is improperly sought and

16   any burden would be undue.

17         THE COURT:  All right.  Why don't we start with your

18   witness.

19         MR. STEELE:  Yes, Your Honor.  I call Steven Smoot.

20         THE COURT:  Mr. Smoot, please step forward to the

21   witness stand and raise your right hand.

22                    **STEVEN W. SMOOT,**

23   having been first duly sworn to tell the truth, the whole

24   truth and nothing but the truth, was examined and testified as

25   follows:

1          MR. STEELE:  Your Honor, would it please the Court if

2    I approach the podium or if I --

3          THE COURT:  No, please approach the podium.  You have

4    to speak into the microphone so the court reporter can capture

5    what you say.

6                       **DIRECT EXAMINATION**

7          BY MR. STEELE:

8    Q.   Mr. Smoot, just to be clear, please state your name and

9    address for the record.

10   A.   Yes, my name is Steven W. Smoot.  I live at 713 Fox Gate

11   Court in Plant City, Florida.

12   Q.   And your occupation?

13   A.   I'm a technology consultant.

14   Q.   And how long have you been a technology consultant?

15   A.   For over 20 years.

16   Q.   And what is your current employment?

17   A.   I'm currently an independent consultant with a consulting

18   firm known as eComp Consultants.

19   Q.   And as part of that employment, what is the description of

20   your responsibilities?

21   A.   I consult on technology involved in everything from

22   assessing new businesses to assessing technology and

23   understanding the issues related to patents on technology.  I

24   also have been involved with forensic investigations involving

25   technology.

1        THE COURT:  And what is the name of your company

2   again?

3        THE WITNESS:  eComp Consultants, E-C-O-M-P

4   Consultants.

5        THE COURT:  Thank you.

6        THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

7        BY MR. STEELE:

8   Q.   All right.  And as part of your consulting, have you had

9   any experience with communication protocols in the internet?

10  A.   Yes, I have.  In fact, my early career was heavily

11  involved in telecommunications, product design, both hardware

12  and software engineering.  My work has also led to the

13  acceptance of protocols that I have designed by the American

14  National Standards Institute for level two and level four

15  communications.

16  Q.   Have you performed any other work related to internet or

17  communication protocols?

18  A.   Yes.  A number of products that I was involved in the

19  design of, for instance, the first high speed data encryption

20  device that was accepted by the National Security

21  Administration, and I designed the protocols for implementing

22  what's called the line protocol for those encryptors.

23  Q.   Okay.  Do you have any experience with what's referred to

24  as a BitTorrent protocol?

25  A.   I am knowledgeable on BitTorrent protocol, yes.

1    Q.   Okay.  And do you have any experience or knowledge with a

2    technology called geolocation?

3    A.   I'm aware of geolocation and have used similar techniques,

4    in fact, in testimony where I have testified as to how

5    location systems work.

6    Q.   Speaking of your experience as an expert testifying, how

7    many times have you been qualified as an expert to testify in

8    court?

9    A.   Five times.

10   Q.   Okay.  And in addition to those experiences, have you been

11   called to testify in other matters?

12   A.   Yes, I have.

13   Q.   And what are those other matters?

14   A.   I have testified in theft of corporate secrets in cases

15   involving -- one case was a very serious traffic infraction in

16   which the evidence did not support the state's case, and I

17   have also consulted on a number of cases relating to murders

18   in which location technology was a major factor in the case.

19   Q.   And just so that I'm clear, when did you first begin

20   working in the technology sector or field?

21   A.   That would go back to 1977 -- 1976.

22   Q.   Pardon me?

23   A.   1976.

24        MR. STEELE:  Your Honor, I proffer this person as an

25   expert in the area of internet telecommunications and

1    communications.

2              MR. HUFFMAN:  Your Honor, we object to that proffer.

3              THE COURT:  And why is that?

4              MR. HUFFMAN:  For a number of grounds.  First of all,

5    Your Honor, there has been no showing at all with respect to

6    internet or telecommunications technology or a need or

7    relevance of any expert in that general field.  Secondly, he

8    has only stated that he has knowledge, not even any particular

9    level of knowledge, with respect to BitTorrent technology

10   and/or with respect to IP address geolocation.

11             THE COURT:  Well, I think the appropriate way to deal

12   with that is for you to conduct your own voir dire if you have

13   questions about his underlying qualifications.

14             Plaintiff's counsel may be seated.

15             Conduct your voir dire.

16             MR. HUFFMAN:  Thank you, Your Honor.

17                           **VOIR DIRE**

18         BY MR. HUFFMAN:

19   Q.   What experience do you have specifically with respect to

20   BitTorrent protocols?

21   A.   I have studied the protocol because I keep up on protocols

22   as a matter of keeping up my expertise in communications.  I

23   have also, at times, used BitTorrent protocols to download,

24   for instance, Linux distributions, as I'm also very involved

25   in operating system development.  So I'm aware of both how it

1    works from the user's standpoint, as well as the technical

2    underpinnings of the protocol itself.

3    Q.   To what extent have you studied the operation of the

4    BitTorrent other than your experience as a user downloading

5    operating systems?

6    A.   As I said, I explicitly studied the BitTorrent protocol as

7    I keep up with a number of different protocols that are

8    currently in use on the internet.  It is just a matter of

9    keeping my skills up in my field.

10   Q.   In what way have you studied it?

11   A.   I studied the mechanisms, primarily to understand what's

12   the difference between BitTorrent and other protocols that are

13   out there; why is it better, why is it not; the potential for,

14   you know, problems with the protocol.  Every protocol you

15   design has issues such as losing synchronization or losing

16   packets and these kinds of things, and there must be ways of

17   dealing with those, so I studied the protocol to understand

18   exactly what they were doing in that area.

19   Q.   Have you ever provided any expert witness testimony on the

20   use of BitTorrent protocol?

21   A.   No, I haven't.

22   Q.   Have you ever provided any consulting services with

23   respect to the use of BitTorrent protocol?

24   A.   No, I haven't.

25   Q.   Or with respect to file-sharing?

1    A.   Yes, I have.

2    Q.   What type of file-sharing?

3    A.   Well, it was conventional file-sharing, one-to-one

4    file-sharing.  And the company that I did that work at was

5    Paradigm Corporation, in which we had a number of

6    communications products that had file transfer capabilities,

7    and so I was one of the lead engineers.

8    Q.   Other than one-to-one file-sharing, what consulting

9    services, if any, have you provided?

10   A.   I have not consulted on BitTorrent.

11   Q.   Or peer-to-peer of any kind?

12   A.   No.

13   Q.   With respect to IP address geolocation, what is the nature

14   of your experience and expertise?

15   A.   Location, in general, is my area of expertise, and I

16   have -- I have testified on cell phone location systems, on

17   GPS location systems, on automatic vehicle location systems.

18   I've also been aware of the mechanisms that the geolocation

19   providers use today in terms of receiving blocks of addresses,

20   for example, and the regions that those blocks of addresses

21   are associated with and how that information is used to

22   attempt to locate, to some degree, an IP address.

23   Q.   Have you ever provided any consulting services with

24   respect to IP address geolocation?

25   A.   No, I haven't.

1    Q.  Have you ever been qualified or testified as an expert

2    before with respect to IP address geolocation?

3    A.  No, I have not.

4    Q.  Have you ever examined or performed any study with respect

5    to the difference between GPS location or geolocation, mobile

6    location, if you will, and IP address geolocation?

7    A.  Could you state the question again?

8    Q.  Yes.  Have you ever examined the difference between

9    geolocation or locational technology involving GPS systems in

10   mobile phones, for example, on the one hand, and geolocation

11   with respect to individual subscriber IP addresses?

12   A.  Not before this case.  I did that study as a part of this

13   case.

14   Q.  Have you ever studied or analyzed the accuracy,

15   independent of your study for this case, the accuracy of IP

16   address geolocation techniques?

17   A.  No, I haven't.

18        MR. HUFFMAN:  I submit, Your Honor, that this witness

19   is not qualified in these two particular areas.

20        THE COURT:  Do you have a CV for this witness?

21        MR. STEELE:  Yes, I do, Your Honor.

22        THE COURT:  Would you like to have it marked as an

23   exhibit for this hearing?

24        MR. STEELE:  Yes, Your Honor.

25        THE COURT:  Have you shown it to opposing counsel?

1          MR. STEELE:  I provided it to opposing counsel via

2    email.  I can tender it.

3          THE COURT:  And what is this exhibit?

4          MR. STEELE:  Exhibit 1, Your Honor.

5          THE COURT:  Plaintiff's Exhibit 1.

6          It will be accepted.

7          (Plaintiff's Exhibit 1 admitted into evidence)

8          THE COURT:  I will hear testimony from this witness as

9    an expert --

10          MR. STEELE:  Thank you, Your Honor.

11          THE COURT:  -- under Federal Rule of Evidence 702.

12          MR. STEELE:  Thank you, Your Honor.

13          I apologize.  I had a little technical difficulty with

14    printing out something this morning.

15                    **DIRECT EXAMINATION (CONTINUED)**

16          BY MR. STEELE:

17    Q.  Mr. Smoot, how did you come to be involved in this case?

18    A.  I was contacted last Friday to determine whether or not I

19    would have information or knowledge related to the area of the

20    use of BitTorrent products or systems, and I replied that I

21    did.

22    Q.  And what technical areas were you asked to look into?

23    A.  Specifically, the areas of geolocation dealing with

24    accuracy and/or the lack thereof; how geolocation works; how

25    the data that is used for the geolocation process is

1    generated; how that data is sometimes enhanced for use by

2    people who would lease or license this data for various kinds

3    of business applications.  I also was asked to look at

4    specifically the differences in BitTorrent between -- or

5    between BitTorrent and other protocols that have existed both

6    relatively recently and going back further to give basically a

7    summation of how things have changed over the years.

8    Q.   Okay.  Just so we're clear, briefly what is BitTorrent

9    protocol?

10   A.   BitTorrent is a protocol that allows users to share files.

11   The files are typically broken down into pieces and

12   distributed over a number of what probably are best called

13   peers.  They are more technical terms such as leachers and

14   seeders, but I think peers would be best for this discussion.

15   Q.   Okay.  Please describe how the BitTorrent protocol

16   operates between these peers.

17   A.   Basically, a user will obtain what is called a torrent

18   file.  There are a number of ways to obtain them.  They could

19   be published on websites, is one of the most common ways of

20   accessing them.  They could also be emailed between users.

21   They could be shared in private networks of people who have

22   similar interests.  And once the user has a torrent, he loads

23   the torrent into what would be a BitTorrent client

24   application.  That's a piece of software that runs on his

25   local personal computer and allows him to do the file download

1    that he desires to do.

2         Once that torrent is loaded in, the application checks

3    information within the torrent to determine, one, you know,

4    how big is this file; two, how many parts has it been broken

5    into as it has been distributed throughout the internet.  It

6    also has a table or an index inside it that indicates what

7    machines will be cooperating in the downloading process, the

8    IP addresses of other users.

9    Q.   How would you describe the process between the various

10   peers?

11   A.   Once the client application has read that information, it

12   contacts each of the peer computers if they're available

13   online and requests information about what pieces of the file

14   that particular peer is holding at that time, and they have to

15   be complete pieces, not incomplete pieces.  And that peer will

16   respond with information indicating which pieces it has.  And

17   so simultaneously it is asking multiple peers for this

18   information.  After receiving all that back, the downloader's

19   client software is able to determine which blocks it can

20   access at that time out of, you know, the number of blocks

21   that it still needs to complete a file download, and it then

22   starts a download with each of the peers that has a block of

23   interest to the downloader's client.

24   Q.   I want to show you -- let me go back to the microphone.  I

25   want to show you what's labeled 2, Exhibit 2.  Do you

1    recognize that document?

2    A.   Yes, I do.

3    Q.   And what is that document?

4    A.   It is a portion of a study that was commissioned by NBC,

5    and it is specifically dealing with an analysis of the top

6    10,000 or most active torrents during the 2010 period,

7    December 2010 period, and it's identifying out of all the --

8            THE COURT:  Excuse me.  Can you just tell us the

9    source of the document?  And have you shared this with

10   opposing counsel?

11           MR. STEELE:  I have, Your Honor.

12           MR. SEIVER:  I'm sorry.  I don't have a copy.  Did you

13   send one to me?

14           MR. STEELE:  I apologize.  I sent it to Counsel

15   Huffman, and it may not have gotten cc'ed to -- I can provide

16   now my copy to other counsel.

17           THE COURT:  Can't people at that table share a copy of

18   this document?

19           MR. SEIVER:  We can share, Your Honor.

20           MR. STEELE:  Ironically, counsel's employer actually

21   commissioned the study.

22           THE COURT:  It's commissioned by Comcast?

23           MR. STEELE:  Comcast's parent company.

24           Hold on one moment.  I can give you my copy.

25           MR. SEIVER:  For the record, Comcast is NBC's parent

1    company.

2           MR. STEELE:  I apologize, Your Honor.  I will have to

3    look for it.

4           THE COURT:  I'm sure other people at the table can

5    share a copy of this with counsel.

6           MR. FOX:  Your Honor, we just need one copy.

7           MR. HUFFMAN:  I received an email from Mr. Steele last

8    night that said "expert documents" on the "re" line and had

9    10 megabytes of documents attached.  I think I was on a

10   flight, actually.  I have no printout.  I can't access the

11   documents now because they just reside on my email.

12          MR. STEELE:  Your Honor, there's more to the story.  I

13   requested --

14          THE COURT:  I don't want to hear the story.  Let's

15   proceed.

16          MR. STEELE:  Thank you.

17          THE WITNESS:  So let me finish --

18          MR. STEELE:  Yes.

19          THE WITNESS:  -- my statement there.

20          What the particular page that we were reviewing here

21   is indicating is that a very large amount of the content

22   downloaded in these top 10,000 torrents was of copyrighted

23   material or pornography.  The remaining small percentages were

24   unknown torrents, and the torrents that were identifiable as

25   non-copyrighted actually came out to .01 percent of the

1    content.

2            THE COURT:  But Mr. Smoot, what is the date of the

3    document you're holding?

4            THE WITNESS:  The date -- the study was completed in

5    December 2010, and the document was copyright 2011.  That's

6    the only date that I have.

7            THE COURT:  And over what period of time did this

8    study collect data that it is reporting on?

9            THE WITNESS:  I believe this was a -- I'm trying to

10    remember.  I've read several.  The ones I recall reading were

11    one month.  I believe this was a one-month time frame.

12            THE COURT:  So it was a one-month time frame in

13    December of 2010?

14            THE WITNESS:  Yes.  That's my recollection.

15            MR. SEIVER:  Your Honor, if I might, it says it's page

16    number 12.  We don't know the other pages -- what the other

17    pages included with the disclosure --

18            MR. STEELE:  Your Honor --

19            MR. SEIVER:  -- it's problematic.  If it's his study,

20    that is one thing, but I don't think it's his study.  It says

21    Envisional.

22            MR. STEELE:  Your Honor, I have a copy -- Envisional

23    was the one hired by NBC to prepare the study.  I have a full

24    copy of it here, and I can provide my copy to counsel.  If we

25    would like to take a break, fine; but if we could just move

1    along, I would be more than happy to give counsel my copy.  I

2    don't think this is the issue at the moment.  If I could just

3    finish my examination.

4         MR. SEIVER:  Your Honor --

5         THE COURT:  Well, Mr. Steele, let me just be clear

6    from my perspective, putting aside the objections.  You're

7    creating a record here I presume for a purpose, and you're

8    going to share with us at some point what the purpose is, but

9    I personally would like to know exactly what I'm looking at,

10   who did it, when it was performed, and what the source of the

11   evidence is that you're putting before the Court for

12   consideration.  If this is an excerpt from a report, I think

13   it would be better practice for you to put the entire report

14   in.  And when you identify it for the record as Plaintiff's

15   Exhibit 2, have the witness explain exactly what the document

16   is, not what the contents of the document are, but what the

17   document is, so I have a sense of where are we going with

18   this.

19        MR. STEELE:  I apologize.

20        THE COURT:  We have a Plaintiff's Exhibit 2 that has

21   been marked as one excerpt.  Why don't we mark the entire

22   study, if you have a copy, as a plaintiff's exhibit, of which

23   Exhibit 2 is an excerpt.

24        MR. STEELE:  One moment.

25        All right.  Your Honor, I found -- I apologize.  I

1    found the document, and I marked it Plaintiff's Exhibit 3,

2    just for clarity.  I can have the witness provide the

3    foundation if Your Honor would like.  I apologize again.

4           THE COURT:  Have you shared the entire report with

5    opposing counsel?

6           MR. STEELE:  I provided the entire report to Counsel

7    Huffman, but I can also first provide this copy to the other

8    counsel before providing it to the witness, if you would like.

9           THE COURT:  Okay.  Why don't you let them have an

10   opportunity to inspect it.

11          MR. SEIVER:  Indulge us.

12          Your Honor, could we be heard briefly on the Exhibit?

13          THE COURT:  Well, I don't think this is the

14   appropriate time.  He hasn't moved for its admission.

15          MR. SEIVER:  Very well.

16          BY MR. STEELE:

17   Q.   Showing you a document marked Exhibit 3, are you familiar

18   with that document?

19   A.   Yes, I am.

20   Q.   In fact, is that document -- in fact, is Exhibit 2 one

21   page of Exhibit 3?  Or specifically page 12 of Exhibit 3?

22   A.   Yes, it is.

23   Q.   Okay.  And what document -- what's the title of document 3

24   or Exhibit 3?

25   A.   The title is "Technical Report, an Estimate of Infringing

1    Use of the Internet," published in January of 2011,

2    version 1.8.

3    Q.   Does it state who prepared that report?

4    A.   It was prepared by Envisional Limited.

5    Q.   Does it have any other information as to who either

6    prepared it or who paid for the report or who sponsored the

7    report?

8    A.   Yes, it does.  It indicates in the first paragraph that

9    Envisional was commissioned by NBC Universal to analyze

10   bandwidth usage.

11   Q.   Back to page 12 or Exhibit 2, as you will, you stated that

12   according to --

13        THE COURT:  Mr. Steele, I know this is just a hearing,

14   we can be a little bit more informal than we would at a

15   trial --

16        MR. STEELE:  Yes, Your Honor.

17        THE COURT:  -- but typically even at a hearing, if you

18   want the Court to actually look at this in consideration of

19   the pending motions, you would have to introduce it into

20   evidence at the hearing --

21        MR. STEELE:  Of course.

22        THE COURT:  -- which would then give the opportunity

23   to defense counsel to be heard if they have an objection.

24        MR. STEELE:  Yes.

25        THE COURT:  So before you start discussing it, unless

1    this is further foundation argument, are you moving for its

2    introduction?

3         MR. STEELE:  Well, Your Honor, I was going to move for

4    introduction after but --

5         THE COURT:  If he is going to be discussing the

6    contents --

7         MR. STEELE:  Yes.

8         THE COURT:  -- it might be more appropriate for you to

9    move for its introduction first, and then I can hear what the

10   objections are since I think some of your opposing counsel --

11        MR. STEELE:  I will submit to your wisdom, Judge.

12        THE COURT:  -- might be getting antsy in their seats.

13        MR. STEELE:  I can feel the tension behind me, Your

14   Honor.  I'll defer --

15        THE COURT:  I don't think so --

16        MR. STEELE:  Thank you.

17        THE COURT:  -- everybody likes to talk.

18        So are you moving the admission of both --

19        MR. STEELE:  Yes, Your Honor.

20        THE COURT:  Excuse me.  Let me finish speaking.

21        Are you moving the admission of Exhibits 2 and 3?

22        MR. STEELE:  Yes, Your Honor.  I apologize.

23        THE COURT:  Is there objection?

24        MR. SEIVER:  Yes, Your Honor.

25        THE COURT:  Please state your objection.

1          MR. SEIVER:  It's a hearsay exhibit.  It wasn't

2     prepared by this witness.  We don't know what its relevance is

3     to this proceeding, either.  There has been no connection at

4     least in the foundational part that it has anything to do with

5     what the issues are for the Court's resolution or even for the

6     resolution of the Complaint.

7          THE COURT:  Thank you.  Overruled.

8          Please proceed.

9          They will both be admitted.

10         (Plaintiff's Exhibits 2 and 3 admitted in evidence)

11         MR. STEELE:  Thank you, Your Honor.

12         BY MR. STEELE:

13    Q.   Mr. Smoot, you stated that the identified and

14    non-copyrighted percentage of the top 10,000 torrents tracked

15    in December 2010 was .01 percent, but as an actual number, of

16    those 10,000 torrents, how many of those torrents were found

17    to be non-copyrighted?

18    A.   One.

19    Q.   One torrent?

20    A.   One torrent was of non-copyrighted content.

21    Q.   Okay.  I'm going to show you a page entitled number 4.  Do

22    you recognize that document?

23    A.   Yes, I do.

24    Q.   And what is that document?

25    A.   This is a screen capture of a application running on a

1    Macintosh.  It is known as uTorrent.  The same application is

2    available for the PC.  The particular screen capture here

3    indicates that a single torrent is being downloaded.  It

4    happens to be a Ubunto Linux distribution --

5           THE COURT:  Before you go into what the contents are

6    again, Mr. Smoot, what is the date of the screen capture?

7           THE WITNESS:  I did not take the screen capture.  I'm

8    not sure of the date.

9           THE COURT:  And do you know who did the screen

10   capture?

11          THE WITNESS:  I believe Mr. Steele did.  I don't know

12   the time or date that occurred.

13          THE COURT:  But you did not do it?

14          THE WITNESS:  I did not.

15          THE COURT:  And have you ever used uTorrent yourself?

16          THE WITNESS:  Yes, ma'am, I have.

17          THE COURT:  All right.  Please proceed, Mr. Steele.

18          MR. SEIVER:  Your Honor, may I be heard if he's going

19   to move it in?

20          THE COURT:  I don't know whether he is or not.

21          MR. STEELE:  I'm not, Your Honor.

22          BY MR. STEELE:

23   Q.  I have handed you a document titled number 5.  Do you

24   recognize that document?

25   A.  Yes, I do.

1            THE COURT:  Just to be absolutely clear for the

2       record, this is Plaintiff's Exhibit 5, the document itself is

3       not titled 5; correct?

4            MR. STEELE:  You're right, Your Honor.  I apologize,

5       Your Honor.  It is Plaintiff's Exhibit 5.

6            THE COURT:  All right.  Please proceed.

7            BY MR. STEELE:

8       Q.   Do you recognize Plaintiff's Exhibit 5?

9       A.   Yes, I do.  I recognize the content of the document.  It's

10      another screen capture.  It happens to be on the PC platform

11      this time.

12      Q.   And I believe . . .

13           Your Honor, for the record, this has been admitted.

14      This is a part of a pleading that has already been admitted in

15      this case.  It is a document that is already in the court file

16      in this case.  I believe it's pleading document 27-1 in this

17      case.

18           THE COURT:  27?

19           MR. STEELE:  Yes, Your Honor, 27-1.

20           BY MR. STEELE:

21      Q.   And you said you're familiar with this screen shot,

22      Steve -- Mr. Smoot?

23      A.   Yes, I recognize what this screen shot represents, yes.

24      Q.   Okay.  Is this a typical screen shot that one would see if

25      they were downloading a file using BitTorrent?

1          MR. HUFFMAN:  Your Honor, may we object if he is going

2     to move to admit this?

3          THE COURT:  I'm just getting to this.  Hold on a

4     second.

5          Yes, what's your objection?

6          MR. HUFFMAN:  Your Honor, this is, I believe, an

7     exhibit to the declaration of Mr. Hansmeier, who was

8     designated as a potential witness today, who we were hoping

9     would show up because he, in fact, is the sole evidentiary

10    basis on which this plaintiff seeks to obtain the discovery of

11    thousands of individuals, and Mr. Hansmeier is not here to

12    testify to this.  There is no foundation laid for this.  And

13    this witness has absolutely no knowledge of it.  It hasn't

14    been admitted at all.  To the contrary, it was submitted as

15    part of an ex parte submission to the Court that the very

16    inability to challenge which goes to the core of the reasons

17    why we believe this discovery is improper.

18          THE COURT:  It's overruled.

19          Go ahead.

20          BY MR. STEELE:

21    Q.  Mr. Smoot, just so I remember your answer here, is this

22    typical of what it looks like when someone is downloading a

23    file using BitTorrent?

24          MR. SEIVER:  Objection, Your Honor.  It's leading, but

25    I was letting it go before.  I apologize.  He's suggesting the

1    answer to the witness.

2         THE COURT:  Overruled.  Please proceed.

3         THE WITNESS:  Yes, this is typical.  It shows the

4    files that are being downloaded and various statistics and

5    other information related to the download process.

6         BY MR. STEELE:

7    Q.   Okay.  On the right-hand side, what does -- there's a

8    number underneath the word "seeds."  What does that mean?

9    A.   That's the number of other computers that are cooperating

10   and providing information about the network of computers that

11   are involved in the download and providing information about

12   the parts of the download that are available.

13   Q.   Okay.  So when someone is running this program, is this on

14   their screen?

15   A.   Yes, it would typically be.  The application must be

16   running in order to perform its function, and as part of its

17   function, it collects this information during the download

18   process.

19   Q.   Okay.  And on the bottom half of the screen --

20        THE COURT:  Before you leave the question, under

21   seeds, as I read it on document 27-1, page 2 of 2, under

22   seeds, it has the number 11, and then, in parentheses, 184.

23   What is the difference between the 11 and the 184?

24        THE WITNESS:  The 184 is actually the number of seeds

25   that are collected in the torrent.  The 11 is the currently

1   active seeds.

2          THE COURT:  Meaning the 11 reflects the number of

3   users who are actively online at that time?

4          THE WITNESS:  Providing parts of the file.

5          THE COURT:  Got it, thank you.

6          BY MR. STEELE:

7   Q.  In the bottom half of the screen shot, what are

8   these -- all these numbers underneath the word "IP"?

9   A.  The numbers are the IP addresses or the apparent IP

10  addresses of the machines that are actually taking part in the

11  download.

12  Q.  So these IP addresses are the other computers or other

13  identifying numbers of the people that are sharing the

14  information with the person?

15         MR. SEIVER:  Objection, Your Honor.  It's leading.

16         THE COURT:  Given the informality of this hearing, I'm

17  going to allow -- just so we don't keep interrupting with a

18  number of objections, I'm going to allow great leeway for both

19  this witness and your witnesses since it is almost 12:30, so

20  just so you all can relax, enjoy the testimony.  If there is

21  something severely objectionable that you really think ought

22  to be cautioned before I hear it, please do not hesitate to

23  rise and let me know.

24         Please continue, Mr. Steele.

25         BY MR. STEELE:

1    Q.   All right, so -- one moment.

2         So you stated earlier that there were 11 peers

3    actively sharing data with this person at this screen shot.

4    How many IP addresses are underneath the word "IP" here?

5    A.   Eleven.

6    Q.   In your expert testimony, is there a correlation between

7    these 11 IP addresses and the word "11" -- or the number "11"

8    underneath the word "seeds" in the screen shot?

9    A.   It is my expectation that the 11 in the top part of the

10   screen represents the number of users who were participating,

11   and it is my expectation that the addresses of those users are

12   shown in the bottom.

13        MR. STEELE:  I would ask that Exhibit 5 be entered

14   into evidence.

15        MR. SEIVER:  We object, Your Honor.

16        THE COURT:  Overruled.  It will be admitted.

17        (Plaintiff's Exhibit 5 admitted into evidence)

18        MR. STEELE:  Thank you, Your Honor.

19        BY MR. STEELE:

20   Q.   Lastly, I'm going to show you document --

21        THE COURT:  Before we leave this, I understand that

22   you have some digital forensic expertise.

23        THE WITNESS:  Yes.

24        THE COURT:  And is this list of IP addresses involved

25   in this download, is this logged anywhere on the application

1    so that -- and stored so it is retrievable?

2            THE WITNESS:  It depends on the application.  Some

3    applications do log this information.  I'm not sure it is a

4    requirement that all applications must log this information.

5    But during the time that --

6            THE COURT:  And even if not within the application

7    itself, within the operating system, which has internet

8    history, logs of all different kinds, I mean are there other

9    places, depending on the operating system of the computer,

10   where this kind of information through a forensic examination

11   could be obtained?

12           THE WITNESS:  Yes.  At least in the area of the IP

13   addresses itself.  You won't necessarily receive all the other

14   information unless that is completely logged, but the history

15   of IP addresses that are contacted is typically logged at the

16   operating system level.

17           MR. STEELE:  May I proceed?

18           THE COURT:  Proceed.

19           MR. STEELE:  Thank you, Your Honor.

20           BY MR. STEELE:

21   Q.  I'm showing you a document marked number 6.  Are you

22   familiar with this document?

23   A.  Yes, I am.

24   Q.  How are you familiar with this document?

25   A.  I reviewed this document online as part of my

1    investigation into the uTorrent application.

2    Q.   And what is this document?

3    A.   It's an end user license agreement, which means it's an

4    agreement between the provider of the application and the

5    ultimate user of the application.  In this particular case,

6    the product is not sold; it is licensed.

7    Q.   Okay.  And what product are we looking at here?

8    A.   This is the uTorrent application.

9    Q.   What is the uTorrent application?

10   A.   It is a BitTorrent client application.

11   Q.   What's -- please describe to the Court the relevance in

12   particular of uTorrent.

13   A.   It's -- that's the name of the application, and it happens

14   to be the application that is also developed and distributed

15   by BitTorrent, Incorporated, the developers of the original

16   BitTorrent protocol and servers.

17   Q.   How would you describe the market share of uTorrent?

18        MR. SEIVER:  Objection.  Sorry.

19        THE WITNESS:  uTorrent has the majority of the market

20   share.  I don't know the exact figures, but I do know that

21   it's the largest, the most widely used BitTorrent application.

22        THE COURT:  Okay.  About how many BitTorrent

23   applications are there that are available?

24        THE WITNESS:  That I didn't study, but I can tell you,

25   from my own experience, there are probably at least 15 on the

1    PC; and there's probably at least 10, 9 or 10, on the

2    Macintosh; and there's probably some on the Linux, which I'm

3    not aware of, Linux operating system.

4    Q.   Do you have to agree to the end user license agreement

5    with uTorrent before you can use it?

6    A.   Typically, if the user is required to execute or accept

7    the license before a download of the application, there might

8    be a button on the bottom of the screen that says, I accept

9    this, and then it takes you to the download.  I don't see that

10   here, but that does not indicate that they're not required to.

11            MR. SEIVER:  Your Honor, if I can state for the

12   record, it is beyond his expertise, calling for a legal

13   conclusion, and should not be admitted, but I understand Your

14   Honor is giving leeway.

15            THE COURT:  Thank you.

16            MR. STEELE:  I have no further questions on this.  I

17   just ask it be admitted into evidence.

18            THE COURT:  The uTorrent application end user license

19   agreement?

20            MR. STEELE:  Yes, Your Honor.

21            MR. SEIVER:  We object.

22            THE COURT:  The objection is overruled.  It will be

23   admitted.

24            (Plaintiff's Exhibit 6 admitted into evidence)

25            MR. STEELE:  Thank you, Your Honor.

 1          THE COURT:  Do you have any further questions of this

 2    witness?

 3          MR. STEELE:  Yes, Your Honor.  Yes, Your Honor.

 4          BY MR. STEELE:

 5    Q.   I want to talk a little bit about geolocation.  Please

 6    provide a brief overview of geolocation.

 7    A.   Geolocation is the -- this is a term that is specific to

 8    the internet industry, and has to do with placing an IP

 9    address within a certain geographical location, using data

10    from databases to look up the IP address against that database

11    and return information about the location.  It can be very

12    specific or not very specific.

13    Q.   Do you have an expert opinion as to the accuracy of

14    geolocation?

15    A.   Yes, I do.  It's not an absolute system of location.  It's

16    an approximate system of location.  It is appropriate for some

17    uses.

18    Q.   Okay.  When you use a service to obtain the geolocation of

19    an IP address, do you know from the service how accurate that

20    information you get back is?

21    A.   In rare exceptions, yes; but in most cases, no.

22    Q.   Okay.  Can you give us an example?

23    A.   If I were to, as an individual user, go and search for my

24    IP address or any other person's IP address without a license

25    to subscribe to these kinds of databases, then I will not get

1    an indication of the accuracy.  If I were a subscriber to

2    this, some services do provide what are called confidence

3    factors to indicate whether or not -- to indicate that

4    service's confidence of the accuracy of the location.

5    Q.   Okay.  In preparing for your testimony here today, did

6    you, in fact, examine various geolocation services?

7    A.   I did a survey of seven different services to determine

8    whether they could place me accurately under several different

9    circumstances.  One was from my home in Plant City, Florida.

10   Another one was from up here in Washington, D.C., after I

11   arrived and --

12   Q.   Let's first talk about you being in Plant City.  Going

13   to -- one moment, Your Honor.  I realize these weren't

14   organized.

15        I'm going to show you a document that is titled

16   Plaintiff's Exhibit 7.  I want you to describe for me what

17   this document is.

18        MR. HUFFMAN:  Is this three separate documents?

19        MR. STEELE:  It is all one document.  It's a

20   compilation document.

21        THE COURT:  How many pages?

22        MR. STEELE:  It is seven pages, Your Honor.

23        THE COURT:  And this is among the material you've

24   already forwarded to opposing counsel?

25        MR. STEELE:  Yes, Your Honor, Counsel Huffman.

1           BY MR. STEELE:

2    Q.   Do you recognize this compilation document?

3    A.   Yes, I do.

4    Q.   And what is this document?

5    A.   These were individual results that I compiled, testing the

6    various services to determine whether they could accurately

7    place me at the locations that I tested it from.

8    Q.   Can you describe the results that you observed?

9    A.   Yes.  Of the seven, two were able to place me in Plant

10   City accurately.  The other placements were New York City; I

11   believe Washington, D.C.; and Reston, Virginia; and Tampa,

12   Florida.

13   Q.   Okay.

14           THE COURT:  And how far is Tampa from Dale City?

15           THE WITNESS:  Pardon?

16           THE COURT:  How far is Tampa from Dale City?

17           THE WITNESS:  Plant City?

18           THE COURT:  Plant City.

19           THE WITNESS:  It's 35 miles, Your Honor.

20           MR. STEELE:  I'm going to apologize, Your Honor.  I'm

21   going to also -- there's one missing here.  I'm going to show

22   you a document titled number 8.

23           THE COURT:  Is this Plaintiff's Exhibit 8?

24           MR. STEELE:  Yes, Your Honor.

25           THE COURT:  Are you moving the admission of

1    Plaintiff's Exhibit 7?

2              MR. STEELE:  I didn't hear Your Honor.

3              THE COURT:  Are you moving the admission of

4    Plaintiff's Exhibit 7?

5              MR. STEELE:  Yes, Your Honor, I am.

6              MR. SEIVER:  We object, Your Honor.

7              THE COURT:  Overruled.

8              (Plaintiff's Exhibit 7 admitted into evidence)

9              BY MR. STEELE:

10   Q.   Do you recognize Exhibit 8, Mr. Smoot?

11   A.   Yes, I do.

12   Q.   And what is document 8?

13   A.   That is one of the services that I did include in my

14   survey, and this happens to be the one that identified my

15   location while I was in Plant City, Florida, as being in

16   Reston, Virginia.

17   Q.   All right.  Thank you.

18            And you stated earlier that when you had arrived in

19   D.C., you also did this search, what you described, using the

20   services with geolocation; is that correct?

21   A.   Yes, I did.

22   Q.   Okay.  How many different services did you use?

23   A.   I believe I tested five of the seven.

24   Q.   Okay.  I'm going to show you a compilation, which is three

25   pages marked Exhibit 9.

1        Do you recognize -- do you recognize that document?

2   A.   Yes, I do.

3   Q.   What is that document?

4   A.   These were the additional items that I tested to

5   determine, again, the accuracy of these services.  The one

6   service here, IP2 location, is the name of the service,

7   identified me as being in Baltimore, Maryland, while I was in

8   Washington, D.C.

9        THE COURT:  Could you precisely describe how you did

10  this?

11       THE WITNESS:  Yes.  The services that I chose to use

12  were services that automatically identify your IP when you

13  come in.  In other words, I don't have to type anything in.

14  They know me by the fact that they've collected my IP address,

15  and they respond with this information as a result of that.

16  So all I did was go there, and I look at the results that they

17  gave.  They also give you the option, though it is not the

18  point of my survey, to enter an IP address and find that at

19  the time, as well.

20       MR. HUFFMAN:  Your Honor, in addition to the other

21  objections we would have to this exhibit and the ones

22  preceding it, we object to any conclusions based on any study

23  done using a sample of one without respect -- in addition to

24  the other, of course, lack of foundation.

25       THE COURT:  Overruled.

1        BY MR. STEELE:

2   Q.   Before you had run your searches, these surveys in D.C.,

3   would you have been able to predict which one would have been

4   the accurate one?

5        MR. SEIVER:  Objection, Your Honor.

6        THE COURT:  Overruled.

7        THE WITNESS:  No, I would not have been able to

8   predict.  The only way I can tell whether or not a particular

9   response is inaccurate is I have the firsthand knowledge of

10  where I was.  If I did not have that firsthand knowledge, I

11  would have no idea as to whether or not it is giving me

12  accurate information.

13       THE COURT:  Mr. Smoot, didn't you say that a number of

14  these sites have some indication of how accurate they are?

15       THE WITNESS:  Documentation on some of these sites do

16  indicate that.  For instance, a company called MindMax

17  publishes that kind of information.  If you're subscribers to

18  databases that contain that type of information, you can get

19  that.  As an end user using a service like this, it is not

20  displayed to you.

21       THE COURT:  Okay.

22       BY MR. STEELE:

23  Q.   Lastly, I just want to understand why -- what's

24  your -- what was your determination as to why this geolocation

25  varies from service to service?

1    A.   There are a number of factors involved in the accuracy of

2    this, and it is probably a little bit too deep and too

3    technical, but it basically comes down to a few things:  the

4    accuracy of the data that's supplied to the database; the

5    algorithm that is used to search the database and make

6    determinations; and then finally, the IP address that comes

7    in, whether or not that has been masked or in any other way

8    changed so that the IP address that comes in is not the actual

9    IP address of the end point user.

10   Q.   Who provides -- do you know who provides the information

11   to the services that provide geolocation services?

12   A.   Generally, the ISPs, the people who actually own the

13   network's address space, they provide that information to a

14   third party, and that third party collects all that

15   information and makes it available to other people.  The

16   information that is provided is very narrow.  It generally

17   only allows you to make a location determination to within the

18   range of about a country or a region within that country.  To

19   get more specific than that, you have to what's called augment

20   or enhance the data.

21   Q.   Who provides this augmented or enhanced data?

22   A.   That could be provided by a number of different sources.

23   It all depends on the company who is compiling the information

24   and what deals they make to gain this information.

25             Give you an example:  One might make a deal with a

1    very large e-commerce company so that every time that

2    e-commerce company sees a hit on their website and someone

3    makes a purchase, they collect not only that IP address but

4    information about the individual and they keep that in a

5    database and they sell that to some of the list managers.

6    Q.   So is it possible that if an e-commerce site has some

7    wrong data in their database it could result in a geolocation

8    result being incorrect?

9    A.   There are many factors that could affect the quality of

10   data provided by an e-commerce provider, e-commerce company.

11            MR. STEELE:  No further questions, Judge.

12            THE COURT:  Do you have any questions?

13            MR. HUFFMAN:  Just a couple, if I may, Your Honor.

14            THE COURT:  Please proceed.

15                      **CROSS-EXAMINATION**

16            BY MR. HUFFMAN:

17   Q.   Mr. Smoot, you said that you had used BitTorrent to

18   download a Lenux operating system?

19   A.   Yes.

20   Q.   Can you describe how that worked, in general.  I mean, did

21   you download a whole operating system using BitTorrent?

22   A.   Yes, I did.  I went to a site where the Linux provider,

23   developer, published a torrent for downloading their

24   particular distro, and I clicked on that and received a

25   torrent and went through the process that I outlined earlier.

1    Q.   So large open source software files are one legitimate use

2    of BitTorrent file-sharing?

3    A.   Yes, sir.

4    Q.   Skipping for a moment to the IP address geolocation issue,

5    do you know what IP address geolocation technology

6    Mr. Hansmeier, who is both with the Steele Hansmeier firm, now

7    known as Prenda Law, and also with the alleged forensic

8    investigator in this case?

9    A.   Could you shorten that?

10   Q.   Yes.  Do you know what IP address -- what IP address

11   geolocation technology Mr. Peter Hansmeier uses?

12   A.   It's not been fully disclosed to me.  I've heard it

13   discussed, but I don't have a full disclosure on it.

14   Q.   Do you know of any that he uses?

15   A.   No, I don't.

16   Q.   Do you know whether he uses any geolocation technology?

17   A.   Again, I have heard discussions of it and how it has been

18   applied and so forth, but I don't know the details.

19   Q.   So you don't know one way or the other whether he's used

20   it in connection with these type of cases?

21   A.   In a very absolute sense, I can't say that he has, but I

22   know nothing particular about it.

23   Q.   Do you have any opinion as to whether or not the use of

24   geolocational technology would result in a good faith basis

25   for a contention that somebody was likely to live somewhere?

1    A.   Please restate the question.

2    Q.   Certainly.  Do you have any opinion as to whether or not

3    the use of IP address geolocation technology could result in a

4    good faith basis for the contention that an individual is

5    likely to be located somewhere when using the internet on

6    that IP address --

7    A.   Within -- pardon me.  Within some degree of questionable

8    accuracy, it can put you within a reasonable region in some

9    cases; in other cases, it will be way off.

10        I ran another example that put me in Kansas while I

11   was here.

12   Q.   But do you have any opinion as to whether or not such use

13   could constitute a good faith basis for a contention?

14        MR. STEELE:  Objection, Your Honor.  Calls for a legal

15   conclusion, "good faith basis."

16        THE COURT:  It does, but overruled.  If he can answer

17   it, he can try to; if he can't answer it, he can say he can't

18   answer it.

19        THE WITNESS:  I'm trying to parse accurately the good

20   faith aspect of it versus what he's trying --

21        BY MR. HUFFMAN:

22   Q.   Let me ask you this question then:  Do you know whether

23   the lawyers representing the plaintiff in this case have

24   alleged that the use of IP address geolocation technology, in

25   fact, forms a good faith basis for such a contention?

1    A.    I do have knowledge of that.

2    Q.    Do you know whether they have?

3    A.    I believe that they have stated that the geolocation

4    methods that are available to them were not sufficient to make

5    a good faith estimate of the location.

6    Q.    Would it surprise you if I told you that in over 100 cases

7    they have contended that it did, in fact, form a good faith

8    basis for the likely location of an individual?  That would be

9    surprising to you?

10   A.    Not surprising.

11   Q.    Why not?

12   A.    Pardon?

13   Q.    Why not?

14   A.    Because there are cases, obviously, that have gone before

15   this that have dealt with issues that were pertinent to the

16   case, and this being one of them, the facts surrounding it I

17   have no idea how they came to that conclusion.

18   Q.    What is unique about this particular case and the location

19   of individuals using IP addresses that would render

20   determination as to whether or not IP address geolocation was

21   more or less likely to be a good faith indicator of where

22   somebody is likely to be located when using the internet?

23   A.    I would say that what makes this case unique is, one, the

24   accessibility of technology that would give them that type of

25   result.  I don't know how the Court judges, you know, did they

1    have the appropriate technology, did they not, how does that

2    affect the outcome.  And there was -- I think there was a

3    second aspect to that.

4    Q.   So do you think the geolocation technology, in general,

5    has improved over the years or deteriorated or do you have an

6    opinion?

7    A.   My opinion is that it has improved.

8    Q.   And would it surprise you if I told you that this very

9    plaintiff, AF Holdings, Inc., has contended in five other

10   cases that the use of geolocation technology was a good faith

11   basis for the assertion of where somebody is located when

12   using the internet?  Would that be surprising to you?

13   A.   It's not surprising to me.  It's also beyond my knowledge.

14   Q.   Why would it not be surprising to you?

15   A.   Again, I don't know the facts and circumstances of all the

16   other cases, so it has no bearing on how I understand what

17   the --

18   Q.   Well, let me go back to my other question earlier because

19   maybe I misstated it.  I was trying to understand what could

20   be different -- if we take two cases that involved Doe

21   Defendants allegedly using BitTorrent file-sharing to commit

22   copyright infringement, what might be different in one case

23   versus another in terms of whether or not any given IP address

24   is likely to resolve to a particular location as indicated

25   by geolocation technology?

1          MR. STEELE:  Your Honor, I understand it's loose, but

2    he is asking a non-attorney about cases that he has never even

3    heard of.

4          THE COURT:  Overruled.  He will respond if he can.

5          THE WITNESS:  I think the best answer I have there is

6    that the -- each case is going to have various

7    technology -- or may have various technologies involved.  I

8    don't know the histories of all the cases.  But each service

9    that might be used or any technology that might be put

10   together in order to do tracing or any of those kinds of

11   things, unless it's exactly the same for every case, then I

12   would have -- my expectation is that they may produce very

13   differing results, widely differing results.  I have no

14   knowledge of the facts surrounding that.

15         BY MR. HUFFMAN:

16   Q.   What technologies, what BitTorrent technologies were

17   employed in this case?

18   A.   Not the BitTorrent technologies but the geolocation

19   technologies.

20   Q.   So you think that it would depend upon whether or not a

21   particular geolocation technology was being used in terms of

22   whether or not that should be viewed as likely to indicate

23   where somebody is located when using the internet?

24   A.   That is one factor, yes.

25   Q.   And so how would that be different -- if we're talking

1    about the same plaintiff, the same company doing it,

2    how -- I'm trying to understand how it is different from one

3    case to the next?  Is it the case that two months ago

4    different technology was available to the same company than it

5    is today?

6    A.   I have no idea of the continuity of the technology.

7         THE COURT:  I actually have to say I'm a little

8    puzzled by this whole line.  I don't think anybody disputes

9    that geolocation information may be improving.  I don't think

10   anybody disputes that geolocation information is inexact.  I

11   don't think anybody disputes that no geolocation tool that is

12   available today is 100 percent accurate on all IP addresses.

13   I don't think anybody disputes that in those courts that

14   require geolocation information that counsel in good faith

15   uses geolocation tools fully understanding that it is not

16   100 percent and that they can say, using good faith, this is

17   what geolocation tools that are not 100 percent show us about

18   the location of an IP address.  That doesn't mean that anybody

19   has said in any case that I've read, in no representation that

20   I have ever seen, that every geolocation tool is 100 percent

21   accurate or that, frankly, any geolocation tool is 100 percent

22   accurate.

23        So where are you going with this, Mr. Huffman?

24        MR. HUFFMAN:  Just trying to understand whether there

25   is a distinction between the different cases and the different

1    positions that have been taken by the plaintiff and their

2    lawyers, if there's a different factual basis --

3           THE COURT:  But if any lawyer has said in any court

4    that they have a good faith basis for believing that

5    particular IP addresses are associated with particular

6    locations, understanding that no geolocation tool is

7    100 percent accurate, why is that a good faith basis?  I still

8    don't really understand your point.

9           MR. HUFFMAN:  I think they have alleged that and then

10   they're trying to show something different here is the point.

11          THE COURT:  Well, then, I'm missing your point.

12          Are you finished?

13          MR. HUFFMAN:  I think so.  Thank you, Your Honor.

14          THE COURT:  I have a question for you.  Going back to

15   Plaintiff's Exhibit 5, which is ECN number 27-1, which is the

16   screen shot that talked about the seeds --

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  -- when in BitTorrent -- when using

19   BitTorrent technology, when people refer to swarms, is the

20   swarm that list of IP addresses that's indicated on that

21   sheet, or is the swarm something different?

22          THE WITNESS:  The swarm is the collection of computers

23   that can cooperate to effect the download.

24          THE COURT:  Is the swarm the 184 computers under seeds

25   or what is the swarm?

1          THE WITNESS:  At any point in time, only a portion of

2     the seeders may be online with their computers; at other

3     points in time, other seeders may be online.  They would all

4     be considered part of the computers that are cooperating to

5     download the file.

6          THE COURT:  And that is the swarm?

7          THE WITNESS:  Yes, that is my understanding, that a

8     swarm is the collection of computers that are identified in

9     the torrent.

10         THE COURT:  Okay.  And under seeds, where we talked

11    about the difference between the 11, which are the online

12    computers offering up parts of the file being downloaded

13    versus the 184, which are part of the torrent, and when we say

14    they're part of the torrent, they're part of the torrent with

15    the same file that if any one of those 184 went online they

16    would then be available to offer parts of the file for the

17    downloader?  Is that correct?

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  Okay.  Thank you.

20         MR. SEIVER:  Your Honor, a few questions of the

21    witness.  Thank you.

22         THE COURT:  Okay.

23                        **CROSS-EXAMINATION**

24         BY MR. SEIVER:

25    Q.  Mr. Smoot, good morning -- well, almost afternoon.

1          Following up on Exhibit 5, do you have that handy, or
2     do you need to look at it?
3     A.   I do not have it in front of me.
4          THE COURT:  Just so you know, my clock is wrong.
5          MR. SEIVER:  By an hour.  Thank you, Your Honor.
6          THE COURT:  So if your stomach is rumbling, that's
7     why.
8          BY MR. SEIVER:
9     Q.   Do you remember Exhibit 5, or do I need to show it to you?
10    A.   It's the exhibit the Judge referred to, yes.
11         MR. SEIVER:  May I approach the witness, Your Honor?
12         THE COURT:  Yes, you may.
13         THE WITNESS:  Thank you, sir.
14         BY MR. SEIVER:
15    Q.   Mr. Smoot, I want to follow up and understand -- and part
16    of what Judge Howell was asking -- of these 11 IP addresses,
17    there are some indications under the word "downloaded" -- do
18    you see that, where it says KBs and there are some blanks,
19    also? -- does that mean that of these 11, the ones that have
20    blanks were not doing anything, they just happened to be noted
21    as having the file available?
22    A.   In this case, all the data in the bottom represents what's
23    called a session, which is the time that this particular
24    application was running and in communication with other
25    computers.  This particular column downloaded shows what,

1    during this session, this computer has downloaded from each of

2    those sources.

3    Q.   And do we know how long the session was?  Or even when or

4    the date of the session?

5    A.   Not from the screen shot.

6    Q.   Does the -- in the top gray bar going across, do you see

7    where you had the seeds, there is an ETA, it says four hours

8    zero minutes -- am I reading that correct?

9    A.   Yes.

10   Q.   Does that have anything to do with the time or the

11   length --

12   A.   It's the estimated time to complete the download given the

13   current data rates.

14   Q.   Oh, that's an estimated time to complete a download, not

15   whether a download occurred?

16   A.   That's correct.

17   Q.   And because there are no files listed as uploaded -- do

18   you see that? --  I'm back down to the bottom half -- does

19   that mean during the period of time, whenever it was, that

20   nothing was uploaded from these particular seeders?

21   A.   Nothing was uploaded to them.

22   Q.   Nothing was uploaded to them --

23   A.   Yes.

24   Q.   -- I see.

25          Do you know -- did you ever look at the complaint that

1    was filed in AF Holdings in this case?

2    A.   I have briefly.

3    Q.   Did you look at the exhibit that was attached that listed

4    1,058 IP addresses?

5    A.   Yes, sir, I did.

6    Q.   And is it your testimony or do you have knowledge that

7    those IP addresses were drawn from an exhibit or a screen shot

8    such as the one that we're looking at for Exhibit 5?

9    A.   It is my understanding they were obtained with the

10   technology that either AF Holdings or someone representing

11   them was able to collect using whatever tool that was, not

12   collected with something like this.

13   Q.   Okay.  Because there had to be something to show a date

14   and time; is that right?

15        There had to be something that would show the date and

16   time that an IP address was actually active to do something

17   consistent with the exhibit?

18        Do you need to look at the exhibit?

19   A.   Yes, please.

20        MR. SEIVER:  May I approach, Your Honor?

21        THE COURT:  Yes, you may.

22        BY MR. SEIVER:

23   Q.   This is the complaint, which is document 1 in the

24   proceeding, and I'm open to page 9 of 33, which is the

25   beginning of the exhibit.  If you'll look at the IP addresses,

1    do you see that there is also a date and time?

2    A.   Yes, sir, I do see that.

3    Q.   So your understanding is there is something else other

4    than what we've been shown today that would indicate the date

5    and time that anything was occurring?

6    A.   Yes, sir, that's my understanding.

7    Q.   One last question, Mr. Smoot.

8            If I may approach again, Your Honor?

9            THE COURT:  Yes, you may.

10           BY MR. SEIVER:

11   Q.   The geolocation technology, whatever was used, is not only

12   just to give city and state, but it also gives the ISP; is

13   that right?

14           Let me start over.  If you have an IP address and you

15   plug it in, you have no idea, it could be Comcast or AT&T, but

16   the geolocation technology is the one that gives you the ISP?

17   A.   There's several ways of obtaining that information, but

18   typically, because of the way the addresses are distributed in

19   these list management services, that is part of the

20   information that's included -- that comes from the ISP to the

21   services --

22   Q.   And people that are under contract with the geolocation

23   services can get more detailed than, for example, IP2 location

24   that you used when you were just testing yourself?

25   A.   Yes, sir, that's correct.

```
1              MR. SEIVER:  Thank you, Your Honor.  That's all I
2      have.
3              THE COURT:  Yes, please proceed, Mr. Fox.
4              MR. FOX:  Your Honor, I am mindful of the time and I
5      have --
6              THE COURT:  And I haven't even gotten to my questions,
7      which are extensive.
8              MR. FOX:  I will be very brief.  And my stomach is
9      grumbling.
10             Perhaps we are all in agreement that geolocational
11     makes it likely that someone is in a certain area but it's not
12     certain.  I just want to ask the witness, if I may, about a
13     statement in the declaration by Peter Hansmeier.  It is dated
14     January 12, 2012.
15             If I may approach.
16             THE COURT:  You may.
17                         CROSS-EXAMINATION
18         BY MR. FOX:
19     Q.  I direct your attention to paragraph 24, and I have tabbed
20     it.
21             MR. STEELE:  Could I see it?
22             MR. FOX:  If I may, Your Honor.
23         BY MR. FOX:
24     Q.  I direct your attention to paragraph 24 in this
25     declaration, and in it -- I quote -- Mr. Hansmeier states, "If
```

1    one knows a computer's internet protocol address, one can,

2    using publicly available reverse lookup databases on the

3    internet, identify the ISP used by that computer and the city

4    (or county) and state in which the computer was located at the

5    date and time that the internet protocol address was obtained.

6    Using this information MCG was able to determine that the IP

7    addresses associated with John Doe and his peers listed on

8    Exhibit A of the amended complaint were all most likely

9    located in California."

10         Sir, do you have any opinion one way or the other

11   about whether a consultant or an expert could make a

12   determination that John Does or IP addresses were likely

13   located in California?  And I want to focus you on "were all

14   most likely located in California."

15   A.   It's my opinion that it would be very difficult to say

16   that they are all most likely located in California.  I don't

17   know of a method of making that determination.

18   Q.   You have not had any discussions with -- have you had any

19   discussions with Mr. Hansmeier about this declaration or his

20   opinions with respect to the reliability of geolocational

21   services?

22         MR. STEELE:  Your Honor, for clarification, there

23   might be a little confusion.  There's two Hansmeiers.  There's

24   a Peter Hansmeier and there's a Paul Hansmeier.  I can inform

25   the Court that, as an officer of the Court, that this witness

1    has never seen, heard, or talked to a Peter Hansmeier.

2              THE COURT:  And I just note for the record that this

3    is a declaration filed by a Peter Hansmeier in the Eastern

4    District of California on January 12, 2012.

5              MR. FOX:  Thank you, Your Honor.

6              And this is the same Peter Hansmeier -- I believe it's

7    the same declarant who submitted the declaration in this case

8    at the time of the original application for expedited

9    discovery.

10             THE COURT:  I'm sorry.  I'm missing the point of this.

11   No one has said that they're 100 percent.  I don't think this

12   says that it is 100 percent, either.  "All most likely."  So

13   what is your point just before lunch?

14             MR. FOX:  My point is only that it is something that

15   is available and that the plaintiff's expert has used in other

16   cases.

17             THE COURT:  Thank you.

18             Any other questions?

19             MR. FOX:  Thank you.

20             THE COURT:  Any other questions?

21             You're excused.

22             THE WITNESS:  Thank you, Judge.

23             THE COURT:  All right.  My matters this morning took

24   up a little bit longer than I was anticipating, which has

25   delayed us a little bit longer than I had planned.  So we're

1    going to take a break for a short lunch for 45 minutes, and

2    we're going to resume at a quarter of 2.  Do not believe that

3    clock.  Look at your own wristwatches, which I hope are more

4    accurate.  In 45 minutes we're going to resume here.  You're

5    excused for lunch.

6         (Luncheon recess taken from 1:00 p.m. to 1:45 p.m.)

7

8                     **AFTERNOON SESSION**

9         THE COURT:  All right.  Counsel, do you have any

10   more witnesses?  Mr. Steele?

11        MR. STEELE:  No other witnesses.

12        THE COURT:  Because I thought that I would get all the

13   witnesses out of the way so that during Q and A and argument,

14   if you guys wanted to refer to the witnesses, we would all be

15   on the same page.

16        Do you all have witnesses?

17        MR. FOX:  We do, Your Honor.

18        THE COURT:  Okay.  Why don't you --

19        MR. STEELE:  I don't mean to interrupt you.  I was

20   going to finish and say other than, quite possibly, a brief

21   rebuttal in the event depending on what opposing counsel

22   brings.

23        THE COURT:  Understood.  Brief rebuttal by Mr. Smoot?

24        MR. STEELE:  Yes, Your Honor.

25        THE COURT:  I see.

1          MR. HUFFMAN:  Your Honor, we would also like to

2     introduce a demonstrative summary exhibit to the Court, if I

3     may --

4          THE COURT:  Okay, that's fine.

5          MR. HUFFMAN:  -- offer that.

6          THE COURT:  Have you shown that to Mr. Steele?

7          MR. HUFFMAN:  I'll give him a copy.

8          Your Honor, we would like to submit a summary chart

9     evidencing cases filed by Prenda Law and its predecessor firm

10    involving multiple John Does, and the pertinence of this

11    chart -- there's several reasons why this chart is pertinent.

12    First of all, in some rulings, it has been said that the undue

13    burden can be viewed in the aggregate, and we believe the

14    aggregate burden of these proceedings is pertinent.  We also

15    believe that the chart which shows that in only a couple of

16    cases, a handful of cases at most, has any defendant, Doe

17    Defendant, actually been named and included in the lawsuit.

18    Some Courts have also taken into account the actual purpose of

19    the discovery, whether it is for actual litigation or for some

20    other purpose.  And in addition, we believe that the

21    overwhelming -- over 100 cases where they've asserted, as

22    we've already discussed with Your Honor, the IP address,

23    geolocation is pertinent to the personal jurisdiction and

24    venue issue, is of some significance.  We would like to offer

25    this, Your Honor.

1          THE COURT:  Mr. Steele, is that the reason for your

2     motion in limine to bar evidence and argument about unrelated

3     cases that was filed, like, today?

4          MR. STEELE:  This morning, Your Honor.

5          Yes, this is a common issue that comes up.

6          THE COURT:  And is it related to this document?

7          MR. STEELE:  Well, this is the first time I've seen

8     this document.  I don't know if this is replacing the proposal

9     to bring in an attorney instead.  I would object to bringing

10    in this law firm or any other law firm or any other cases that

11    this firm handles for other clients in other states and other

12    countries, just like I would object to whatever attorneys, law

13    firm, does for other clients in other states, in other

14    countries, I think that -- besides the obvious fact, clearly

15    the facts are different.  Just glancing at this, some of these

16    are class actions.  Some of these are so glaringly different.

17    I could go through a list in about a couple of minutes showing

18    you judges that have granted us expansive orders just like

19    Your Honor has, and we've proceeded along -- we've

20    named -- I'll just leave it at that.  It's pretty obvious.

21         THE COURT:  Let me just be clear about my perspective

22    on all this, which is that there are times when the District

23    Court feels like a mere speed bump on the way to a higher

24    court, and since the ISPs have made clear that they want

25    certification to get to the circuit, which is an issue we'll

1    address whenever we get to questioning, my view is let both

2    sides build whatever record they feel is necessary for the

3    arguments that they might want to both present to me; and that

4    should this case go to the circuit, that people feel that

5    they've had an opportunity to put into the record at the

6    District Court level whatever they think is pertinent for the

7    Court of Appeals to review.

8         So, with that, I will -- you know, my general view is

9    that what goes on in other cases, given the differences in

10   different judges' views about what's necessary at this stage

11   of these file-sharing cases, is of limited help or relevance

12   to my review.

13        At the moment, I don't know exactly, although I have

14   an idea based on the papers, exactly what arguments will be

15   made based on this chart, let alone what arguments parties may

16   want to make should this go to the Court of Appeals.

17        So with that, I am going to deny your motion that you

18   filed today to bar evidence and argument about unrelated

19   cases; and as a consequence of that denial, I will accept the

20   compilation summary document that the ISPs are putting in.

21        Is this put in on behalf of all the ISPs, Comcast,

22   AT&T, and the other ones, or just you, Mr. Huffman?

23        MR. HUFFMAN:  I believe all of the ISPs.

24        Is Comcast joining in that?

25        MR. SEIVER:  We'll join in that, Your Honor.

1          THE COURT:  So on behalf of all the ISPs.

2          MR. SEIVER:  All the ISPs, that's correct.  Just for

3   clarity, this exhibit is not designed to reflect what judges

4   have necessarily ruled, and there are no class actions

5   included in here, but it is more designed to be descriptive of

6   the various cases for the purposes of the Court's

7   consideration.

8          THE COURT:  And you will point out to me what about it

9   is at all relevant to my consideration of the pending motion

10   to compel and the pending motions to quash, which is really

11   the focus of what I would like to get to.

12          MR. STEELE:  Judge, just for the record, I'm not sure

13   what predecessor firm means, but Prenda Law has no legal

14   relationship with another law firm or does not -- was not

15   owned by another firm.  I don't know exactly what that means,

16   but Prenda Law is its own law firm.

17          THE COURT:  I have no idea what it means, either.

18          MR. HUFFMAN:  Your Honor, sometime about the beginning

19   of this year, Mr. Steele himself called me to tell me that

20   Prenda Law had acquired his prior firm, Steele Hansmeier.  So

21   the predecessor firm, to my understanding, as reflected in

22   numerous filings around the country, is the Steele Hansmeier

23   law firm.

24          THE COURT:  All right.  Let's get the oral testimony

25   out of the way, to the extent that you have or wish to present

1    testimony of Mr. Schoen, I believe, whose declaration is

2    already in the record.  So please limit it to supplementing

3    what is already in the record if you're going to call him.

4           And so the record is clear, plaintiff's motion at ECF

5    number 37 is denied.

6           MR. HUFFMAN:  Thank you, Your Honor.  AT&T calls Seth

7    Schoen.

8                          SETH SCHOEN,

9    having been first duly sworn to tell the truth, the whole

10   truth and nothing but the truth, was examined and testified as

11   follows:

12          THE COURT:  Please be seated.

13          MR. STEELE:  Your Honor, I will stipulate that

14   Mr. Schoen is an expert, for judicial economy.

15          THE COURT:  That's fine, but if you could just

16   describe his background generally.

17                      **DIRECT EXAMINATION**

18          BY MR. HUFFMAN:

19   Q.   Good afternoon, Mr. Schoen.

20   A.   Good afternoon.

21   Q.   Would you please state your full name for the record.

22   A.   My name is Seth, S-E-T-H; Schoen, S-C-H-O-E-N.

23   Q.   What is your current position?

24   A.   I'm a senior staff technologist at the Electronic Frontier

25   Foundation in San Francisco.

1    Q.   For how long have you held that position?

2    A.   I have been working as a staff technologist there for ten

3    years.

4    Q.   And where did you work before that?

5    A.   Before that I worked for a technology company called

6    Linuxcare.

7    Q.   Did you work with Linux, presumably, in connection with

8    that?

9    A.   Yes, I did.

10   Q.   What about before that?

11   A.   Before that I worked for a web firm called Atrenet.

12   Q.   Your duties and responsibilities with EFF as a senior

13   staff technician, do those involve internet traffic

14   technologies?

15   A.   Excuse me?

16   Q.   Have your duties and responsibilities involved internet

17   traffic technologies in the analysis of internet traffic

18   technologies?

19   A.   Yes, they have.

20         THE COURT:  What is an internet traffic technology?

21         BY MR. HUFFMAN:

22   Q.   Can you describe that, please, in terms of the delivery.

23         THE COURT:  I know about internet traffic, I know

24   about technologies, I know about technologies that are used on

25   the internet, but the combination of internet traffic

1    technologies, what is that?

2            THE WITNESS:  I understood that as a reference to

3    internet protocols and --

4            THE COURT:  That's a word I understand.

5            THE WITNESS:  -- technologies related to internet

6    protocols.

7            BY MR. HUFFMAN:

8    Q.   In the delivery of packets of data via the internet?

9    A.   Yes, that's correct.

10   Q.   Have you, in fact, programmed software dealing with

11   internet packet deliveries?

12   A.   Yes, I have.

13   Q.   And in connection with peer-to-peer file-sharing systems?

14   A.   Yes, I have.

15   Q.   Have you served as an expert witness on matters pertaining

16   to internet packet deliveries, internet protocols?

17   A.   Essentially, yes.

18   Q.   What about, have you testified before Congress?

19   A.   No, I have not.

20   Q.   Did you testify before this Court before?

21   A.   No, not before this Court.

22   Q.   Have you testified before other courts, Federal Courts?

23   A.   I testified before the District Court in San Francisco.

24   Q.   And what was the nature of that testimony?

25   A.   I was analyzing some evidence related to telephone calls.

1    Q.   And did it involve the delivery -- did it involve the

2    internet at all?

3    A.   No.  Only the telephone system.

4    Q.   Okay.  And have you studied and written about BitTorrent

5    technology?

6    A.   I have studied and written about BitTorrent technology,

7    yes.

8    Q.   And what about matters dealing with IP address

9    allocations?

10   A.   I've studied matters relating to IP address allocation.

11        MR. HUFFMAN:  We would like to offer Mr. Schoen as an

12   expert on geolocation technology and BitTorrent peer-to-peer

13   file-sharing systems.

14        THE COURT:  I believe it's been stipulated to --

15        MR. STEELE:  That's correct.

16        THE COURT:  -- and he can be accepted as an expert.

17        MR. HUFFMAN:  Thank you, Your Honor.

18        BY MR. HUFFMAN:

19   Q.   So just a quick overview of an IP address, if you could,

20   please, Mr. Schoen.

21   A.   Sure.  An IP address is a number used to identify a

22   computer on the internet for purposes of letting internet

23   routers determine where to send, where to deliver traffic.  An

24   IP address is a 32-bit-long number.  So there are about

25   4.2 billion of them.  And it is usually written equivalently

1  as a series of four numbers of eight bits each separated by

2  periods.

3  Q.   And does an individual IP address identify the

4  corresponding internet user?

5  A.   The IP address is an identifier for a computer rather than

6  a user.   Today with network address translation technology, it

7  might actually identify a network containing multiple

8  computers rather than, as it traditionally did, identifying

9  only a single computer.

10  Q.   And how does a network then -- a network which is

11  addressed by a single IP address reallocate computer traffic

12  to devices within a home or other location?

13  A.   That's a technology called network address translation or

14  NAT.   A network address translating router keeps track of

15  connections from computers inside the router that are outbound

16  to other computers on the public internet, and it remembers

17  when each connection is established, which computer on the

18  internal network was responsible for or associated with that

19  connection.

20  Q.   And the ISP would not typically -- excuse me -- the

21  internet service provider would not typically retain or

22  allocate the internal IP addresses on a NAT; is that correct?

23  A.   So, if a, say, residential or business internet subscriber

24  is using a network address translation device, then the

25  internal addresses on the internal network created by that

1    device are so-called private addresses, and they're not

2    allocated by or directly visible to the upstream internet

3    service provider.

4    Q.   Moving for a moment to -- or moving on to geolocation,

5    could you please describe IP address geolocation technology

6    briefly.

7    A.   Sure.   IP address geolocation is a technology that's about

8    mapping from an IP address onto a physical location in the

9    physical world by making an estimate of where the connection

10   associated with that IP number is likely to be.

11   Q.   And is that typically done in connection with, say, mobile

12   phones?

13   A.   Mobile phones use different approaches to location.   So

14   mobile phones, for example, determine their own location using

15   the global positioning system.   That's different from IP

16   geolocation.

17   Q.   Typically, IP geolocation, is it a home or other premises

18   -- residential or normal physical stable location?

19   A.   Yeah, it's typically used to get an estimate of a location

20   for a device that is not a mobile device.   Since mobile

21   devices may also use the internet protocol, there may be a

22   possibility of using IP geolocation to get an estimate for the

23   location of a mobile device.

24   Q.   But it is not typically done, it would be more frequently

25   done through GPS; would that be correct?

1    A.   Yeah.   So mobile applications may have access to a much

2    more precise position estimate because they have access to a

3    GPS receiver inside the phone.

4    Q.   How is IP address geolocation technology used in commerce?

5    A.   So one example would be for a website to determine what

6    language to present to a visitor, so if you were to access a

7    site like Google or Facebook from Germany, it would generally

8    come up in German because the site is using a geolocation

9    technology to get an estimate indicating that you're in

10   Germany.   And if you were in France, it would typically come

11   up in French.

12   Q.   And that also might affect things like currencies or the

13   goods that are offered?

14   A.   Yes, certainly.

15   Q.   And is that same -- does that same basis for use apply to

16   the copyright context at all in terms of copyright licensing?

17   A.   Well, one example is that there are some sites that have

18   licensed copyrighted content, and they say that their licenses

19   only extend to showing that content to people in particular

20   territories.   So, for example, Canadians are very irritated

21   when they try to access a site like Hulu, a licensed video

22   streaming site which deals with big entertainment companies,

23   because a site like Hulu will use geolocation technology and

24   say, essentially, you're in Canada, this content is not

25   licensed for display to you.   Americans might have the same

1    experience trying to access video programming from the BBC.

2    The BBC may respond, well, you don't seem to be in the United

3    Kingdom, so you're not licensed to view this video

4    programming.

5    Q.   Do other websites that provide goods and services use

6    geolocation technology to tailor the goods and services that

7    are presented to a particular user?

8    A.   I would associate that especially with advertising, so in

9    terms of what they advertise to someone.  If you had a site

10   like Yelp, a site that's used to find a directory of or

11   reviews of restaurants or local businesses, a site like that

12   might use geolocation to decide by default where to start your

13   search for a restaurant.

14   Q.   What about for fraud prevention; is geolocation used for

15   fraud prevention purposes?

16   A.   Yes, it is.

17   Q.   In what way?

18   A.   So sites might find, if they're e-commerce sites, that

19   they have trouble with stolen credit cards being used to

20   purchase goods or services, which could result ultimately in a

21   charge back to the site if the legitimate owner of the credit

22   card finds out about the fraudulent charge and disputes it, so

23   it is very unfortunate for an e-commerce merchant, if they

24   have sold something to someone who turned out to be using the

25   credit card fraudulently, and then the merchant is out both

1    the payment and the goods and services.

2              THE COURT:  Mr. Huffman, before we spend any more time

3    on this, what is your point?

4              MR. HUFFMAN:  Just wanting to get into the record that

5    geolocation is a measure of accuracy in commerce and accepted

6    as such, but I'm ready to move on.

7              THE COURT:  Good.

8              MR. HUFFMAN:  We can discuss some of the different

9    technologies and different things that are available for

10   geolocation, but I'm not thinking that that is going to be

11   particularly pertinent to Your Honor's consideration at this

12   point.

13             THE COURT:  No, it is not.

14             BY MR. HUFFMAN:

15   Q.   If I can just ask him to list, list what they are, in

16   addition to private companies that were discussed earlier,

17   could you just list the other several ways that geolocation

18   technology can be -- the other available references for

19   geolocation information for the record?

20   A.   I'm sorry.  I didn't understand what you meant by

21   "references."

22   Q.   The other publicly available references.

23   A.   Okay, so if you wanted to find out a physical location

24   that was likely to be associated with an internet

25   connection --

1   Q.   Yes.

2   A.   -- you could get that kind of information from a

3   commercial geolocation provider, and there are several

4   companies that provide that kind of information.

5   Q.   Right.

6   A.   You can also look in public records, which I think were

7   briefly discussed before, such as the American Registry For

8   Internet Numbers --

9   Q.   Yes.

10   A.   -- a registration database which indicates which internet

11   service provider has had a certain range of IP addresses

12   allocated to them.

13   Q.   And what else?

14   A.   There is also a thing called reverse DNS, DNS for the

15   domain name system.  The domain name system is used to make a

16   mapping from names like uscourts.gov to internet protocol

17   addresses.  Reverse DNS is used to make the reverse mapping

18   from an internet protocol address back to a human readable

19   name.  And many internet service providers commonly configure

20   reverse DNS names for IP addresses that have been allocated to

21   them.  And consulting those names may provide an indication of

22   the identity of the internet service provider and often

23   contain some kind of a geographic indication of the region in

24   which the IP address is used.

25   Q.   Thank you.

1           And then trace routes would be the same thing but with

2    respect to routers as opposed to individual websites; is that

3    correct?

4    A.   Yeah, that's correct.

5    Q.   Okay.  Moving on then to BitTorrent protocol, what is

6    BitTorrent, in your understanding of the term, briefly?

7    A.   BitTorrent is a peer-to-peer file-sharing protocol

8    invented by Bram Cohen, and it is a relatively efficient way

9    to distribute very large files, especially if the first party

10   that originally wanted to distribute the files has limited

11   network resources.

12   Q.   And we discussed earlier the distribution of Linux

13   operating software via BitTorrent.  Are you familiar with that

14   practice?

15   A.   Yes, I am.

16   Q.   Can you think of another example of the use of BitTorrent

17   aside from the distribution and sharing of movie files?

18   A.   My understanding is that the video game company Valve uses

19   BitTorrent to distribute video games that they sell to

20   customers.

21   Q.   And how, then, do they ensure that only licensed customers

22   use the video game?

23   A.   They have a license key that some customers will have and

24   some customers won't.

25   Q.   When we speak about a tracker in the context of a

1    BitTorrent protocol usage by multiple users, what does the

2    tracker, what information about a given swarm does the tracker

3    retain?

4    A.   Well, the tracker is a computer that facilitates

5    BitTorrent transfers by introducing peers to one another.

6    Q.   So the peers don't direct -- the peers don't introduce

7    themselves to one another?

8    A.   There are technologies that move in that direction.  In

9    the context in which I think BitTorrent has been discussed in

10   this case by all of the declarants and all of the witnesses so

11   far, we're talking about the traditional style with

12   centralized trackers which have the responsibility for

13   introducing peers to one another.

14   Q.   So a given user doesn't necessarily know who they're

15   uploading or downloading from or to, nor do they direct that

16   traffic; is that correct?

17   A.   Well, that relies on making a distinction between the user

18   and between their software or their computer.  So their

19   software or their computer certainly does have that

20   information and is certainly using it and directing it.

21   That's information that would be available to the user if they

22   were interested.  It's not information that the user is

23   required to know in order for BitTorrent to work properly.

24   Q.   So in the typical use of the BitTorrent software, to

25   upload or download files, is the user going to be directing a

1    given packet, either in or out of that user's computer, or is

2    that going to be done automatically by the software?

3    A.    That's going to be done automatically by the software.

4    Q.    When we speak about a swarm, a swarm can involve thousands

5    of individuals or thousands of individual users; is that

6    correct?

7    A.    Yes, an enormous number of users.

8    Q.    Are they typically global swarms or typically restricted

9    to a given country?

10   A.    It's possible that interest in joining a particular swarm

11   might be concentrated in a particular country.  For example,

12   if the swarm is distributing something in a certain language

13   that's commonly spoken in a particular place, it might be

14   primarily in that place, but generally swarms are open to

15   participation by people all around the world.  And certainly

16   if we look at swarms, for example, distributing Linux

17   operating system CDs, those typically do include people from

18   all around the world simultaneously.

19   Q.    So if a given number of Does are served in a particular

20   lawsuit and are said to be members of a swarm, is there any

21   necessary connection between the percentage of does in that

22   list, in that list that had been sued in the lawsuit, and the

23   percentage of does in the overall swarm from which the subset

24   of defendants were chosen?

25   A.    Presumably, the plaintiffs in bringing a lawsuit would

1    have the ability to choose which Does they want to sue in the

2    lawsuit, and not necessarily all the participants in the swarm

3    would be known to them.

4    Q.   For an individual in a swarm on let's just say point in

5    time X and another individual in a swarm at point in time X

6    plus 3 months, is it the case that the individual at the

7    3-month later point in time necessarily had any connection to

8    the first Doe?  Any direct connection to the first individual?

9    Excuse me.

10   A.   I think it depends on what you mean by "connection."

11   Q.   I mean uploading or downloading of files in common with.

12   A.   Well, they haven't necessarily communicated directly with

13   one another, if that's what you mean.

14   Q.   In fact, does that grow less likely as time passes?

15   A.   Yeah, as people's presence in or participation in a swarm

16   is more removed in time, it's less likely that those people

17   have communicated directly with one another using BitTorrent.

18   Q.   Do most people stay in the swarm --

19        THE COURT:  Excuse me just a second.  When you say

20   "users," we're talking about computers communicating with one

21   to another, we're not talking about the actual computer user

22   communicating with anyone else in the swarm; right?

23        THE WITNESS:  I think computing may be more afflicted

24   with metonymy than any other field or profession.  So I hope

25   you'll excuse my metonymies.  We sort of use them all day long

1    and say, you know, user Alice and user Bob, and we actually

2    mean software that someone else wrote that user Alice

3    installed awhile ago and may not even remember that she has.

4    Yes, so . . .

5          THE COURT:  If somebody has downloaded a file using

6    the BitTorrent application and they have -- this user has his

7    or her BitTorrent application open and has made available that

8    particular file that's been downloaded sitting in their

9    application, it is then available for excerpting, which is a

10   term I think some people use, or for bits of it to then be

11   shared with other people perhaps in a different swarm but for

12   however long their computer is on and the application is open,

13   even if it is running in the background and the computer user

14   him or herself is using Word; correct?

15         THE WITNESS:  I think that's correct, Your Honor.

16   There's only one exception that I would take to what you just

17   said --

18         THE COURT:  Uh-huh.

19         THE WITNESS:  -- which is even if it is a different

20   swarm, because in fact the use of BitTorrent to upload or

21   download a particular file is really tightly coupled to a

22   particular swarm.  So people wouldn't just sort of jump over

23   or fall over into another swarm, because their BitTorrent

24   software is communicating with a particular tracker or set of

25   trackers about a particular version of a particular file, and

1    so in terms of your point that if the user has the file

2    available for sharing and has the application continuing to be

3    open and connected that it will be shared with other people

4    even if the user is doing something else, I think that is

5    completely correct.

6         THE COURT:  It could be if they have the computer on,

7    and many people just keep their computers on all the time and

8    many people keep their applications open all the time, it

9    could be day 1, day 1 plus 30 days, day 1 plus 35 days; is

10    that correct?

11         THE WITNESS:  There has been a bit of empirical

12    research about this, which I mentioned in my declaration,

13    where some people have attempted to measure this by observing

14    swarms.  I think that the techniques that they use to observe

15    the swarms for academic purposes are probably quite similar to

16    the techniques that plaintiff's declarants in litigation like

17    this have used.

18         It seems that when people look at this for academic

19    purposes that they find that a lot of people seem to drop out

20    of the swarm relatively quickly.  That certainly doesn't mean

21    that everyone has dropped out of the swarm quickly; it simply

22    means that empirical observations seem to suggest that it is

23    typical that most people drop out of the swarm relatively

24    quickly after their downloads are finished.  But certainly

25    there are presumably people who continue to be part of the

1    swarm for a long time, even while they're doing other things

2    on their computer.

3              BY MR. HUFFMAN:

4    Q.   And does it vary, does the ability of a tracker to call

5    upon a given piece that's been uploaded or downloaded to or

6    from the tracker or into the swarm, if you will, does the

7    ability of the tracker subsequently to get it when a user is

8    no longer involved in that swarm, in other words, if I'm a

9    user and I have downloaded a complete file and thereby I have

10   become a seed effectively within the swarm, do some of the

11   BitTorrent systems then cut off my participation in the swarm

12   unless I sort of voluntarily say that I want to continue to be

13   a part of the swarm?

14   A.   By "BitTorrent systems," did you mean client application

15   software?

16   Q.   Yes.  Yes.

17   A.   My understanding is that some BitTorrent client software

18   can be configured to drop out of the swarm as soon as the

19   download is complete.  Users might want to do that in order to

20   conserve their network resources because although other users

21   would consider it altruistic and beneficial if someone

22   remained in the swarm and shared the file for a longer period

23   of time, the user might be annoyed about this because it's

24   slowing down other things that they want to do.  So that's an

25   option that users may be given by their client software.

1          THE COURT:  Can I ask you a question about the whole

2     tracker software or tracker computer.  Can a computer that

3     holds the BitTorrent application be turned into a tracker

4     without the user being aware of that?  I mean, is it part of

5     how the BitTorrent protocol works that it selects

6     automatically certain computers to be trackers without the

7     user having to be aware of it at all?

8          THE WITNESS:  Well, I would hate to introduce more

9     technical complexity into the picture; but when the BitTorrent

10     protocol was originally designed by Bram Cohen and originally

11     implemented, the trackers were exclusively servers that were

12     running special tracker software and that were chosen by the

13     people who created particular torrent files.

14          THE COURT:  But we're way beyond that now; right?

15     Aren't we beyond that?

16          THE WITNESS:  So modern BitTorrent clients still

17     support and commonly use that mode of operation, but they also

18     support a mode of operation called trackerless torrents, also

19     known as distributed hash table mode.  I was thinking it might

20     not be better to get into this simply because I don't think

21     that anybody in this case has found it necessary on either

22     side to address the difference between centralized trackers

23     and distributed hash table mode.  But since you've asked, in

24     modern practice, there is available this mode of operation in

25     which essentially people can also become trackers.  So to

1    summarize, as BitTorrent was originally designed, the

2    file-sharing aspect was decentralized in a peer-to-peer way,

3    and the tracking aspect of introducing peers to each other was

4    centralized at least with regard to a particular swarm.

5    Subsequently, people have invented and implemented a mechanism

6    where both functionalities can be distributed.

7    Q.   And is there any evidence of the more modern potential for

8    trackering at the peer level, is there any evidence of that in

9    this case that you're aware of?

10   A.   I think Mr. Hansmeier didn't directly state in his

11   declaration in this case whether the swarms he was monitoring

12   were using distributed so-called trackerless mode or not.

13   Q.   Would he have been able to determine that?

14   A.   If it had been of interest to him, he would have been able

15   to determine that.  I think it's not obvious to me that it

16   directly impacts his ability to gather the evidence that he

17   says he's gathered one way or the other.

18   Q.   And that's the last point I want to ask you about here

19   today, is the gathering of the IP addresses.  Have you viewed

20   the IP address list that was gathered in connection with this

21   case?

22   A.   Yes, I spent a long time viewing it.

23   Q.   I think you have actually run some tests on it; haven't

24   you?

25   A.   Yes.  So I did a lookup in the service of a geolocation

1    provider called Quova, and I have submitted that to this Court

2    based on the IP addresses.

3    Q.   I remember that from your declaration, but I want to know

4    if you understand from the testimony -- or the declaration of

5    Mr. Hansmeier and the list how Mr. Hansmeier obtained the list

6    from the swarm or at least how he said he obtained the list

7    from the swarm, which list was attached to either the

8    complaint or the motion for expedited discovery in this case?

9    A.   I feel like I do in a general way but not in a specific

10   way.

11   Q.   What do you generally understand?

12   A.   So any participant in a BitTorrent swarm is able to

13   immediately see the IP addresses of at least some of the other

14   participants in that swarm.  By joining a swarm, by contacting

15   a tracker, a participant is told about the IP addresses of

16   other participants in the swarm.  Although I believe that

17   BitTorrent clients commonly don't save that information, like

18   in a text file, it would be possible to write software that

19   would save or record that information, for example, with a

20   date or a time stamp.  So my general understanding is that

21   Mr. Hansmeier has probably developed or modified software to

22   connect essentially as an ordinary user would to a particular

23   BitTorrent swarm and start to observe and record IP addresses

24   attributed to participants in that swarm.

25   Q.   And would it necessarily be the case that the IP addresses

1    attributed to participants in the swarm would be the same as

2    IP addresses of people who had successfully completed a

3    download in the swarm?

4    A.    It's possible for someone to join a swarm and fail to

5    successfully complete a download.  While they're in the swarm,

6    they could still be observed by other participants in the

7    swarm, whether or not they had been successful in completing a

8    download.

9    Q.    So we don't know for sure whether these IP addresses

10   successfully completed a download based on Mr. Hansmeier's

11   declaration?

12   A.    I don't remember whether Mr. Hansmeier explained having a

13   way to know that for sure.  Based on what I remember of his

14   declaration, I'm not confident that he knew that for sure.

15   Q.    And do you recall from his declaration any indication of

16   the software that he used other than his statement that it was

17   a proprietary software?

18   A.    I don't.  That statement was the reason that I said that I

19   thought he had written or modified software for this purpose.

20   Q.    So you have no way of knowing based on his declaration

21   whether that software was reliable or accurate or otherwise?

22   A.    That's correct.

23        MR. HUFFMAN:  I have no further questions at this

24   time, Your Honor.  Thank you, Mr. Schoen.

25        THE COURT:  Mr. Steele, go ahead.

**CROSS-EXAMINATION**

BY MR. STEELE:

Q.   Good morning.  Is it Schoen?

It's afternoon, by the way.

Schoen?

A.   One syllable, Schoen.

Q.   I apologize if I butcher that.

I'll try to go through a couple of points as quickly as I can.  You mentioned Hulu and how the geolocation knows general areas where you are based on that.  Obviously, there's ways that you can mislead geolocation, isn't that correct, if you're using something like proxy servers and whatnot?

A.   Yeah.  So the geolocation database would return an address where the connection appears to originate from.

Q.   Right.  So, hypothetically speaking, if you used a proxy server based out of Sweden and you went to the site, you would suddenly get Swedish language on your web browser?

A.   Yes, that's correct.  A lot of users of proxy software like Tor have noticed that they actually get such a thing.

Q.   Okay.  I think the important thing about geolocation that I'm trying to ask about here is the accuracy.  Is it -- let's see here -- would you say -- you were talking about the other things besides copyrighted content as being used on BitTorrent is Linux and Valve, is that correct, Valve?

A.   Those were some examples that I mentioned of uses of

1    BitTorrent.

2    Q.   Okay, let me get past that.  You stated that the people

3    that are using BitTorrent software don't know who they're

4    connecting with, but isn't it true that they know that they

5    are connecting with people?

6    A.   Well, not every BitTorrent user knows exactly how

7    BitTorrent works.  Clearly, there are some BitTorrent users

8    who understand that BitTorrent is a peer-to-peer system and

9    that they're connecting to other people.

10   Q.   Let me ask it this way:  If I'm sitting there at my

11   computer and want something I don't have, don't I, by

12   definition, know that I'm going out somewhere to get it?

13   A.   I'm sure that users who download things understand that

14   the things have come from somewhere else.

15   Q.   Right.  It's not fallen from the sky, they know they have

16   to go to another computer to get that software, that program,

17   or that file; correct?

18   A.   I think there's been a level of confusion between, say,

19   peer-to-peer and non-peer-to-peer systems.  For example, I

20   have seen journalists report on BitTorrent as a site, which I

21   would consider rather inaccurate.  So, I mean, I think there

22   is a level of confusion floating around about these topics;

23   but I think people do understand that when they download

24   things that those things are coming from somewhere else.

25   Q.   Okay.  You stated that there was some study or

1    some -- some studies that looked at how long, on average,

2    people might stay on these torrent swarms.  Do you have any

3    proof or any study that's been done as to how long people

4    stayed on this swarm relating to this litigation?

5    A.   No, I don't.

6    Q.   Okay.  You stated that it is possible to automatically

7    leave a swarm once you finish getting your movie -- I'm

8    sorry -- your file.  Let me rephrase that.  Your file.  Is

9    that correct?

10   A.   Yes.

11   Q.   Okay.  But isn't there a benefit, also, to -- and correct

12   me, I'm not trying to put words in your mouth, I'm not an

13   expert on this -- but if you remain giving out this

14   information after you have gotten the entire movie, don't you

15   get some kind of benefit like increased ratio where you get to

16   then download more stuff in the future easier or faster?

17   A.   So there are two different things that you might be

18   referring to.  One is that there are some trackers which

19   attempt to measure the amount of uploading and downloading

20   that particular users have done in order to essentially reward

21   those users or allow them to be part of the community of

22   uploaders and downloaders of particular material.  And so

23   that's implementing what is referred to as a ratio test, which

24   is a concept that long predates BitTorrent.  And the idea of

25   the ratio test is that someone might be measuring whether

1    you're being sufficiently cooperative or alturistic with your

2    resources to allow you to participate in that community.  If

3    people are a part of such a community and using its trackers,

4    then they definitely do have an incentive to stay connected

5    longer in order to improve their measured ratios.

6    Q.  Okay.

7    A.  I don't know whether the swarm that is at issue in this

8    case is in that category or not.  It's true that that's a

9    reason in general that some BitTorrent users would have an

10   incentive to stay connected longer.

11   Q.  All right.  Thank you.

12         And you stated -- and last issue -- you stated that

13   you, when discussing Mr. Hansmeier's -- I will say Mr. Peter

14   Hansmeier's -- software declaration, referring to his

15   software, that you were essentially guessing as to how he

16   conducted or managed his software.  Is that fair to say, that

17   you are just attempting your best guess as to how he, in fact,

18   performs this analysis?

19   A.  Well, I read his declaration, and so I feel like it's an

20   informed guess, but I feel like there are details of the

21   analysis that are, perhaps, not set forth in his declaration.

22   Q.  That's fair.

23         But would it -- would it be reasonable if you were to

24   find out down the road, say, in the actual trial or when it's

25   time for evidence to come out against an actual party or a

1    defendant that the actual system used to obtain this

2    information was much more advanced than your reasoned guess at

3    this point?

4    A.   Well, with any network protocol, there are limits to what

5    can be done through that network protocol.  So we have, for

6    example, the simple mail transfer protocol to send email

7    messages, and it has certain commands and certain features

8    that are associated with sending email addresses.  So if

9    someone implemented email software using that protocol, there

10   are limits to what can be done with it, what kinds of

11   information the email software can get.  And I think the same

12   is true of BitTorrent.  There's a protocol, there are certain

13   capabilities and certain features in the protocol.  It's hard

14   for me to imagine that there's sort of an unlimited range of

15   what you can do with the BitTorrent protocol.

16   Q.   That's fair.  That's fair.

17         Thank you.  No further questions.

18         THE COURT:  Anything further from any of the ISPs?

19         Mr. Schoen, is there any way you can think of

20   technically, if you're a copyright owner who believes your

21   work has been infringed, to obtain information about the

22   subscriber other than to subpoena that information from an

23   ISP?

24         THE WITNESS:  I think it's always an interesting

25   question to think about.  You know, at my work, we talk about

1   how personally identifying is an IP address or not, and that's

2   an issue that has come up in a lot of cases and a lot of

3   contexts.  There, in many cases, may be other parties than the

4   ISP who have records that would tend to identify users.  One

5   example would be a service like Google or Facebook.  If users

6   have accounts, then those services have records showing which

7   IP address a user has logged in from.  And so, for example,

8   Google has records that show that my IP address at home has

9   something to do with my roommate because my roommate logs into

10  Google services every day from that same IP address.  The ISPs

11  are clearly the most direct source of that information and the

12  ones who are most likely to have it.

13          I guess my observation is just that because other

14  services are also recording personally identifiable

15  information together with IP addresses, there may actually be

16  other parties who turn out to have that same information.

17          THE COURT:  Right.  Thank you.

18          Any other questions?

19          You're excused.  Thank you.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Thank you very much.

22          Okay.  There are a number of areas that I would like

23  to inquire about just to make me sure that I'm understanding

24  everything that you all want me to understand from the papers

25  that have been submitted.

1          Under Rule 45, there are two prongs under which a

2     subpoena can be quashed, a mandatory prong and a permissive

3     prong.  And I just want to be absolutely clear that the ISPs

4     are moving to quash under the requisite prong of 45(c)3(A).

5     Is that correct for those of you who are speaking for

6     the -- not Comcast, I know you're here in a position of a

7     motion to compel -- but for the other ISPs?

8          MR. FOX:  Your Honor, I know that you said Rule 45

9     generally; I'm looking at the notice of motion.

10         THE COURT:  Can you please come forward to the

11    microphone.

12         You represent the biggest cluster of ISPs.

13         MR. FOX:  Ben Fox for Verizon, Bright House, and Cox.

14         The moving papers moved under Rule 26 and 45, yes, and

15    the specific provision, I believe it is 45(c)(1).

16         THE COURT:  Well, Rule 45(c)(3)(A) requires a court to

17    quash or modify a subpoena that fails to allow reasonable time

18    to comply; (2) requires a person to travel more than

19    100 miles; (3) requires disclosure of privileged or other

20    protected matter; or (4) subjects a person to undue burden.

21    So I take it --

22         MR. FOX:  (C)(3)(A)(iv), you're correct, Your Honor.

23         THE COURT:  The main focus of your motion to quash is

24    because of undue burden; is that correct?

25         MR. FOX:  Yes, Your Honor.  And we cite secondarily

1      Rule 26 (b)(2)(C)(iii) requiring Courts to limit discovery

2      where the burden or the expense of the proposed discovery

3      outweighs its likely benefit.  So that's another grounds in

4      the moving papers.

5           THE COURT:  Okay.  Before I get to the undue burden, I

6      also understand from your papers that the ISPs are arguing

7      that any burden in this case is undue because of what the ISPs

8      view as -- and I'll quote -- the procedural defects of the

9      case.  But in addition, at least some of the ISPs, I think,

10     cite to the administrative burdens, substantial administrative

11     burdens on the ISPs.

12          Are the ISPs that you're representing relying on any

13     substantial administrative burden as the reason that the

14     subpoena should be quashed under Rule 45(c)(3)(A)?

15          THE WITNESS:  Yes, Your Honor.  In the context of this

16     case, we ask the Court to look both at this case and at the

17     other cases that have been brought to the Court's attention

18     both in the briefs and by the chart submitted by Mr. Huffman

19     and AT&T.

20          THE COURT:  And the factual support for the

21     substantial administrative burden is where in this record?

22          MR. FOX:  It is in the declaration of Mr. Cadenhead,

23     Mr. Frendfield, the AT&T witness, and Mr. Sean Moriarty from

24     Verizon.

25          THE COURT:  All I see in those declarations are fairly

1    conclusory statements of there's been a burden.  No statement

2    about -- or any further explanation.  Frankly, when I asked

3    for the parties to submit witness lists, I was expecting

4    witnesses about the administrative burden.  So I've been

5    scratching my head a little bit for most of this day with you

6    all.

7              MR. FOX:  Well, Your Honor, I will --

8              THE COURT:  So, you know, I just want to be clear that

9    the only part of the factual support for the substantial

10   administrative burden that the ISPs are asserting in

11   connection with their motion asking me and urging me to quash

12   the subpoena based on undue burden is fairly, to say the

13   least, conclusory.

14             MR. FOX:  Your Honor, they are the declarations that

15   we have, and the chart, and I recognize that there is not a

16   voluminous record here; and we would ask the Court to consider

17   this evidence in connection with the cases that we have

18   submitted.  And we will acknowledge that the burden in

19   responding to a single subpoena is not --

20             THE COURT:  Well, let me just say --

21             MR. FOX:  -- very substantial --

22             THE COURT:  -- because I think when I'm evaluating

23   undue burdens in other cases and usually have a fairly

24   voluminous record in those cases about what the burden is, I

25   think it's fair to evaluate the burden in context; what's the

1    cost of subpoena compliance versus the benefits to the person

2    having to produce the subpoena.  So if you can speak on behalf

3    of your clients, multiple as they are, what is the cost of

4    complying with a subpoena for one person, ten persons,

5    whichever way you're best able to articulate that.

6         MR. FOX:  My understanding of the administrative

7    burdens for the client group that I represent is that they

8    have devoted at least one and I think for some of them several

9    employees, not full-time, but a substantial amount of their

10    time has been spent, and that is articulated --

11        THE COURT:  How many employees?

12        MR. FOX:  At least one per ISP and probably several

13    staff people, including in-house lawyers, have devoted their

14    time responding to these subpoenas.

15        THE COURT:  How much revenue does each ISP derive from

16    each subscriber to the extent that you can tell me on average

17    per month, per year?  What is that amount?

18        MR. FOX:  That I don't know, and I don't know that

19    there is a direct tie between any of the IP addresses that are

20    at issue here and this motion.  To say it in another way, I

21    don't know that any revenue would be lost by complying.

22        THE COURT:  Okay.  You may sit down.

23        Mr. Seiver for Comcast.

24        MR. SEIVER:  Yes, Your Honor.

25        THE COURT:  I was interested in seeing that Comcast

1    has proposed in its papers, at ECF 12 at page 15, that it can

2    reasonably respond to no more than 50 IP address lookup

3    requests per month.  But again, what is the basis for that

4    statement?

5         MR. SEIVER:  Well --

6         THE COURT:  Because all I have is your conclusory

7    statement on that regard with no other evidentiary support.

8         MR. SEIVER:  It is a difficult one to pin down because

9    there are a lot of subpoenas and a lot of IP addresses that

10   are requested on a daily basis to Comcast.  And when we had

11   our first case, and it was before Judge Collyer, and it was

12   probably the Achte Neunte, or I think it was before Your

13   Honor, Call of the Wild, there is one other case that I'm

14   drawing a blank on, and we did have declarations and we talked

15   about it, and that was at the infancy, and Comcast was hiring

16   people to handle it, and we did a breakdown of the

17   administrative costs, and we came out with it.  And we have

18   also worked with people like Mr. Steele and other copyright

19   plaintiff lawyers to come up with a dollar amount per address.

20   So our undue burden was either based on the legal relevancy --

21   and one Court has said, well, if it is not legally relevant,

22   then any burden is undue.  Instead of going from that, we

23   moved to the administrative aspect of timing.  And for

24   example, in another case with Mr. Steele, the judge ordered us

25   to come up with 1,200 IP identifications in 60 days, and

1   that's because I went on the phone and we came up, and the

2   most, with their analysts, they could do in a week was 180,

3   and that's putting everybody else's to the side except for law

4   enforcement, the child pornography, the runaways, there are a

5   number of FBI requests, and the reason I have been directed to

6   stick to 50 is because if everybody comes in at the same time,

7   we just can't do it.  We have to do it on a rolling basis.

8           THE COURT:  You can't do it without hiring more people

9   or investing more resources?

10          MR. SEIVER:  Exactly.  But then the time today to hire

11  and train and to get them implemented and get it working is

12  going to take time.  And we don't know, because so many other

13  Courts, after we have gone through the process of notifying

14  and doing all this, have then come back and revoked their

15  discovery orders and quashed.  That's why we were hoping,

16  because Your Honor's court has become, not the focal point of

17  the filings, but since many plaintiffs do come to D.C. now for

18  their cases, we needed to know, do we need to go on another

19  massive hiring or are things going to get quashed, as they

20  have been in California and in Chicago and in other

21  jurisdictions, because we're at the whim and caprice of the

22  -- we don't know how many cases somebody is going to file

23  tomorrow, how many orders -- we can't keep track of the

24  ex parte orders because we don't know about them until we get

25  a subpoena.  That's why I have tried to keep it at 50, because

1    then it's going to reward -- we're going to have to drop off

2    and either commit contempt in another case or delay somebody

3    else where we're working along in order to come up with that.

4          THE COURT:  I do understand that Comcast is also

5    relying, as the other ISPs are, not on just conclusory

6    administrative burden arguments, but also on this argument

7    that any burden is undue because of the merits of the

8    underlying case.  Am I correct?

9          MR. SEIVER:  That is correct, Your Honor.

10          THE COURT:  Okay.  And I have to say that this has

11    been a very interesting argument to read because, as

12    non-parties, that all these ISPs are scrutinizing the merits

13    of an underlying case to which they're not a party to evaluate

14    whether or not it is sufficiently meritorious for the ISPs, as

15    third parties, to produce information.  I mean, as you just

16    said, Comcast -- I'm sure all the ISPs -- get a number of

17    discovery requests in all types of cases --

18          MR. SEIVER:  Yes, Your Honor.

19          THE COURT:  -- in discovery that may be ongoing in a

20    child porn case or a criminal case, civil case.  And the

21    effort to evaluate the merits of all of those cases to make a

22    determination of whether or not the underlying case is

23    meritorious in terms of whether or not it's an undue burden

24    for you to comply with a subpoena is a pretty amazing argument

25    for the ISPs to make.  From my perspective, since I have

1    criminal cases, I've got other cases where parties located

2    here are probably subpoenaing and performing discovery all

3    across the country for relevant evidence, that might lead to

4    relevant evidence in a case, which is really, from my

5    perspective, the stage we're at in this case, we don't have

6    named defendants, IP addresses are not defendants, they're

7    not, so is this case special, are file-sharing cases

8    special --

9         MR. SEIVER:  Well, yes.

10        THE COURT:  -- that ISPs are going to review the

11   merits of the underlying cases before they decide whether or

12   not to comply with subpoenas?

13        MR. SEIVER:  Thank you, Your Honor.  I do want to

14   engage in this debate because I think it is critical to

15   understanding what's going on.  At the beginning, because it

16   was a civil case, and under the cable act, cable operators are

17   in a much deeper hole than non-cable providers because of

18   47 U.S.C. 551, we have to give notice to our subscribers, and

19   there has to be a court order, so anytime a civil subpoena

20   would come in, not --

21        THE COURT:  And you have a court order here --

22        MR. SEIVER:  I understand, Your Honor.

23        THE COURT:  -- and it requires notice --

24        MR. SEIVER:  I understand --

25        THE COURT:  -- your whole cable act argument is really

1      a puzzle to me --

2              MR. SEIVER:  If you will just let me finish.

3              And so when these subpoenas come rolling in to Comcast

4      by fax or by email, the first thing the analysts look for is a

5      court order, and they see it, and notice, that's great.  And

6      at the beginning, you know, we were getting subpoenas for

7      maybe 100, maybe 50.  It wasn't the 26,000 like in Hurt

8      Locker.  It wasn't like the thousands that we'll get from

9      Mr. Steele.  We have 55,000 IP address look-ups at issue now

10     from the hundreds of cases that have been filed, and we went

11     along.  And at the beginning, Your Honor, that's why I gave

12     you the history of this, that's all we did.  As long as we

13     could get a reasonable amount of money, and that was anywhere

14     from 70 to 100 dollars per IP address, depending on the timing

15     and whatnot, we had the analysts do it, send out the notice,

16     it went by FedEx so there was no question that there was a

17     signature, came back, we put it in the Excel chart, which is

18     what they wanted, and we did all that.  The problem was is

19     that after these ex parte orders were being granted and the

20     subpoenas were being issued and we were complying, some Courts

21     started changing course, and that's the whole reason we're

22     here today, is to at least bring to Your Honor's attention the

23     number of courts that have kind of put us, Comcast, and I

24     think the other ISPs, in a bind, because here we are, we

25     have -- and pardon the common use of the word "ratted out" --

1    maybe in these thousand IPs, since we're doing it on a rolling

2    basis, we may have ratted out a hundred or a hundred and fifty

3    before the Court then says, well, wait a minute, I'm quashing

4    all these subpoenas.  And then we've got subscribers saying:

5    We are being shaken down for $2,500 and the judge revoked the

6    order.  Why are you doing this to us?

7         As that problem grew, that's when we started having

8    some resistance.  And despite the fact that it does

9    appear maybe disingenuous to say, well, we don't have a fight

10   in this and as long as we're doing what we're supposed to do

11   under our court order, we're getting whip-sawed because under

12   the cable act a subscriber could bring a statutory damage

13   claim against us for violation.  And if we gave it, I think we

14   have the cover of a court order, and we also have the cover of

15   the fact that, you know, there is an allegation of

16   infringement, but some of the Courts have said, no, we're

17   going to sever, this is not right, we're not going to allow

18   all these people to be joined, we're not going to allow the

19   co-conspirators.  And we have got six or seven different

20   flavors now of cases.  And maybe it is good for outside

21   counsel and not good for the ISP.  We have, for example, here,

22   where there is a thousand Doe defendants, that's one way to

23   look at it, then we have a single Doe defendant with a

24   thousand co-conspirators.  That's another way to look at it.

25   Then we have the Rule 27 cases.  Then we have the state court

1    cases.

2         And they're saying:  Well, what do we do?  If we

3    comply or not comply, we're stuck.

4         And so we wanted to bring it to Your Honor's

5    attention, and so I had a supplementary authority with the

6    Northern District of Illinois, and I believe there is one case

7    from Texas, another case from Michigan, another case from

8    Maryland, where judges are saying either I'm not going to

9    grant ex parte orders on discovery or, like in Texas, some of

10   them are revoking them and then quashing the subpoenas after

11   the fact, and we're like, now what do we do.

12        Now, I understand from what Your Honor says, then we

13   can call everybody off of those subpoenas and we can put them

14   on to the other subpoenas that are not being quashed and are

15   in cases where the orders haven't been revoked, but it has

16   become somewhat of a nightmare.

17        If I can make just one last point on this.  When we

18   looked at what was going on and how it was being handled, we

19   noticed that there were some cases that made no sense about

20   where they were being filed because the cases were being filed

21   in one jurisdiction, subpoenas captioned in another, and it

22   was very confusing when we gave notice to our subscribers if

23   they wanted to contest it where they should go.  And then we

24   had the example, which I did in our sur-reply, Your Honor,

25   where counsel, Prenda, filed a case here in D.C. and got Judge

1    Wilkins.  That was the Nu Image author.  And so they knew

2    within a few days, I'm not going to get my ex parte order from

3    him, so they dismissed the case.  But one of the ones they

4    dismissed that had been assigned to Judge Wilkins they refiled

5    in Texas.  Instead of being 1 -- versus 350 defendants, it was

6    against 1, with 349 as the subpoena.  And then they came back

7    to this Court and issued the subpoena out of this Court even

8    though the case was in Texas.

9         My client says:  What do we do?  I mean, that doesn't

10   seem right.

11        If it was Judge Wilkins, we knew that it wasn't going

12   to happen.  So that's why I had to bring it to your Court's

13   attention, asking you to review what's been happening, and

14   some of the statements in K-Beech, for example, that your

15   Court's processes are being used to allow them to contact and

16   obtain settlements from people who have not been proven except

17   by virtue of an IP address that shows up on a screen somewhere

18   to have participated in these --

19        THE COURT:  Well, among the grounds that you believe

20   that the complaint filed in this case is procedurally

21   defective is because of joinder and lack of personal

22   jurisdiction; correct?

23        MR. SEIVER:  Correct.

24        THE COURT:  And as I read Rule 8(a), which requires

25   short, plain statement of the grounds for the court's

1   jurisdiction, the claim showing that the pleader is entitled

2   to relief and a demand for the relief sought, and I compare

3   Rule 8(a) to the complaint filed in this case, which alleges a

4   valid copyright in the work at issue, verified that the work

5   was illegally downloaded, identified the IP address used to

6   engage in that allegedly infringing inactivity, needing one

7   key remaining, answer to the question of who done it, my view

8   is that this complaint satisfies Rule 8(a).

9        I mean do the ISPs in any way challenge whether or not

10  this plaintiff has a good faith basis for asserting copyright

11  infringement claims against the users of the IP addresses that

12  are identified in the complaint that's engaged in allegedly

13  infringing activity?

14       MR. SEIVER:  Your Honor, I will let the other ISPs

15  talk.  And my point is not just 8(a), but Rule 20(a).  That is

16  the problem and that whether --

17       THE COURT:  Well, let's talk about that for a second.

18  But, first, do you have any question, under the rule 12(b)(6)

19  rubric of failure to state a claim, that this complaint

20  sufficiently sets out a claim of copyright infringement?

21       MR. SEIVER:  Your Honor, yes.  If there were one

22  defendant and the discovery was sought of that one defendant's

23  address, as we have done it with Mr. Steele, there's nothing,

24  we say fine.

25       THE COURT:  Well, let me be more precise.  Do you

1     think that the term "jurisdiction," as used in Rule 8(a),

2     refers to joinder or personal jurisdiction?

3          MR. SEIVER:  Yes.

4          THE COURT:  Is that your understanding of the word

5     "jurisdiction"?

6          MR. SEIVER:  That's the way we've interpreted it and I

7     believe other judges have interpreted it, as well --

8          THE COURT:  And is that the way you've interpreted the

9     word "jurisdiction" in Rule 8(a), to cover both venue and

10    personal jurisdiction?

11         MR. FOX:  Your Honor, we're looking at the Caribbean

12    Broadcasting standard for pre-Rule 26 discovery; and in that

13    context, we understand the Court's -- I'm sorry not to be at

14    the lectern -- I may be jumping ahead of things, but if I

15    could take a step back and try to do a little bit of

16    distillation of where I think we are.

17         I understand the Court's skepticism.  I think that --

18    a few points that I think are uncontested, I think that it's

19    clear that we have a very unusual situation here because we

20    have the split of authority both in this district with

21    Nu Image and with Call of the Wild and with other decisions,

22    and there are enough --

23         THE COURT:  And around the country.

24         MR. FOX:  Yeah.  And there are enough cases that are

25    published these days on Lexis and Westlaw that both sides can

1    have large handfuls of cases that they can hold up and say,

2    look at my authority.  So that is pretty unusual in this case.

3    I think that it also is hopefully uncontested that the parties

4    will benefit from a unified rule, independent of what it is,

5    and I hear again the Court's skepticism that the Court is

6    not --

7              THE COURT:  No, I mean I think that I may have -- you

8    may have noted my facial expression when you say it's

9    undisputed or not contested because I think the plaintiff has

10   strenuously objected to your certification requests to try and

11   get a uniform rule.

12             MR. FOX:  Yes.

13             THE COURT:  So I would say that the ISPs, as

14   Mr. Seiver has articulated, are feeling probably between a

15   rock and a hard place of which way to go and would like a

16   uniform rule.  Of course, also a uniform rule that they're

17   requesting, so --

18             MR. FOX:  The plaintiff does not agree but if we

19   accept --

20             THE COURT:  But the plaintiff doesn't agree.

21             MR. FOX:  If the plaintiff's view prevails and the

22   practical effect is that there is forum shopping around the

23   country and there will be questions even in this district as

24   to how these cases are going to turn out and it will be

25   largely determined by random assignment, and this is the kind

1    of situation where the Court of Appeals -- another point, and

2    again, they don't agree with this --

3            THE COURT:  Can I just explore with you for a

4    minute --

5            MR. FOX:  Please.

6            THE COURT:  -- because I'm glad, Mr. Fox, that you've

7    sort of raised this to bring this, really, not a thousand feet

8    up, but actually to the heart of the issue here, which is this

9    difference of perspective on where we're at in these cases,

10   with some Courts with very thoughtful opinions, you know,

11   Judge Wilkins, you know, I have utmost respect for him, very

12   thoughtful interesting opinion that he wrote with a different

13   perspective of the procedural posture of the case than I have.

14   I view this as a case where people are seeking discovery, just

15   like they do in every other case, and the discovery is wide

16   open, and they have sufficiently alleged copyright

17   infringement, and the one last little piece of evidence they

18   need about that copyright infringement is in the hands of the

19   ISPs.  And he views the IP addresses as much closer associated

20   with named defendants than I do.  I don't view them as named

21   defendants at all, anywhere closely associated to the

22   defendants, they may never become a defendant.  In fact, that

23   is correct in the cases before me; I have had some named

24   defendants and some not, some who have waived personal

25   jurisdiction because for whatever reason they want to come in

1    and litigate in this courthouse, and some who have raised it,

2    so I have seen the whole gamut.

3         And the real issue is if the Courts, let's say the

4    D.C. Circuit, were to accept all of the ISP's arguments and

5    those posited by EFF and the other amici on joinder or

6    personal jurisdiction and venue, so that each individual IP

7    address had to be named alone in an individual lawsuit, so

8    that instead of what the ISPs complain about are hundreds of

9    file-sharing lawsuits with tens of thousands of IP address

10   look-ups to have to do, instead the Federal Court system would

11   have tens of thousands of individual copyright infringement

12   lawsuits, and the number of subpoenas to the ISPs would be the

13   same.  So your burden would be the same unless you all are

14   banking on the fact that the copyright owners will just give

15   up the ghost and not engage then in lawsuits.  Is that really

16   what you're banking on?

17        MR. FOX:  Well, wearing my ISP hat, I see these as

18   cases that are, as you said, generating hundreds of subpoenas,

19   and that's the only capacity in which I see them.  But looking

20   at the docket, I also see these as cases that are not

21   resulting in final judgments, for the most part, and aren't

22   being litigated past this stage of the proceeding --

23        THE COURT:  But let me just talk to you about that for

24   a second, because, you know, from a busy Federal District

25   Court's perspective, if parties take control of their own

1    destiny -- I don't know if you were here earlier when I was

2    talking about scheduling trials in matters and always lecture

3    the parties, you know, before you go to trial, you got control

4    of your own destiny now, seize the day, seize the opportunity,

5    go off and talk, see if you can settle this case, from my

6    perspective, there is absolutely nothing wrong with

7    settlement.  So I hear you, but I don't think that there is

8    anything wrong with parties evaluating their positions and

9    settling a case.  I'm being honest with you.

10            MR. FOX:  Sure.

11            THE COURT:  And so that really doesn't make me

12    sympathetic to your position.

13            MR. FOX:  There are other Courts that have said the

14    Court has concerns about a settlement with a subscriber who is

15    in Mexico, assuming this is a D.C. Court saying that, or is in

16    Hawaii or Washington State, because the Court doesn't have the

17    ability to oversee and see that this is a fair settlement --

18            THE COURT:  Very different perspectives on it.

19            MR. FOX:  In addition to Call of the Wild that has

20    gone the way this Court is describing it.

21            THE COURT:  Let me turn right then to the

22    certification question under 28 U.S.C. 1292(b), and a couple

23    of the questions that come up:  One, whether you really meet

24    the certification requirements under 1292(b).  The plaintiff

25    argues you guys are non-parties, there is no controlling

1    question of law here.  So, you know, there are legal

2    requirements.

3         Let me ask you, there is another much simpler way for

4    you to get the D.C. Circuit, and that's by me holding you in

5    contempt.  Have you considered that?

6         MR. FOX:  We --

7         THE COURT:  What would be wrong with that?

8         MR. FOX:  We recognize that that generates an

9    appealable order and it is outside -- that's not

10   discretionary --

11        THE COURT:  It is outside of 1292.

12        MR. FOX:  Sure.  And as a lawyer, I never want to be

13   held in contempt.  I think that my clients --

14        THE COURT:  It would be your client.

15        MR. FOX:  -- don't want to be held in contempt.  But I

16   think -- so I can't say on behalf of any of my clients that I

17   will volunteer them to be held in contempt, but I would

18   recommend, if the terms were not draconian and if it was

19   understood by all parties that the reason for this is because

20   we really need to give the Court of Appeals an opportunity,

21   there has been no Court of Appeals decision and there probably

22   won't be absent either a certification or a contempt citation,

23   so if the terms were palatable, I would recommend it to my

24   clients, yes.

25        THE COURT:  Well, I mean, the plaintiff has

1    strenuously objected to whether or not the requirements of

2    1292(b) are satisfied here.  And how do you respond to that

3    argument?

4            MR. FOX:  It is a controlling issue of law as a

5    practical matter because these cases have not proceeded past

6    this stage, as we have seen.  So, you know, we have cited many

7    cases --

8            THE COURT:  That doesn't necessarily make it a

9    controlling question of law; does it?

10           MR. FOX:  Well, it makes it an important issue, and it

11   is controlling in that if the subpoenas are quashed, there

12   will be no identification, there will be no further

13   proceedings in this Court.  If the motions to quash are

14   denied, the ISPs will produce information; and that, also,

15   too, is likely to be the end of the case.  So how the case

16   turns depends on whether or not the plaintiff gets the

17   personally identifiable information.

18           THE COURT:  Well, the other conundrum is, of course,

19   under 1292, that even if I were to certify an appeal here, you

20   know, it has a very important proviso clause that says,

21   provided, however, application for appeal shall not stay

22   proceedings in the District Court unless so ordered.  So part

23   of the plaintiff's concern, of course, is that should I

24   certify the question and not stay subpoena compliance and the

25   ISP is complying, then by the time you got to the circuit, the

1    circuit might very well view the issue as moot.

2            MR. FOX:  Well, if --

3            THE COURT:  Would you agree?

4            MR. FOX:  If the plaintiffs were interested, we would

5    stipulate to an expedited briefing schedule.  It would have to

6    be agreed by the Court of Appeals, of course.  The ISPs are on

7    notice that these IP addresses are at issue and they're

8    preserving information, so it's not going to disappear.  There

9    are 200 other cases like this.  So it is not as if this

10   plaintiff's lawyer has nothing else to do.  So I think the

11   issues will be live no matter how long the Court of Appeals

12   takes to decide it.

13           THE COURT:  All right.

14           MR. STOLTZ:  Your Honor, may I address some of the

15   questions you've raised?

16           THE COURT:  Just a second.  I want to make sure there

17   are no other certification questions that I want to have

18   addressed.

19           If you could be seated, I would like to talk to

20   Mr. Steele for a second about the whole certification

21   question, because one of the things that you say in one of

22   your briefs is that the non-parties will have every

23   opportunity to file an appeal at the conclusion of this

24   litigation and achieve their stated goal of bringing

25   uniformity to the rules.  You say this at ECF number 13, at

1  page 4.  I just wanted to make sure --

2        MR. STEELE:  I'm sorry, Your Honor.

3        THE COURT:  -- I understand what you were talking

4  about because I don't see how the ISPs, these non-parties,

5  will ever have an opportunity to file an appeal unless they're

6  held in contempt and take an appeal that way unless I certify

7  it.  So what were you talking about?

8        MR. STEELE:  The purpose -- well, because they're

9  non-parties, the --

10        THE COURT:  How will they ever have an opportunity to

11  appeal this issue?

12        MR. STEELE:  Well, the simple fact is since they don't

13  have standing -- see, this is the problem of arguing something

14  you don't have standing to argue.  Since you don't have

15  standing to argue it, you'll probably never have standing to

16  appeal it, either.  That's kind of interesting; isn't it?  So

17  they're complaining about it will be moot because we won't be

18  able to appeal it.  Well, yeah, because you shouldn't be here,

19  in the first place, to argue it.  That's true.  And it will --

20  the other point is that -- I'm sorry for laughing.  But they

21  confuse the fact that once out of 20 cases or whatever it

22  is -- I don't remember the exact number -- but we all know

23  Prenda Law has many cases out there, and they try to point to

24  the one or two that --

25        THE COURT:  I'm learning.

1          MR. STEELE:  There's very few, and they're pointed

2     out, emboldened that once in a blue moon a judge will kick out

3     a case, but there is a confusion -- I think there is a little

4     sleight of hand here, Judge -- never in the history of this

5     country has a judge said these ISPs have standing to bring

6     these arguments, so there is no split of opinion in any

7     district in this country, period.  So to say that there are

8     judges -- a split of opinion -- we should have a appellate

9     court review this; well, shouldn't there be a split of opinion

10    first?  And so what I brought up in page 18 of this is real

11    simple.  You have to have a substantial ground for a

12    difference of opinion.  I would respectfully ask the ISPs to

13    please give me, and this Court, one case that holds that

14    non-parties have standing to raise personal jurisdiction and

15    joinder arguments --

16         THE COURT:  Well, that is the issue that you focused

17    on --

18         MR. STEELE:  Uh-huh.

19         THE COURT:  -- in terms of whether or not the ISPs

20    would meet the 1292 -- in the issue before me, on a motion to

21    quash a subpoena or a motion to compel compliance with the

22    subpoena -- would satisfy the 1292 standard of a controlling

23    question of law when they don't have standing to assert that

24    question of law on personal jurisdiction and joinder.  But on

25    the issue of venue, which is really where Courts are, I think,

1    having a division of authority, certainly in this district and

2    more and more so around the country, on whether or not venue

3    has to be established at this stage of the proceeding, you

4    know, is a question that could be controlling in, certainly,

5    the limited context of these file-sharing cases.  So why isn't

6    that a question that has some controlling impact or authority

7    in this case?  And there's certainly a substantial ground for

8    a difference of opinion on this question even in this Court.

9         MR. STEELE:  Well, venue is essentially the same as

10    personal jurisdiction at this stage in this context.

11         THE COURT:  And neither one needs to be pled under

12    Rule 8(a).

13         MR. STEELE:  Thank you.

14         So the issue becomes how can there be a difference of

15    opinion on something that is not even required at this point?

16    So the fact of the matter is that it's not even a requirement.

17    There can't be a difference of opinion over whether or not

18    something -- a standard has been met when it is not even

19    necessary to have been started.  There is no requirement for

20    me to reach -- I'm sorry -- for our law firm to reach a goal

21    when there is simply no goal.  So if I don't state any -- if I

22    don't meet even the most modicum of venue and personal

23    jurisdiction, that's okay at this stage.

24         THE COURT:  Well, let me just ask, because putting

25    aside the adversarial nature of this case --

1        MR. STEELE:  Uh-huh.

2        THE COURT:  -- where you say white, they say black;

3   they say white, you say black --

4        MR. STEELE:  Uh-huh.

5        THE COURT:  -- but wouldn't it be helpful to you who's

6   engaged in so much of this file-sharing litigation, and to

7   your firm, to have a uniform rule and have a circuit court

8   speak on this issue that might then be considered and followed

9   around the country and then you'd know what the rules of the

10  game are?

11       MR. STEELE:  Well, not necessarily -- here's the

12  problem.  The ISPs have, you know -- they're not necessarily

13  innocent bystanders in this process.  They have a financial

14  interest in what's going on here.  They are paid a lot of

15  money by these large number of subscribers who do leave them

16  and whatnot when we start going after them, and they do have

17  an interest in continuing the current status quo.  The long,

18  despite what -- those innuendos out there, the overwhelming

19  case law and the overwhelming number of judges out there are

20  in our favor.  With due respect to Counsel Seiver and

21  Mr. Huffman, they both know in the last 14 days they've both

22  had the same issues brought up before judges and they've both

23  lost, these exact same issues.  It's happening over and over

24  again.  So, of course, they constantly ask the judges, can we

25  please appeal this, because of course when you lose you like

1    to appeal.  In fact, in some of those cases they just simply

2    are ignoring the judge's orders, and we got to keep coming

3    back on motions to compel because every month that they wait,

4    they get to make more money for their clients.  And I

5    understand that, but as far as --

6            THE COURT:  So this issue of certification is coming

7    up in front of other judges, and have other judges denied the

8    certification --

9            MR. STEELE:  Yes.

10           THE COURT:  -- request?

11           MR. STEELE:  Yes.  And they said no, this is an early

12   discovery matter, you are third parties.

13           THE COURT:  In which courts?

14           MR. STEELE:  I apologize.  Can I get some water,

15   Judge?

16           I can pull the order because I don't want to speak --

17   but a Judge Kay I was in front of last week with --

18           THE COURT:  Magistrate Judge Kay?

19           MR. STEELE:  Yes, Your Honor.

20           That was regarding, I think -- I don't think they

21   asked for certification.  I believe --

22           MR. SEIVER:  Did not, Your Honor.

23           THE COURT:  All right.

24           MR. STEELE:  Right.  So I want to make sure I'm clear

25   on that.  So the certification --

1        THE COURT:  Let me --

2        MR. STEELE:  -- question didn't come up there.

3        THE COURT:  Let me ask you because I don't agree with

4   a number of the arguments that the ISPs have raised, but it

5   has sparked my curiosity:  How do you decide where to file the

6   file-sharing cases?  Is it where you can use the same court to

7   file your case and issue the subpoena to the ISPs, so you're

8   looking at Rule 45 100-mile radius issues?  Or how do you

9   decide where to file the file-sharing cases?

10       MR. STEELE:  Well, there's a lot of different factors;

11  and quite frankly, it changes depending on different types of

12  cases.  We come up with different ideas.  It depends on -- for

13  instance, one of the newer type of cases is where we find

14  someone who's very involved in the infringement, someone

15  referred to as one of the, for lack of a better term, master

16  infringers, someone who is really one of the base people.  And

17  this was what actually occurred, I think, in Judge Wilkins'

18  case, when we realized this person was in Texas.  We went and

19  changed the whole case around and went after him in his own

20  state or whatever.  We named all the people he's worked with

21  as co-conspirators.  That's one way of doing it.

22       THE COURT:  So where you can easily issue a subpoena

23  from a District Court to an ISP because of Rule 45's 100-mile

24  radius rule, doesn't it play a role or does it play a role?

25       MR. STEELE:  Well, wherever the ISP is located is

1    important.  Texas is very good for that purpose because

2    there's a lot of ISPs there; same with Illinois because,

3    obviously, most of the major ISPs have a presence in Illinois.

4    There are certain legal mechanisms that are available in

5    certain states that are not available in others for state

6    court purposes.  There are, in Florida -- for instance, there

7    are a couple -- there is a very unique state law there that

8    allows us to go after some Florida residents if we can show

9    the relationship with other out-of-state residents.

10           THE COURT:  Okay.

11           MR. STEELE:  So there are different mechanisms.

12   That's the other thing.  We have a certain limitation because

13   there's always going to be differences in facts and so on.

14   And so, for instance, you know, I had a conversation with one

15   of the counsel, and they said, well, if this judge rules in

16   your favor, we're going to stop fighting this.  Well, the

17   judge ruled mostly in our favor, ruled in one way.  Well, that

18   wasn't really that way, so we're going to keep fighting.

19   There's always -- I don't want to impugn any opposing counsel,

20   but it's not like just because we're going to win today that

21   the other cases in which I'm going to see counsel on two weeks

22   from now that they're going to say, you know what, you're

23   right, John, we're going to stop fighting you in every one of

24   these cases.  This is a financial matter.  I appreciate that.

25   And that's fine.

1              The underlying facts are real simple.  These are third

2      parties.  It is a Rule 45 analysis.  When I heard this Court

3      go through this with counsel, I said, well, I made a lot of

4      notes last night for no reason.  You know, it is really

5      simple.  Non-parties give this information.  If they want to

6      have an appealable issue, they can make one real quick, they

7      simply don't comply, be held in contempt, and that's how third

8      parties appeal an issue.  They don't do what third parties are

9      supposed to do in a case.  But what they don't do is act like

10     a second judge and say, well, I don't think you've done this

11     right in your complaint, I'm going to ask for a second order.

12     And so when they don't get their second order, they say, well,

13     I would like to appeal this now, and so why don't you give me

14     a small monetary fine, which by the way they did ask for that

15     two weeks ago in a state court action.  So I don't know if you

16     want to take that under consideration.  But they did ask for

17     that exact thing, they asked, not to be certified, but asked

18     to be appealed to the appellate court in Illinois, in

19     St. Clair County, and the judge said no.  And the reason why,

20     he goes, no, what's the purpose here?

21              MR. HUFFMAN:  Your Honor, that hasn't been ruled on.

22     That motion is set Monday.  He's making stuff up.

23              THE COURT:  Okay.

24              MR. HUFFMAN:  I'm sorry.  I sat still as long as I

25     could.

1          THE COURT:  There are professional, civil ways to

2     respond.

3          MR. HUFFMAN:  I know.

4          MR. STEELE:  Judge, I would be more than happy to

5     provide the orders and the transcripts to show what the judge

6     in that case thinks of the various ISPs' behavior in that

7     case.

8          THE COURT:  I don't need to know what another judge --

9          MR. STEELE:  Sure, I understand.

10         THE COURT:  -- thinks of certification.  I do share

11    with all of you my own views that I think given the split at

12    least in this district, let alone the country, and the lack of

13    circuit court consideration of the issue, it would be very

14    helpful to me to have a circuit court evaluate my reasoning.

15    You know, I welcome a good editor, but I am very seriously

16    concerned that you don't meet the specific terms for

17    certification.  So, I will be pondering that, and then you all

18    will have to ponder whether, if I find that certification is

19    not appropriate here, whether or not you want to take the

20    contempt route, which will give you a fast track, not

21    upstairs, downstairs to the fifth floor.  So I will hear from

22    you, Mr. Fox, unless you have anything else to add,

23    Mr. Steele.

24         MR. STEELE:  Just one quick thing, and that is, I

25    didn't get to bring this up, but there is an ongoing damage

1    and effect that is happening right now to my client because

2    this -- the effects that are happening is these people are

3    continuously -- you know, unknown to us and continuously

4    infringing and hurting our clients, and the fact is, as time

5    goes on, these people become aware of this litigation, they

6    get notice from different places, and they, you know, change

7    their phone numbers, change clients, they move, they get out

8    of Dodge so to speak.

9            THE COURT:  So is it better for the ISPs not to send a

10   notice or to send a notice?  Because I don't have -- I don't

11   know for a fact, but getting a notice from an ISP that the IP

12   address at issue has been identified as engaging in allegedly

13   infringing activity, based on what I've seen in the

14   file-sharing cases in which I have presided, it seems to have

15   a deterrent effect because then people put up security on

16   their system, they, you know, figure out how it happened if

17   they believe they weren't the person engaging in it, so I

18   think it -- the notice does have -- can have a deterrent

19   effect even if the person never gets named.  But the question

20   is:  Are you saying that a notice would be not helpful as

21   opposed to helpful?

22           MR. STEELE:  No, I wasn't clear.  What I meant by

23   notice, there are websites out there and groups that provide

24   helpful notice to each other, pirate groups, they have

25   websites saying, hey, there's a new suit out there, if you

1    have Comcast, blah, blah, blah, be careful.  I'm not talking

2    about notice from the actual ISPs because I don't want to

3    speak for them, but I have a sneaking suspicion that they have

4    not given notice to their clients yet --

5            THE COURT:  Well, I think they have said so.

6            MR. STEELE:  Okay, I apologize.  So that we know that

7    they haven't given them even though you've ordered them to.  I

8    would like them to give notice.  I would love to have an order

9    from this Court that they're instructed to immediately comply

10   with your Court's order so that we can move forward and

11   start -- you know, obviously move forward.

12           Thank you.

13           THE COURT:  Well, you're not going to get that because

14   I view this as another opportunity to write on the issue, and

15   I will, certainly if it goes to the circuit, either on a

16   certification or on contempt, if I ultimately decide that way.

17   But let's say I do decide to grant your motion to compel, deny

18   the ISP's motion to quash, and I guess the ISP -- and decline

19   to certify the question, then I suppose the ISPs could comply

20   with the subpoena to the extent of notice to subscribers and

21   decline to comply with the rest of the subpoena in order to be

22   held in contempt in order to take an appeal.  But I

23   wasn't -- you know, I really wanted to get a sense of the

24   position of the parties on notice to the subscribers.

25           MR. FOX:  Thank you, Your Honor.

1          THE COURT:  Yes, Mr. Fox.

2          MR. FOX:  Just mechanics, not argument so much.

3    First, I appreciate the Court's interest in writing an

4    opinion.  I think it will be helpful.  I refer the Court to

5    our reply brief at pages 2 to 3, which deal specifically with

6    the standing issue, and I'll just leave it on the table and

7    say our best cases on certification are in the reply brief

8    at --

9          THE COURT:  I'm aware of that.

10          MR. FOX:  -- pages 12 and 13.  I think they get us

11    there.  I know the Court will read them and the Court will

12    decide whether she thinks I'm right.

13          On the case that was filed, assigned to Judge Wilkins

14    and then dismissed voluntarily and refiled in Texas, that

15    wasn't a single defendant case, that was a multi-doe defendant

16    case.  And when it was refiled, it sought the same IP

17    addresses.

18          Finally, by suggestion, I think that certification is

19    the surest way to get us to the Court of Appeals because it

20    doesn't require the clients to throw themselves on the

21    chopping block, but if --

22          THE COURT:  But the Court of Appeals will look very

23    closely at these requirements for certification, and if they

24    disagree that the issue is certifiable for any number of

25    reasons, then it's been for naught.  The surest way to get

1       their attention is contempt.

2              MR. FOX:  We still would like certification, but in

3       the event the Court declines that request, I think it would be

4       helpful to have some parameters as to what the contempt order

5       would be if there were one so that the ISPs are not marching

6       into the void, and perhaps that could be either by a

7       supplemental order or on the record in some way.

8              THE COURT:  If I decide to grant the motion to compel,

9       deny the motion to quash, and determine that certification is

10      inappropriate here, I will probably give the parties

11      approximately ten days to consult and come up with a plan for

12      contempt, and then you can make your suggestions there.

13             MR. FOX:  In that event, could the parties

14      submit -- how would you like it done?

15             THE COURT:  I'm not sure yet.  I'm sure you'll have

16      plenty of time to think about that.

17             MR. FOX:  Well, thank you.  I want to thank the Court

18      for its time.

19             THE COURT:  This has taken far longer than I thought,

20      and Mr. Stoltz, you have been patiently waiting, I will hear

21      from you.

22             MR. STOLTZ:  Thank you, Your Honor.

23             THE COURT:  Excuse me just one second.  My court

24      reporter, who has been diligently typing away, needs a

25      10-minute break.

1          (Recess taken from 3:30 p.m. to 3:42 p.m.)

2          THE COURT:  Last but not least, Mr. Stoltz.

3          MR. STOLTZ:  Thank you, Your Honor.

4     Your Honor asked the question:  Are file-sharing cases

5     special, mass John Doe file-sharing cases?  We would answer

6     yes.  My organization and the other amici in this case

7     represent internet users, and that is essentially all we know

8     about those whom the subpoenas in this case would identify, is

9     that they are owners of internet accounts.

10          So this Court has said in the past and seems to be,

11    you know, hewing to the point that questions of personal

12    jurisdiction, joinder are premature at this point.  I would

13    submit that that's premised on the assumption that the case

14    will either proceed to an adjudication on the merits or that

15    it will be settled out of court in a fair manner.

16          THE COURT:  Or that the plaintiff, who always has the

17    choice to either bring a suit or name a defendant, may decide

18    not to name a defendant --

19          MR. STOLTZ:  Yes, Your Honor.

20          THE COURT:  -- because further investigation pursuant

21    to the jurisdictional discovery that the plaintiff is

22    undergoing now has demonstrated that the person at the other

23    end of the IP address actually didn't engage in infringing

24    activity or, for whatever the myriad of reasons that might be

25    revealed during discovery, that they did not want to name a

1   defendant.

2          MR. STOLTZ:  That's true, Your Honor, but we would

3   submit that when the names of these owners of internet

4   accounts are disclosed to plaintiffs, those internet users,

5   whether they are defendants or future defendants or --

6          THE COURT:  Not defendants.  Not defendants.

7          MR. STOLTZ:  Not defendants.  They are internet users.

8   Their rights have been affected because at that point

9   plaintiff -- and we've seen evidence of this -- pursues

10  settlements against those internet account holders without

11  regard to the merits of an underlying copyright claim and with

12  the intent to avoid adjudication on the merits of those

13  copyright claims; that they're not in fact seeking a person

14  who infringed, a defendant, they are seeking a settlement by

15  whatever means.

16          And I would submit the legal point on which these

17  motions should turn and on which I think on appeal would

18  clarify is the standard for proceeding with premature

19  discovery rather than Rule 8(a).  It is the law of this

20  circuit, and this is not a split among the judges of the

21  District or elsewhere, the law of the D.C. Circuit has laid

22  out in Caribbean Broadcasting Systems that discovery of this

23  type is justified when the person seeking discovery reasonably

24  demonstrates that it can supplement its jurisdictional

25  allegation through discovery.  In other words, discovery of

1    this type is not granted on request; it requires more.  We've

2    submitted, and the ISPs have submitted, that that's lacking.

3           THE COURT:  I've read your papers.

4           MR. STOLTZ:  So I would just mention, you know, on

5    that question, and we do believe that is the controlling point

6    of law in this case, Rule 1292(b) does not require that the

7    issue to be decided by the appellate court is dispositive of a

8    case, only that it materially advanced the case.  We think

9    this is a paradigmatic example of such a case.

10          THE COURT:  Yes, I thought your papers were quite good

11   on the 1292 argument, but I have to really think that issue

12   through.

13          MR. STOLTZ:  Thank you, Your Honor.

14          We would also just mention that we believe that that

15   question would be decided and affirmed by the -- the question

16   of the propriety of the appeal would be decided and affirmed

17   quickly by the appeals court.  We understand that happens

18   rather quickly and with little additional delay for plaintiff

19   or the District Court.

20          THE COURT:  I think the D.C. Circuit acts quite

21   expeditiously on appeals from contempt orders.  I'm not so

22   sure on certification questions the speed with which they

23   consider that compares.  But that's anecdotal impression on my

24   part.

25          MR. STOLTZ:  I understand.  Your Honor would know

1   better.  Amici would just encourage the Court to consider how

2   this decision will affect those people who are not defendants

3   in this case but whose rights will be materially affected by

4   the disclosure of their identities to the plaintiff.

5          Thank you.

6          THE COURT:  I'm aware of that.

7          Thank you very much.

8          Is there anything further, counsel?

9          MR. HUFFMAN:  Your Honor, I would speak briefly if

10   Your Honor would permit me.

11          THE COURT:  Of course.  I didn't know I was going to

12   be spending all day with you.  I apologize again for the delay

13   in my morning calendar.

14          MR. HUFFMAN:  Thank you for your indulgence and your

15   time, Your Honor.  We appreciate the attention you're giving

16   to this issue.  We view it as very important.

17          As the chart demonstrates, and we hope Your Honor will

18   take the opportunity to look at that further, we --

19          THE COURT:  Your long chart?

20          MR. HUFFMAN:  The long chart.

21          We're sort of echoing the sentiments of the EFF.  We

22   believe this is not -- expressed by the EFF, but also

23   expressed by us in our paper -- we don't believe this is a

24   usual case or controversy.  We believe this is a manifestation

25   of the implementation of a nationwide business plan and that

1    the plaintiffs here effectively are enlisting the courts for

2    an administrative function of look-ups; and that they, as

3    Mr. Steele articulated, believe that we should simply give

4    them names.

5           THE COURT:  What other choice do they have if they

6    want to find out who is engaged in infringing their material?

7           MR. HUFFMAN:  I believe that they can do it through

8    Rule 45 subpoenas, but I believe they have to do it in a

9    proper way.  So, for example --

10          THE COURT:  So you are embracing the world view of

11   10,000 individual lawsuits filed in every district in this

12   country as opposed to merely hundreds of file-sharing lawsuits

13   against tens of thousands of IP addresses?  Is that right?

14          MR. HUFFMAN:  I don't believe that they would do that.

15   I don't believe that meets their business plan, but there is

16   an alternative, which is --

17          THE COURT:  Because of the cost?

18          MR. HUFFMAN:  Right.

19          THE COURT:  Which means you are banking on the

20   copyright owners simply not enforcing their rights because of

21   the expense of filing tens of thousands of lawsuits and the

22   armies of lawyers it would take to initiate and prosecute

23   those cases in every district in the country.

24          MR. HUFFMAN:  Perhaps, Your Honor, one alternative is

25   that they might --

1          THE COURT:  Legislation --

2          MR. HUFFMAN:  -- they might -- well, yes, or they

3    might protect their works.  Looking again at the chart, they

4    seem to recur, and they seem to be sort of -- maybe they

5    actually need to protect those works or pull them back out or

6    whatever they can do.

7          But secondly, there is another recurring type of case

8    that's reflected in that chart.  I sometimes call it their

9    bread-and-butter case, which is where they sue a relatively

10   small number of Does believed to reside in the forum.  I'm not

11   going to say we're taking any particular position with respect

12   to that except that they do it a lot, and that's where they

13   tend to articulate the notion that the IP addresses have been

14   geolocated, et cetera.  So there is at least -- that's another

15   situation that they have tried.

16         THE COURT:  The peculiarity with those lawsuits

17   that -- where they -- because probably rulings from that

18   particular Court, the copyright owner, whether it is the

19   Prenda firm or other copyright owners, have said, okay, to

20   satisfy the venue issues that have been raised in a whole

21   series of courts, we are going to, you know, simply file suit

22   in a particular district for those IP addresses that appear to

23   have originated at least close to that area.  That still

24   doesn't necessarily address the personal jurisdiction issue,

25   and it doesn't address the joinder issue, which the parties

1    have also raised.  So even when they do that, I would think,

2    although I don't know, that they would still get pushed back

3    on those other issues.  So, you know --

4            MR. HUFFMAN:  And some courts have done that.  Some

5    courts have denied even the bread-and-butter suits.

6            THE COURT:  Of course.

7            MR. HUFFMAN:  But many courts have not.  And then the

8    other nuance there is --

9            THE COURT:  There's been a lot -- I mean I have a huge

10   notebook of paper, so there's been a lot of ink spilled about

11   what's going on in those other courts.  I have my hands full

12   with what's going on in my very own courtroom.  So I know it

13   took a lot of work for you to put together your big chart, but

14   I'll be honest with you, it's of very little relevance to me

15   what other courts are doing.

16           MR. HUFFMAN:  Well, and again, that chart's only

17   designed to be descriptive of the suits but not necessarily

18   their outcomes.  It's to display for Your Honor what's

19   actually going on.  And as some of the courts have stated, the

20   courts are not required to be blind to the true purpose of the

21   discovery.

22           THE COURT:  And when you raise that point, I have to

23   tell you, what I'm thinking is, what this means is that the

24   copyright owners have such widespread piracy that's ongoing

25   that they're filing all of these lawsuits, and what exactly

1    is -- Comcast; right?

2            MR. HUFFMAN:  AT&T.

3            THE COURT:  What exactly is AT&T doing about it?

4            MR. HUFFMAN:  AT&T has done a number of things about

5    it, and AT&T is party to an industrywide memorandum of

6    understanding --

7            THE COURT:  I mean, this chart, to me, represents, in

8    terms of the total number of Doe defendants, this represents

9    to me an example of quite widespread infringing activity

10   that's ongoing on these networks.

11           MR. HUFFMAN:  But it's never been challenged.  No one

12   has ever challenged the integrity behind which that

13   information was gathered, tens of thousands of people being

14   affected.  And that's part of the difficult thing.  These

15   people get calls, and they don't even know what court to go

16   to, as Mr. Seiver said, because in the Southern District of

17   Texas, for example, it has been repeatedly held, as elsewhere,

18   that you need to go to the Northern District of Illinois if

19   that's where the subpoena is issued.  So if you imagine, to

20   your point, you're a subscriber, maybe you have been sued in

21   the right place, but wait a minute, you can't even challenge

22   the subpoena there, you got to go to the Northern District of

23   Illinois because Prenda Law is based in Chicago, and they

24   issued the subpoena from the Northern District of Illinois.

25   So there are all kind of complexities.  It is a real problem.

1      THE COURT:  So at least in this case, they filed the

2   lawsuit here and they issued the subpoena here, and what

3   you're telling me is that my world view of -- if all of the

4   ISPs and EFF and the amici's arguments were accepted of single

5   IP addresses in lawsuits around the country, that we could

6   quadruple that or double that because even if they filed an

7   individual lawsuit in each of those cases, they might yet

8   still file miscellaneous lawsuits elsewhere to issue the

9   subpoena.  That's even a scarier world view.

10      MR. HUFFMAN:  Well, what's troubling here is that it's

11   an IP address which results to Seattle, Washington, for

12   example, and the person, as is likely, resides in Seattle

13   Washington.  If that person is contacted by the plaintiffs'

14   lawyers and told that they're going to be sued if they don't

15   pay a settlement and they're going to be sued in D.C. with

16   respect to a work that has some controversial impact

17   potentially to them and that person is not likely to

18   be -- it's going to be a coercive environment, that's what a

19   lot of the courts have recognized, that there hasn't been a

20   showing of the value of the work, right, what's the

21   appropriate amount to demand in that type of a situation.  So

22   there could be, around the good cause -- if I'm going to dream

23   up legislation, there could be some more to the good cause

24   showing that might be required of the plaintiff initially so

25   that when the settlement demands go out, especially given the

1    commonality of the genre that we're dealing with here, when

2    the demands go out, they have passed some sort of a fairness

3    test and so that there's not a coercive environment if we're

4    going to use the courts to facilitate massive administrative

5    extrajudicial settlements.

6        THE COURT:  As a mere judge, I just have to deal with

7    the federal rules as they're given to me and the case law the

8    best I can interpret it.

9        MR. HUFFMAN:  I understand, Your Honor.

10        And the last thing is I just want to say that in

11    silence -- I actually sat and argued in Florida against their

12    bill of discovery proceeding that they filed, the judges in

13    both of those arguments --

14        THE COURT:  Of what --

15        MR. HUFFMAN:  They were Florida State Court procedures

16    -- I'm sorry.  Florida State Court procedures mentioned by

17    Mr. Steele, the Courts in both of those cases on the motions

18    of the ISPs, one of them, they dismissed the entire

19    proceeding, and the other Court quashed all subpoenas.  And

20    I'm just saying that's one example.  I'm not going to go into

21    a litany, because as you saw, I got excited.  By my silence, I

22    don't agree with Mr. Steele's characterization of any of the

23    cases or their outcome anywhere else in the country.

24        THE COURT:  Thank you.

25        MR. HUFFMAN:  Thank you, Your Honor.

1    MR. SEIVER:  Your Honor, I apologize.  It will take

2  three seconds.

3    I just wanted to address your point -- and Mr. Fox

4  went to it -- about what do we do, what else, what's the

5  alternative.  Either individual suits, which aren't going to

6  happen, or some sort of a mass suit with Comcast and other

7  ISPs, along with the Motion Picture Association, the RAA, and

8  some of the studios and producers have a memorandum of

9  understanding recognizing that none of the current methods are

10  perfect, and in fact, far from perfect.  And there is a

11  six-step graduated, which I think is far more likely to stop

12  infringement if that is what Your Honor is actually looking at

13  here, where subscribers get notices, they get thrown to a

14  certain landing site, there's a whole method where it requires

15  cooperation.  I have even invited some of the other producers

16  that Mr. Steele represents, that they should join that, and

17  that would be a far more effective way.

18    And then, Your Honor, on the issue about what you're

19  concerned about, you said that if, in fact, it's certified,

20  and it takes time, we will be producing and rolling them out,

21  so I didn't know if Your Honor was going to take the approach

22  of staying it, or at least having the materials preserved so

23  they could be produced at some later point or giving notice

24  but not disclosure but some aspect, so that if there's going

25  to be an appeal and some other appellate resolution that it's

1    not moot by the time it's decided.

2         THE COURT:  Well, I actually -- I think that if I

3    grant the motion to compel and if I were to deny the motions

4    to quash and agree to a certification and the ISPs then

5    produced the identifying information for the subject of the

6    subpoena, that the Circuit Court could quite appropriately

7    find the issue moot, and so I think that's also Mr. Steele's

8    concern, that the whole certification process would be for

9    naught, unless if it's part of the certification, a stay was

10   imposed so that the issue wouldn't be moot for the circuit,

11   and that I think is part and parcel of his concern about the

12   certification, in addition to his very legitimate legal

13   concerns about whether the requirements for 1292 are met.

14        So, I mean, in answer to your question of whether

15   while going through the certification and appeal process you

16   would still be producing and complying with the subpoena, I

17   think that would defeat appellate review.

18        MR. SEIVER:  Unless we produced it to you in camera,

19   Your Honor.

20        MR. FOX:  Your Honor, if you certified, we would move

21   for a stay.

22        THE COURT:  Of course.

23        MR. FOX:  We could go to the Court of Appeals for a

24   stay, as well.

25        THE COURT:  Of course.

1          MR. STEELE:  If I may have three minutes to get my

2     turn, I just want to deal with the brief issue -- I only need

3     two minutes or three minutes on this.  If there is a -- excuse

4     me.  The issue of this -- raised by Attorney Fox about if

5     there is a contempt that there's some sort of nominal

6     guideline for a contempt so that it is sort of a soft landing

7     and they can have contempt and there not be any really, as

8     mentioned, void, I would like to address that for a moment

9     because the ISPs are here de facto -- in my opinion --

10    de facto representing their clients, which is the subscribers

11    that pay them every single month to -- and they pay them a

12    lot, Comcast has 18 million subscribers.  That's a lot of

13    money.  When you add up all the people just in this case,

14    that's a lot of money every month they don't want to lose.  So

15    they're here to protect their financial bottom line, not

16    alturistic sense of this Federal Court system.  So they have

17    raised arguments that our client would charitably describe as

18    specious and I think that this Court has indicated it has some

19    trouble with, such as joinder, even though they're

20    non-parties, and I think that it is important to not allow

21    non-parties to walk into a courtroom that they probably

22    shouldn't be standing in and raise whatever they like, and

23    then when those arguments get thrown out, they say, well, do

24    you mind, since we're here, can you just give us a $25 nominal

25    or whatever contempt citation so that we could not really get

1    punished while we delay this another six months or year or

2    whatever because really what we want to do is another year of

3    subscriber fees, if possible.  I think if you want to play

4    that chicken game of holding contempt and saying, look, I'm

5    not going to comply, then that's what contempt is about.  It's

6    about saying, look, we really believe that the District Court,

7    with all due respect, is wrong, that's what we're going to do.

8    We're going to not comply, and then we're going to go up to

9    the appellate court and see if we were right, because if all

10   it is is a $25 fee -- and I use that number because that's

11   what one of the attorneys asked for last week, you know, when

12   they applied for appeal -- then what's the point.

13            THE COURT:  What was the number?

14            MR. STEELE:  I think it was $25 or $50.

15            THE COURT:  $25 or $50 per day?

16            MR. STEELE:  No, total.  As the contempt.

17            And I said, well, what's the point of appeal?  I would

18   ask that for every single time a judge ruled against me.  I'd

19   say, can I just pay $50 and appeal this right now, judge?  But

20   that is not the point of the contempt, you know, process.  The

21   point is that you always respect a judge's order.  If the

22   judge tells you to do something, you do it.  You don't say,

23   no, that judge -- this other judge said something different,

24   maybe I will just make that judge tell me again.  That's not

25   the contempt process.  You do what the judge says.  If the

1    judge changes her mind later, you stop doing it; but until she

2    does, you keep doing it.  And I've had this conversation with

3    all these counsel, and they have all ignored your order up

4    until this moment.  And now they want some nominal contempt

5    amount so that they can keep doing this.

6         I will just end by saying, I respectfully suggest, if

7    they want to say, nah, I want to keep ignoring this, Judge,

8    then let's have a real contempt hearing and a real open, as

9    Mr. Fox said, void.

10        THE COURT:  Okay.  Is there anything further?

11        No?

12        MR. FOX:  Thank you, Your Honor.

13        THE COURT:  Mr. Steele, for all of your exhibits that

14   have been submitted today, I need them properly marked with

15   plaintiff exhibit stickers; and if you want the Court to

16   consider them, I need a copy of them, the ones that were

17   admitted.

18        MR. STEELE:  Yes, Your Honor.  I gave a copy, but I

19   did not use stickers.  I can put them on right now.

20        THE COURT:  While I'm leaving, if you could please

21   make sure your exhibits are in order.

22        Thank you, all.

23     (Proceedings concluded at 4:05 p.m.)

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Patricia A. Kaneshiro-Miller, certify that the

4     foregoing is a correct transcript from the record of

5     proceedings in the above-entitled matter.

6

7

8     ----------------------------------    -----------------------

9     PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$2,500** [1] - 98:5
**$25** [4] - 135:24, 136:10, 136:14, 136:15
**$50** [3] - 136:14, 136:15, 136:19

**0**

**01** [2] - 18:25, 24:15

**1**

**1** [9] - 14:4, 14:5, 14:7, 52:23, 77:9, 100:5, 100:6
**1,058** [1] - 52:4
**1,200** [1] - 93:25
**1.8** [1] - 22:2
**10** [3] - 18:9, 33:1
**10,000** [5] - 17:6, 18:22, 24:14, 24:16, 127:11
**10-minute** [1] - 122:25
**100** [13] - 44:6, 47:12, 47:16, 47:17, 47:20, 47:21, 48:7, 56:11, 56:12, 58:21, 89:19, 97:7, 97:14
**100-mile** [2] - 115:8, 115:23
**11** [12] - 28:22, 28:23, 28:25, 29:2, 30:2, 30:7, 30:9, 49:11, 50:16, 50:19
**12** [7] - 19:16, 21:21, 22:11, 54:14, 56:4, 93:1, 121:10
**12(b)(6** [1] - 101:18
**12-48** [1] - 4:2
**1292** [6] - 107:11, 108:19, 111:20, 111:22, 125:11, 134:13
**1292(b** [3] - 106:22, 108:2, 125:6
**1292(b)** [1] - 106:24
**12:30** [1] - 29:19
**13** [2] - 109:25, 121:10
**14** [1] - 113:21
**15** [2] - 32:25, 93:1
**18** [2] - 111:10, 135:12
**180** [1] - 94:2
**184** [6] - 28:22, 28:23, 28:24, 48:24, 49:13, 49:15

**1976** [2] - 9:21, 9:23
**1977** [1] - 9:21
**1:00** [1] - 57:6
**1:45** [1] - 57:6

**2**

**2** [14] - 16:25, 20:15, 20:20, 20:23, 21:20, 22:11, 23:21, 24:10, 28:21, 57:2, 89:18, 121:5
**20** [2] - 7:15, 110:21
**20(a)** [1] - 101:15
**200** [1] - 109:9
**2010** [5] - 17:6, 17:7, 19:5, 19:13, 24:15
**2011** [2] - 19:5, 22:1
**2012** [2] - 54:14, 56:4
**24** [2] - 54:19, 54:24
**26** [3] - 89:14, 90:1, 102:12
**26,000** [1] - 97:7
**27** [2] - 26:18, 98:25
**27-1** [4] - 26:16, 26:19, 28:21, 48:15
**28** [1] - 106:22

**3**

**3** [11] - 21:1, 21:17, 21:21, 21:23, 21:24, 23:21, 24:10, 75:6, 89:19, 121:5
**3-month** [1] - 75:7
**30** [1] - 77:9
**32-bit-long** [1] - 65:24
**33** [1] - 52:24
**349** [1] - 100:6
**35** [2] - 36:19, 77:9
**350** [1] - 100:5
**37** [1] - 62:5
**3:30** [1] - 123:1
**3:42** [1] - 123:1

**4**

**4** [3] - 24:21, 89:20, 110:1
**4.2** [1] - 65:25
**45** [8] - 57:1, 57:4, 89:1, 89:8, 89:14, 115:8, 117:2, 127:8
**45's** [1] - 115:23
**45(c)(1)** [1] - 89:15
**45(c)(3)(A** [2] - 89:16, 90:14
**45(c)3(A)** [1] - 89:4

**47** [1] - 96:18
**4:05** [1] - 137:23

**5**

**5** [11] - 25:23, 26:2, 26:3, 26:5, 26:8, 30:13, 30:17, 48:15, 50:1, 50:9, 52:8
**50** [4] - 93:2, 94:6, 94:25, 97:7
**55,000** [1] - 97:9
**551** [1] - 96:18

**6**

**6** [2] - 31:21, 33:24
**60** [1] - 93:25

**7**

**7** [4] - 35:16, 37:1, 37:4, 37:8
**70** [1] - 97:14
**702** [1] - 14:11
**713** [1] - 7:10

**8**

**8** [4] - 36:22, 36:23, 37:10, 37:12
**8(a** [5] - 100:24, 101:3, 101:15, 102:1, 102:9
**8(a)** [1] - 101:8, 112:12, 124:19

**9**

**9** [3] - 33:1, 37:25, 52:24

**A**

**ability** [5] - 75:1, 78:4, 78:7, 80:16, 106:17
**able** [11] - 16:19, 36:9, 39:3, 39:7, 52:11, 55:6, 80:13, 80:14, 81:12, 92:5, 110:18
**above-entitled** [1] - 138:5
**absent** [1] - 107:22
**absolute** [2] - 34:15, 42:21
**absolutely** [4] - 26:1, 27:13, 89:3, 106:6

**academic** [2] - 77:15, 77:18
**accept** [5] - 33:6, 33:8, 60:19, 103:19, 105:4
**acceptance** [1] - 8:13
**accepted** [5] - 8:20, 14:6, 65:16, 70:5, 131:4
**access** [7] - 16:20, 18:10, 68:1, 68:2, 68:6, 68:21, 69:1
**accessibility** [1] - 44:24
**accessing** [1] - 15:20
**according** [1] - 22:12
**account** [2] - 58:18, 124:10
**accounts** [3] - 88:6, 123:9, 124:4
**accuracy** [12] - 13:14, 13:15, 14:24, 34:13, 35:1, 35:4, 38:5, 40:1, 40:4, 43:8, 70:5, 83:21
**accurate** [10] - 34:19, 39:4, 39:12, 39:14, 47:12, 47:21, 47:22, 48:7, 57:4, 82:21
**accurately** [4] - 35:8, 36:6, 36:10, 43:19
**achieve** [1] - 109:24
**Achte** [1] - 93:12
**acknowledge** [1] - 91:18
**acquired** [1] - 61:20
**act** [4] - 96:16, 96:25, 98:12, 117:9
**Action** [1] - 4:2
**action** [1] - 117:15
**actions** [2] - 59:16, 61:4
**active** [3] - 17:6, 29:1, 52:16
**actively** [1] - 29:3, 30:3
**activity** [4] - 101:13, 119:13, 123:24, 130:9
**acts** [1] - 125:20
**actual** [9] - 24:15, 40:8, 58:18, 58:19, 75:21, 86:24, 86:25, 87:1, 120:2
**add** [3] - 6:8, 118:22, 135:13
**addition** [8] - 9:10, 38:20, 38:23, 58:20, 70:16, 90:9, 106:19, 134:12
**additional** [2] - 38:4,

125:18
**address** [78] - 7:9, 10:10, 12:13, 12:22, 12:24, 13:2, 13:6, 13:16, 34:9, 34:10, 34:19, 34:24, 38:14, 38:18, 40:6, 40:8, 40:9, 40:13, 41:3, 42:4, 42:5, 42:10, 43:3, 43:6, 43:24, 44:20, 45:23, 47:18, 52:16, 53:14, 55:1, 55:5, 58:22, 60:1, 65:8, 65:10, 65:19, 65:21, 65:24, 66:3, 66:5, 66:6, 66:11, 66:13, 66:14, 66:24, 67:5, 67:7, 67:8, 68:4, 71:18, 71:24, 79:22, 80:20, 83:13, 88:1, 88:7, 88:8, 88:10, 93:2, 93:19, 97:9, 97:14, 100:17, 101:5, 101:23, 105:7, 105:9, 109:14, 119:12, 123:23, 128:24, 128:25, 131:11, 133:3, 135:8
**addressed** [2] - 66:11, 109:18
**addresses** [51] - 12:19, 12:20, 13:11, 16:8, 29:9, 29:10, 29:12, 30:4, 30:7, 30:11, 30:24, 31:13, 31:15, 44:19, 47:12, 48:5, 48:20, 50:16, 52:4, 52:7, 52:25, 53:18, 55:7, 55:12, 66:22, 66:25, 67:1, 71:11, 71:17, 71:20, 80:19, 81:2, 81:13, 81:15, 81:23, 81:25, 82:2, 82:9, 87:8, 88:15, 92:19, 93:9, 96:6, 101:11, 104:19, 109:7, 121:17, 127:13, 128:13, 128:22, 131:5
**adjudication** [2] - 123:14, 124:12
**Administration** [1] - 8:21
**administrative** [12] - 90:10, 90:13, 90:21, 91:4, 91:10, 92:6, 93:17, 93:23, 95:6, 127:2, 132:4

**admission** [5] - 21:14, 23:18, 23:21, 36:25, 37:3
**admit** [1] - 27:2
**admitted** [14] - 14:7, 24:9, 24:10, 26:13, 26:14, 27:14, 30:16, 30:17, 33:13, 33:17, 33:23, 33:24, 37:8, 137:17
**advanced** [2] - 87:2, 125:8
**adversarial** [1] - 112:25
**advertise** [1] - 69:9
**advertising** [1] - 69:8
**AF** [5] - 4:2, 4:7, 45:9, 52:1, 52:10
**affect** [4] - 41:9, 45:2, 68:12, 126:2
**affected** [3] - 124:8, 126:3, 130:14
**affirmed** [2] - 125:15, 125:16
**afflicted** [1] - 75:23
**afternoon** [4] - 49:25, 62:19, 62:20, 83:4
**AFTERNOON** [1] - 57:8
**aggregate** [2] - 58:13, 58:14
**ago** [3] - 47:3, 76:3, 117:15
**agree** [8] - 33:4, 103:18, 103:20, 104:2, 109:3, 115:3, 132:22, 134:4
**agreed** [1] - 109:6
**agreement** [5] - 32:3, 32:4, 33:4, 33:19, 54:10
**ahead** [3] - 27:19, 82:25, 102:14
**al** [1] - 4:3
**algorithm** [1] - 40:5
**Alice** [2] - 76:1, 76:2
**allegation** [2] - 98:15, 124:25
**alleged** [4] - 42:7, 43:24, 48:9, 104:16
**allegedly** [4] - 45:21, 101:6, 101:12, 119:12
**alleges** [1] - 101:3
**allocate** [1] - 66:22
**allocated** [3] - 67:2, 71:12, 71:20
**allocation** [1] - 65:10
**allocations** [1] - 65:9
**allow** [9] - 29:17,

29:18, 85:21, 86:2, 89:17, 98:17, 98:18, 100:15, 135:20
**allows** [4] - 15:10, 15:25, 40:17, 116:8
**almost** [2] - 29:19, 49:25
**alone** [3] - 60:15, 105:7, 118:12
**alternative** [3] - 127:16, 127:24, 133:5
**altruistic** [1] - 78:21
**aluristic** [2] - 86:1, 135:16
**amazing** [1] - 95:24
**amended** [1] - 55:8
**American** [2] - 8:13, 71:7
**Americans** [1] - 68:25
**amici** [4] - 5:10, 105:5, 123:6, 126:1
**amici's** [1] - 131:4
**amicus** [1] - 4:17
**amount** [8] - 18:21, 85:19, 92:9, 92:17, 93:19, 97:13, 131:21, 137:5
**analysis** [5] - 17:5, 63:17, 86:18, 86:21, 117:2
**analysts** [1] - 94:2, 97:4, 97:15
**analyze** [1] - 22:9
**analyzed** [1] - 13:14
**analyzing** [1] - 64:25
**anecdotal** [1] - 125:23
**annoyed** [1] - 78:23
**answer** [9] - 27:21, 28:1, 43:16, 43:17, 43:18, 46:5, 101:7, 123:5, 134:14
**anticipating** [1] - 56:24
**antsy** [1] - 23:12
**anytime** [1] - 96:19
**apologize** [9] - 5:25, 14:13, 17:14, 18:2, 20:19, 20:25, 21:3, 23:22, 26:4, 27:25, 36:20, 83:7, 114:14, 120:6, 126:12, 133:1
**apparent** [1] - 29:9
**appeal** [20] - 108:19, 108:21, 109:23, 110:5, 110:6, 110:11, 110:16, 110:18, 113:25, 114:1, 117:8, 117:13, 120:22,

124:17, 125:16, 133:25, 134:15, 136:12, 136:17, 136:19
**appealable** [2] - 107:9, 117:6
**appealed** [1] - 117:18
**Appeals** [10] - 60:7, 60:16, 104:1, 107:20, 107:21, 109:6, 109:11, 121:19, 121:22, 134:23
**appeals** [2] - 125:17, 125:21
**appear** [2] - 98:9, 128:22
**appearances** [1] - 4:5
**appellate** [6] - 111:8, 117:18, 125:7, 133:25, 134:17, 136:9
**application** [30] - 15:24, 16:2, 16:11, 24:25, 25:1, 28:15, 30:25, 31:2, 31:6, 32:1, 32:4, 32:5, 32:8, 32:9, 32:10, 32:13, 32:14, 32:21, 33:7, 33:18, 50:24, 76:6, 76:6, 76:7, 76:9, 76:12, 77:2, 78:14, 79:3, 108:21
**applications** [6] - 15:3, 31:3, 31:4, 32:23, 68:1, 77:8
**applied** [2] - 42:18, 136:12
**apply** [1] - 68:15
**appreciate** [3] - 116:24, 121:3, 126:15
**approach** [7] - 7:2, 7:3, 50:11, 52:20, 53:8, 54:15, 133:21
**approaches** [1] - 67:13
**appropriate** [7] - 10:11, 21:14, 23:8, 34:16, 45:1, 118:19, 131:21
**appropriately** [1] - 134:6
**approximate** [1] - 34:16
**area** [9] - 9:25, 11:18, 12:15, 14:19, 31:12, 54:11, 128:23
**areas** [5] - 13:19, 14:22, 14:23, 83:10,

88:22
**argue** [3] - 110:14, 110:15, 110:19
**argued** [1] - 132:11
**argues** [1] - 106:25
**arguing** [2] - 90:6, 110:13
**argument** [12] - 23:1, 57:13, 59:2, 60:18, 95:6, 95:11, 95:24, 96:25, 108:3, 121:2, 125:11
**arguments** [12] - 60:3, 60:14, 60:15, 95:6, 105:4, 111:6, 111:15, 115:4, 131:4, 132:13, 135:17, 135:23
**armies** [1] - 127:22
**arrived** [2] - 35:11, 37:18
**articulate** [2] - 92:5, 128:13
**articulated** [3] - 92:10, 103:14, 127:3
**aside** [2] - 20:6, 72:17, 112:25
**aspect** [6] - 43:20, 45:3, 80:2, 80:3, 93:23, 133:24
**assert** [1] - 111:23
**asserted** [1] - 58:21
**asserting** [2] - 91:10, 101:10
**assertion** [1] - 45:11
**assessing** [2] - 7:22
**assigned** [1] - 100:4, 121:13
**assignment** [1] - 103:25
**associate** [1] - 69:8
**associated** [9] - 12:21, 48:5, 55:7, 66:18, 67:10, 70:24, 87:8, 104:19, 104:21
**Association** [1] - 133:7
**assuming** [1] - 106:15
**assumption** [1] - 123:13
**AT&T** [12] - 4:13, 5:6, 5:7, 53:15, 60:22, 62:6, 90:19, 90:23, 130:2, 130:3, 130:4, 130:5
**Atrenet** [1] - 63:11
**attached** [3] - 18:9, 52:3, 81:7
**attempt** [2] - 12:22, 85:19

88:22
**attempted** [1] - 77:13
**attempting** [1] - 86:17
**attention** [8] - 54:19, 54:24, 90:17, 97:22, 99:5, 100:13, 122:1, 126:15
**attorney** [2] - 46:2, 59:9
**Attorney** [1] - 135:4
**attorneys** [2] - 59:12, 136:11
**attributed** [2] - 81:24, 82:1
**augment** [1] - 40:19
**augmented** [1] - 40:21
**author** [1] - 100:1
**authority** [5] - 99:5, 102:20, 103:2, 112:1, 112:6
**automatic** [1] - 12:17
**automatically** [5] - 38:12, 74:2, 74:3, 79:6, 85:6
**available** [22] - 16:12, 25:2, 28:12, 32:23, 40:15, 44:4, 47:4, 47:12, 49:16, 50:21, 55:2, 56:15, 70:9, 70:18, 70:22, 73:21, 76:7, 76:9, 77:2, 79:24, 116:4, 116:5
**average** [2] - 85:1, 92:16
**avoid** [1] - 124:12
**aware** [10] - 9:3, 10:25, 12:18, 33:3, 79:4, 79:7, 80:9, 119:5, 121:9, 126:6
**awhile** [1] - 76:3

**B**

**b)(2)(C)(iii** [1] - 90:1
**background** [2] - 62:16, 76:13
**Baltimore** [1] - 38:7
**bandwidth** [1] - 22:10
**banking** [3] - 105:14, 105:16, 127:19
**bar** [3] - 51:6, 59:2, 60:18
**Bart** [1] - 4:12
**base** [1] - 115:16
**based** [13] - 38:22, 60:14, 60:15, 81:2, 82:10, 82:13, 82:20, 83:10, 83:16, 91:12, 93:20, 119:13, 130:23

**basis** [17] - 27:10, 42:24, 43:4, 43:13, 43:15, 43:25, 44:8, 45:11, 48:2, 48:4, 48:7, 68:15, 93:3, 93:10, 94:7, 98:2, 101:10

**BBC** [2] - 69:1, 69:2

**bearing** [1] - 45:16

**become** [6] - 78:10, 79:25, 94:16, 99:16, 104:22, 119:5

**becomes** [1] - 112:14

**Beech** [1] - 100:14

**begin** [1] - 9:19

**beginning** [5] - 52:25, 61:18, 96:15, 97:6, 97:11

**behalf** [5] - 4:7, 60:21, 61:1, 92:2, 107:16

**behavior** [1] - 118:6

**behind** [2] - 23:13, 130:12

**believes** [1] - 87:20

**Ben** [1] - 89:13

**beneficial** [1] - 78:21

**benefit** [4] - 85:11, 85:15, 90:3, 103:4

**benefits** [1] - 92:1

**Benjamin** [1] - 4:9

**best** [7] - 15:12, 15:14, 46:5, 86:17, 92:5, 121:7, 132:8

**better** [6] - 11:13, 20:13, 79:20, 115:15, 119:9, 126:1

**between** [20] - 11:12, 13:5, 13:8, 15:4, 15:5, 15:16, 15:20, 16:9, 28:23, 30:6, 32:4, 47:25, 49:11, 73:17, 73:18, 74:21, 79:22, 84:18, 92:19, 103:14

**beyond** [4] - 33:12, 45:13, 79:14, 79:15

**big** [3] - 16:4, 68:22, 129:13

**biggest** [1] - 89:12

**bill** [1] - 132:12

**billion** [1] - 65:25

**bind** [1] - 97:24

**bit** [8] - 22:14, 34:5, 40:2, 56:24, 56:25, 77:11, 91:5, 102:15

**bits** [2] - 66:1, 76:10

**BitTorrent** [75] - 8:24, 8:25, 10:19, 10:20, 10:23, 11:4, 11:6, 11:12, 11:20, 11:23,

12:10, 14:20, 15:4, 15:5, 15:8, 15:10, 15:15, 15:23, 26:25, 27:23, 32:10, 32:15, 32:16, 32:21, 32:22, 41:17, 41:21, 42:2, 45:21, 46:16, 46:18, 48:18, 48:19, 65:4, 65:6, 65:12, 72:5, 72:6, 72:7, 72:13, 72:16, 72:19, 73:1, 73:5, 73:9, 73:23, 73:24, 75:17, 76:6, 76:7, 76:20, 76:23, 78:11, 78:14, 78:17, 79:3, 79:5, 79:9, 79:16, 80:1, 81:12, 81:17, 81:23, 83:23, 84:1, 84:3, 84:6, 84:7, 84:8, 84:20, 85:24, 86:9, 87:12, 87:15

**black** [2] - 113:2, 113:3

**blah** [3] - 120:1

**blank** [1] - 93:14

**blanks** [2] - 50:18, 50:20

**blind** [1] - 129:20

**block** [2] - 16:22, 121:21

**blocks** [4] - 12:19, 12:20, 16:19, 16:20

**blue** [1] - 111:2

**Bob** [1] - 76:1

**body** [1] - 4:11

**bottom** [7] - 28:19, 29:7, 30:12, 33:8, 50:22, 51:18, 135:15

**Bram** [2] - 72:8, 79:10

**bread** [2] - 128:9, 129:5

**bread-and-butter** [2] - 128:9, 129:5

**break** [3] - 19:25, 57:1, 122:25

**breakdown** [1] - 93:16

**brief** [7] - 34:6, 54:8, 57:20, 57:23, 121:5, 121:7, 135:2

**briefing** [1] - 109:5

**briefly** [7] - 15:8, 21:12, 52:2, 67:6, 71:7, 72:6, 126:9

**briefs** [2] - 90:18, 109:22

**Bright** [2] - 4:10, 89:13

**bring** [9] - 59:9, 97:22, 98:12, 99:4, 100:12,

104:7, 111:5, 118:25, 123:17

**bringing** [3] - 59:9, 74:25, 109:24

**brings** [1] - 57:22

**Broadcasting** [2] - 102:12, 124:22

**broken** [2] - 15:11, 16:4

**brought** [3] - 90:17, 111:10, 113:22

**browser** [1] - 83:17

**build** [1] - 60:2

**bump** [1] - 59:23

**burden** [24] - 6:13, 6:16, 58:13, 58:14, 89:20, 89:24, 90:2, 90:5, 90:7, 90:13, 90:21, 91:1, 91:4, 91:10, 91:12, 91:18, 91:24, 91:25, 93:20, 93:22, 95:6, 95:7, 95:23, 105:13

**burdens** [4] - 90:10, 90:11, 91:23, 92:7

**business** [5] - 4:13, 15:3, 66:23, 126:25, 127:15

**businesses** [2] - 7:22, 69:11

**busy** [1] - 105:24

**butcher** [1] - 83:7

**butter** [2] - 128:9, 129:5

**button** [1] - 33:8

**BY** [36] - 7:7, 8:7, 10:18, 14:16, 21:16, 24:12, 25:22, 26:7, 26:20, 27:20, 28:6, 29:6, 29:25, 30:19, 31:20, 34:4, 36:1, 37:9, 39:1, 39:22, 41:16, 43:21, 46:15, 50:8, 50:14, 52:22, 53:10, 54:18, 54:23, 62:18, 63:21, 64:7, 65:18, 70:14, 78:3, 83:2

**bystanders** [1] - 113:13

**C**

**c)(3)(A)(iv** [1] - 89:22

**cable** [5] - 96:16, 96:17, 96:25, 98:12

**Cadenhead** [1] - 90:22

**calendar** [1] - 126:13

**California** [6] - 55:9,

55:13, 55:14, 55:16, 56:4, 94:20

**camera** [1] - 134:18

**Canada** [1] - 68:24

**Canadians** [1] - 68:20

**capabilities** [2] - 12:6, 87:13

**capacity** [1] - 105:19

**caprice** [1] - 94:21

**captioned** [1] - 99:21

**capture** [7] - 7:4, 24:25, 25:2, 25:6, 25:7, 25:10, 26:10

**card** [2] - 69:22, 69:25

**cards** [1] - 69:19

**career** [1] - 8:10

**careful** [1] - 120:1

**Caribbean** [2] - 102:11, 124:22

**case** [99] - 6:6, 9:15, 9:16, 9:18, 13:12, 13:13, 13:15, 14:17, 26:15, 26:16, 26:17, 32:5, 42:8, 43:23, 44:16, 44:18, 44:23, 45:22, 46:6, 46:11, 46:17, 47:3, 47:19, 50:22, 52:1, 56:7, 60:4, 73:10, 75:6, 79:21, 80:9, 80:11, 80:21, 81:8, 81:25, 86:8, 90:7, 90:9, 90:16, 93:11, 93:13, 93:24, 95:2, 95:8, 95:13, 95:20, 95:22, 96:4, 96:5, 96:7, 96:16, 99:6, 99:7, 99:25, 100:3, 100:8, 100:20, 101:3, 103:2, 104:13, 104:14, 104:15, 106:5, 106:9, 108:15, 111:3, 111:13, 112:7, 112:25, 113:19, 115:7, 115:18, 115:19, 117:9, 118:6, 118:7, 121:13, 121:15, 121:16, 123:6, 123:8, 123:13, 125:6, 125:8, 125:9, 126:3, 126:24, 128:7, 128:9, 131:1, 132:7, 135:13

**cases** [74] - 9:14, 9:17, 34:21, 42:20, 43:9, 44:6, 44:14, 45:10, 45:16, 45:20, 46:2, 46:8, 47:25, 56:16,

58:9, 58:16, 58:21, 59:3, 59:10, 60:9, 60:11, 60:19, 61:6, 88:2, 88:3, 90:17, 91:17, 91:23, 91:24, 94:18, 94:22, 95:17, 95:21, 96:1, 96:7, 96:11, 97:10, 98:20, 98:25, 99:1, 99:15, 99:19, 99:20, 102:24, 103:1, 103:24, 104:9, 104:23, 105:18, 105:20, 108:5, 108:7, 109:9, 110:21, 110:23, 112:5, 114:1, 115:6, 115:9, 115:12, 115:13, 116:21, 116:24, 119:14, 121:7, 123:4, 123:5, 127:23, 131:7, 132:17, 132:23

**category** [1] - 86:8

**cautioned** [1] - 29:22

**cc'ed** [1] - 17:15

**CDs** [1] - 74:17

**cell** [1] - 12:16

**centralized** [3] - 73:12, 79:22, 80:4

**certain** [14] - 34:9, 54:11, 54:12, 71:11, 74:12, 79:6, 87:7, 87:12, 87:13, 116:4, 116:5, 116:12, 133:14

**certainly** [11] - 43:2, 68:14, 73:19, 73:20, 74:15, 77:20, 77:24, 112:1, 112:4, 112:7, 120:15

**certifiable** [1] - 121:24

**CERTIFICATE** [1] - 138:1

**certification** [26] - 59:25, 103:10, 106:22, 106:24, 107:22, 109:17, 109:20, 114:6, 114:8, 114:21, 114:25, 118:10, 118:17, 118:18, 120:16, 121:7, 121:18, 121:23, 122:2, 122:9, 125:22, 134:4, 134:8, 134:9, 134:12, 134:15

**certified** [3] - 117:17, 133:19, 134:20

**certify** [5] - 108:19, 108:24, 110:6, 120:19, 138:3
**cetera** [1] - 128:14
**challenge** [3] - 27:16, 101:9, 130:21
**challenged** [2] - 130:11, 130:12
**change** [2] - 119:6, 119:7
**changed** [3] - 15:7, 40:8, 115:19
**changes** [2] - 115:11, 137:1
**changing** [1] - 97:21
**characterization** [1] - 132:22
**charge** [2] - 69:21, 69:22
**charitably** [1] - 135:17
**chart** [16] - 4:23, 58:8, 58:11, 58:15, 60:15, 90:18, 91:15, 97:17, 126:17, 126:19, 126:20, 128:3, 128:8, 129:13, 130:7
**chart's** [1] - 129:16
**checks** [1] - 16:2
**Chicago** [2] - 94:20, 130:23
**chicken** [1] - 136:4
**child** [2] - 94:4, 95:20
**choice** [2] - 123:17, 127:5
**choose** [1] - 75:1
**chopping** [1] - 121:21
**chose** [1] - 38:11
**chosen** [2] - 74:24, 79:12
**Circuit** [5] - 105:4, 107:4, 124:21, 125:20, 134:6
**circuit** [10] - 59:25, 60:4, 108:25, 109:1, 113:7, 118:13, 118:14, 120:15, 124:20, 134:10
**circumstances** [2] - 35:9, 45:15
**citation** [2] - 107:22, 135:25
**cite** [2] - 89:25, 90:10
**cited** [1] - 108:6
**City** [10] - 7:11, 35:9, 35:12, 36:10, 36:14, 36:16, 36:17, 36:18, 37:15
**city** [2] - 53:12, 55:3
**civil** [5] - 4:2, 95:20, 96:16, 96:19, 118:1

**claim** [5] - 98:13, 101:1, 101:19, 101:20, 124:11
**claims** [2] - 101:11, 124:13
**Clair** [1] - 117:19
**clarification** [1] - 55:22
**clarify** [1] - 124:18
**clarity** [2] - 21:2, 61:3
**class** [2] - 59:16, 61:4
**clause** [1] - 108:20
**clear** [5] - 7:8, 9:19, 15:8, 20:5, 26:1, 59:21, 59:24, 62:4, 89:3, 91:8, 102:19, 114:24, 119:22
**clearly** [3] - 59:14, 84:7, 88:11
**CLERK** [1] - 4:2
**clicked** [1] - 41:24
**client** [13] - 15:23, 16:11, 16:19, 16:23, 32:10, 78:14, 78:17, 78:25, 92:7, 100:9, 107:14, 119:1, 135:17
**clients** [14] - 59:11, 59:13, 79:16, 81:17, 92:3, 107:13, 107:16, 107:24, 114:4, 119:4, 119:7, 120:4, 121:20, 135:10
**clock** [2] - 50:4, 57:3
**close** [1] - 128:23
**closely** [2] - 104:21, 121:23
**closer** [1] - 104:19
**cluster** [1] - 89:12
**co** [2] - 98:19, 98:24, 115:21
**co-conspirators** [2] - 98:19, 98:24, 115:21
**coercive** [2] - 131:18, 132:3
**Cohen** [2] - 72:8, 79:10
**collect** [3] - 19:8, 41:3, 52:11
**collected** [3] - 28:25, 38:14, 52:12
**collection** [2] - 48:22, 49:8
**collects** [2] - 28:17, 40:14
**Collyer** [1] - 93:11
**column** [1] - 50:25
**combination** [1] - 63:25

**Comcast** [21] - 4:20, 5:1, 17:22, 17:25, 53:15, 60:21, 60:24, 89:6, 92:23, 92:25, 93:10, 93:15, 95:4, 95:16, 97:3, 97:23, 120:1, 130:1, 133:6, 135:12
**Comcast's** [1] - 17:23
**coming** [3] - 84:24, 114:2, 114:6
**commands** [1] - 87:7
**commerce** [9] - 41:1, 41:2, 41:6, 41:10, 68:4, 69:18, 69:23, 70:5
**commercial** [1] - 71:3
**commissioned** [4] - 17:4, 17:21, 17:22, 22:9
**commit** [2] - 45:21, 95:2
**common** [4] - 15:19, 59:5, 75:11, 97:25
**commonality** [1] - 132:1
**commonly** [4] - 71:19, 74:13, 79:17, 81:17
**communicated** [2] - 75:12, 75:17
**communicating** [3] - 75:20, 75:22, 76:24
**communication** [3] - 8:9, 8:17, 50:24
**communications** [4] - 8:15, 10:1, 10:22, 12:6
**Communications** [2] - 4:10
**community** [3] - 85:21, 86:2, 86:3
**companies** [3] - 68:22, 70:16, 71:4
**company** [13] - 8:1, 12:4, 17:23, 18:1, 39:16, 40:23, 41:1, 41:2, 41:10, 47:1, 47:4, 63:5, 72:18
**compare** [1] - 101:2
**compares** [1] - 125:23
**compel** [5] - 5:1, 61:10, 89:7, 111:21, 114:3, 120:17, 122:8, 134:3
**compilation** [4] - 35:20, 36:2, 37:24, 60:20
**compiled** [1] - 36:5
**compiling** [1] - 40:23
**complain** [1] - 105:8

**complaining** [1] - 110:17
**Complaint** [1] - 24:6
**complaint** [10] - 51:25, 52:23, 55:8, 81:8, 100:20, 101:3, 101:8, 101:12, 101:19, 117:11
**complete** [7] - 16:15, 16:21, 51:12, 51:14, 78:9, 78:19, 82:5
**completed** [3] - 19:4, 82:2, 82:10
**completely** [2] - 31:14, 77:5
**completing** [1] - 82:7
**complexities** [1] - 130:25
**complexity** [1] - 79:9
**compliance** [3] - 92:1, 108:24, 111:21
**comply** [1] - 89:18, 95:24, 96:12, 99:3, 117:7, 120:9, 120:19, 120:21, 136:5, 136:8
**complying** [5] - 92:4, 92:21, 97:20, 108:25, 134:16
**computer** [23] - 15:25, 31:9, 51:1, 55:3, 55:4, 65:22, 66:5, 66:9, 66:11, 66:17, 73:4, 73:18, 73:19, 74:1, 75:21, 76:12, 76:13, 77:6, 78:2, 79:2, 84:11, 84:16
**computer's** [1] - 55:1
**computers** [17] - 16:12, 28:9, 28:10, 29:12, 48:22, 48:24, 49:2, 49:4, 49:8, 49:12, 50:25, 66:8, 66:15, 66:16, 75:20, 77:7, 79:6
**computing** [1] - 75:23
**concentrated** [1] - 74:11
**concept** [1] - 85:24
**concern** [3] - 108:23, 134:8, 134:11
**concerned** [2] - 118:16, 133:19
**concerns** [2] - 106:14, 134:13
**concluded** [1] - 137:23
**conclusion** [4] - 33:13, 43:15, 44:17, 109:23

**conclusions** [1] - 38:22
**conclusory** [4] - 91:1, 91:13, 93:6, 95:5
**conduct** [2] - 10:12, 10:15
**conducted** [1] - 86:16
**confidence** [2] - 35:2, 35:4
**confident** [1] - 82:14
**configure** [1] - 71:19
**configured** [1] - 78:18
**confuse** [1] - 110:21
**confusing** [1] - 99:22
**confusion** [4] - 55:23, 84:18, 84:22, 111:3
**Congress** [1] - 64:18
**connect** [1] - 81:22
**connected** [3] - 77:3, 86:4, 86:10
**connecting** [3] - 84:4, 84:5, 84:9
**connection** [11] - 24:3, 42:20, 63:7, 64:13, 66:17, 66:19, 67:9, 67:11, 70:25, 74:21, 75:7, 75:8, 75:10, 80:20, 83:14, 91:11, 91:17
**connections** [1] - 66:15
**consequence** [1] - 60:19
**conserve** [1] - 78:20
**consider** [6] - 78:21, 84:21, 91:16, 125:23, 126:1, 137:16
**consideration** [7] - 20:12, 22:18, 61:7, 61:9, 70:11, 117:16, 118:13
**considered** [2] - 49:4, 107:5, 113:8
**consistent** [1] - 52:17
**conspirators** [3] - 98:19, 98:24, 115:21
**constantly** [1] - 113:24
**constitute** [1] - 43:13
**consult** [2] - 7:21, 122:11
**consultant** [4] - 7:13, 7:14, 7:17, 55:11
**Consultants** [3] - 7:18, 8:3, 8:4
**consulted** [2] - 9:17, 12:10
**consulting** [6] - 7:17, 8:8, 11:22, 12:8,

12:23, 71:21
**contact** [1] - 100:15
**contacted** [3] - 14:18, 31:15, 131:13
**contacting** [1] - 81:14
**contacts** [1] - 16:12
**contain** [2] - 39:18, 71:23
**containing** [1] - 66:7
**contempt** [26] - 95:2, 107:5, 107:13, 107:15, 107:17, 107:22, 110:6, 117:7, 118:20, 120:16, 120:22, 122:1, 122:4, 122:12, 125:21, 135:5, 135:6, 135:7, 135:25, 136:4, 136:5, 136:16, 136:20, 136:25, 137:4, 137:8
**contended** [2] - 44:7, 45:9
**content** [8] - 18:21, 19:1, 24:20, 26:9, 68:18, 68:19, 68:24, 83:23
**contention** [4] - 42:25, 43:4, 43:13, 43:25
**contents** [3] - 20:16, 23:6, 25:5
**contest** [1] - 99:23
**contested** [1] - 103:9
**context** [8] - 68:16, 72:25, 73:9, 90:15, 91:25, 102:13, 112:5, 112:10
**contexts** [1] - 88:3
**continue** [3] - 29:24, 77:25, 78:12
**CONTINUED** [1] - 14:15
**continuing** [2] - 77:2, 113:17
**continuity** [1] - 47:6
**continuously** [2] - 119:3
**contract** [1] - 53:22
**contrary** [1] - 27:14
**control** [2] - 105:25, 106:3
**controlling** [8] - 106:25, 108:4, 108:9, 108:11, 111:22, 112:4, 112:6, 125:5
**controversial** [1] - 131:16
**controversy** [1] -

126:24
**conundrum** [1] - 108:18
**conventional** [1] - 12:3
**conversation** [2] - 116:14, 137:2
**cooperate** [1] - 48:23
**cooperating** [3] - 16:7, 28:9, 49:4
**cooperation** [1] - 133:15
**cooperative** [1] - 86:1
**copy** [15] - 17:12, 17:16, 17:17, 17:24, 18:5, 18:6, 19:22, 19:24, 20:1, 20:22, 21:7, 58:7, 137:16, 137:18
**copyright** [19] - 19:5, 45:22, 68:16, 87:20, 93:18, 101:4, 101:10, 101:20, 104:16, 104:18, 105:11, 105:14, 124:11, 124:13, 127:20, 128:18, 129:12, 129:24
**copyrighted** [7] - 18:22, 18:25, 24:14, 24:17, 24:20, 68:18, 83:23
**core** [1] - 27:16
**corporate** [1] - 9:14
**Corporation** [1] - 12:5
**correct** [36] - 5:15, 26:3, 37:20, 49:17, 51:8, 51:16, 53:25, 61:2, 64:9, 65:15, 66:22, 67:25, 72:3, 72:4, 73:16, 74:6, 76:14, 76:15, 77:5, 77:10, 82:22, 83:11, 83:18, 83:24, 84:17, 85:9, 85:11, 89:5, 89:22, 89:24, 95:8, 95:9, 100:22, 100:23, 104:23, 138:4
**correlation** [1] - 30:6
**corresponding** [1] - 66:4
**cost** [3] - 92:1, 92:3, 127:17
**costs** [1] - 93:17
**counsel** [25] - 4:4, 10:14, 13:25, 14:1, 17:10, 17:16, 18:5, 19:24, 20:1, 21:5, 21:8, 22:23, 23:10,

35:24, 47:14, 57:9, 57:21, 98:21, 99:25, 116:15, 116:19, 116:21, 117:3, 126:8, 137:3
**Counsel** [4] - 17:14, 21:6, 35:25, 113:20
**counsel's** [1] - 17:20
**countries** [2] - 59:12, 59:14
**country** [17] - 40:18, 61:22, 74:9, 74:11, 96:3, 102:23, 103:23, 111:5, 111:7, 112:2, 113:9, 118:12, 127:12, 127:23, 131:5, 132:23
**county** [1] - 55:4
**County** [1] - 117:19
**couple** [6] - 41:13, 58:15, 59:17, 83:8, 106:22, 116:7
**coupled** [1] - 76:21
**course** [13] - 22:21, 38:24, 97:21, 103:16, 108:18, 108:23, 109:6, 113:24, 113:25, 126:11, 129:6, 134:22, 134:25
**court** [28] - 4:22, 7:4, 9:8, 26:15, 48:3, 59:24, 89:16, 94:16, 96:19, 96:21, 97:5, 98:11, 98:14, 98:25, 111:9, 113:7, 115:6, 116:6, 117:15, 117:18, 118:13, 118:14, 122:23, 123:15, 125:7, 125:17, 130:15, 136:9
**COURT** [269] - 4:8, 4:11, 4:15, 4:21, 5:3, 5:7, 5:9, 5:12, 5:17, 5:19, 5:21, 5:24, 6:1, 6:8, 6:13, 6:17, 6:20, 7:3, 8:1, 8:5, 10:3, 10:11, 13:20, 13:22, 13:25, 14:3, 14:5, 14:8, 14:11, 17:8, 17:17, 17:22, 18:4, 18:14, 19:2, 19:7, 19:12, 20:5, 20:20, 21:4, 21:9, 21:13, 22:13, 22:17, 22:22, 22:25, 23:5, 23:8, 23:12, 23:15, 23:17, 23:20, 23:23, 23:25,

24:7, 25:5, 25:9, 25:13, 25:15, 25:17, 25:20, 26:1, 26:6, 26:18, 27:3, 27:18, 28:2, 28:20, 29:2, 29:5, 29:16, 30:16, 30:21, 30:24, 31:6, 31:18, 32:22, 33:15, 33:18, 33:22, 34:1, 35:21, 35:23, 36:14, 36:16, 36:18, 36:23, 36:25, 37:3, 37:7, 38:9, 38:25, 39:6, 39:13, 39:21, 41:12, 41:14, 43:16, 46:4, 47:7, 48:3, 48:11, 48:14, 48:18, 48:24, 49:6, 49:10, 49:19, 49:22, 50:4, 50:6, 50:12, 52:21, 53:9, 54:3, 54:6, 54:16, 56:2, 56:10, 56:17, 56:20, 56:23, 57:9, 57:12, 57:18, 57:23, 57:25, 58:4, 58:6, 59:1, 59:6, 59:21, 61:1, 61:8, 61:17, 61:24, 62:12, 62:15, 63:20, 63:23, 64:4, 65:14, 65:16, 70:2, 70:7, 70:13, 75:19, 76:5, 76:18, 77:6, 79:1, 79:14, 82:25, 87:18, 88:17, 88:21, 89:10, 89:16, 89:23, 90:5, 90:20, 90:25, 91:8, 91:20, 91:22, 92:11, 92:15, 92:22, 92:25, 93:6, 94:8, 95:4, 95:10, 95:19, 96:10, 96:21, 96:23, 96:25, 100:19, 100:24, 101:17, 101:25, 102:4, 102:8, 102:23, 103:7, 103:13, 103:20, 104:3, 104:6, 105:23, 106:11, 106:18, 106:21, 107:7, 107:11, 107:14, 107:25, 108:8, 108:18, 109:3, 109:13, 109:16, 110:3, 110:10, 110:25, 111:16, 111:19, 112:11, 112:24, 113:2, 113:5, 114:6, 114:10, 114:13, 114:18, 114:23,

115:1, 115:3, 115:22, 116:10, 117:23, 118:1, 118:8, 118:10, 119:9, 120:5, 120:13, 121:1, 121:9, 121:22, 122:8, 122:15, 122:19, 122:23, 123:2, 123:16, 123:20, 124:6, 125:3, 125:10, 125:20, 126:6, 126:11, 126:19, 127:5, 127:10, 127:17, 127:19, 128:1, 128:16, 129:6, 129:9, 129:22, 130:3, 130:7, 131:1, 132:6, 132:14, 132:24, 134:2, 134:22, 134:25, 136:13, 136:15, 137:10, 137:13, 137:20, 138:1
**Court** [63] - 6:12, 7:1, 7:11, 20:11, 22:18, 27:15, 32:11, 44:25, 55:25, 58:2, 59:23, 60:6, 60:7, 60:16, 64:20, 64:21, 64:23, 81:1, 90:16, 91:16, 93:21, 98:3, 100:7, 103:5, 104:1, 105:10, 106:14, 106:15, 106:16, 106:20, 107:20, 107:21, 108:13, 108:22, 109:6, 109:11, 111:13, 112:8, 115:23, 117:2, 120:9, 121:4, 121:11, 121:19, 121:22, 122:3, 122:17, 123:10, 125:19, 126:1, 128:18, 132:15, 132:16, 132:19, 134:6, 134:23, 135:16, 135:18, 136:6, 137:15
**court's** [1] - 100:25
**Court's** [11] - 24:5, 61:6, 90:17, 100:12, 100:15, 102:13, 102:17, 103:5, 105:25, 120:10, 121:3
**courthouse** [1] - 105:1

**courtroom** [2] - 129:12, 135:21
**Courts** [11] - 58:18, 64:22, 90:1, 94:13, 97:20, 98:16, 104:10, 105:3, 106:13, 111:25, 132:17
**courts** [15] - 47:13, 64:22, 97:23, 114:13, 127:1, 128:21, 129:4, 129:5, 129:7, 129:11, 129:15, 129:19, 129:20, 131:19, 132:4
**cover** [3] - 98:14, 102:9
**Cox** [2] - 4:10, 89:13
**created** [2] - 66:25, 79:13
**creating** [1] - 20:7
**credit** [3] - 69:19, 69:21, 69:25
**criminal** [2] - 95:20, 96:1
**critical** [1] - 96:14
**CROSS** [2] - 41:15, 83:1
**cROSS** [2] - 49:23, 54:17
**CROSS-EXAMINATION** [2] - 41:15, 83:1
**cROSS-EXAMINATION** [2] - 49:23, 54:17
**curiosity** [1] - 115:5
**currencies** [1] - 68:12
**current** [5] - 7:16, 51:13, 62:23, 113:17, 133:9
**customers** [4] - 72:20, 72:21, 72:23, 72:24
**cut** [1] - 78:11
**CV** [1] - 13:20

**D**

**D.C** [13] - 35:10, 36:11, 37:19, 38:8, 39:2, 94:17, 99:25, 105:4, 106:15, 107:4, 124:21, 125:20, 131:15
**daily** [1] - 93:10
**Dale** [2] - 36:14, 36:16
**damage** [2] - 98:12, 118:25

**data** [15] - 8:19, 14:25, 15:1, 15:2, 19:8, 30:3, 34:9, 40:4, 40:20, 40:21, 41:7, 41:10, 50:22, 51:13, 64:8
**database** [7] - 34:10, 40:4, 40:5, 41:5, 41:7, 71:10, 83:13
**databases** [4] - 34:10, 34:25, 39:18, 55:2
**date** [13] - 19:2, 19:4, 19:6, 25:6, 25:8, 25:12, 51:4, 52:13, 52:15, 53:1, 53:4, 55:5, 81:20
**DATE** [1] - 138:9
**dated** [1] - 54:13
**Davis** [1] - 4:20
**days** [7] - 77:9, 93:25, 100:2, 102:25, 113:21, 122:11
**de** [2] - 135:9, 135:10
**deal** [5] - 10:11, 40:25, 121:5, 132:6, 135:2
**dealing** [6] - 11:17, 14:23, 17:5, 64:10, 65:8, 132:1
**deals** [2] - 40:24, 68:22
**dealt** [1] - 44:15
**debate** [1] - 96:14
**December** [4] - 17:7, 19:5, 19:13, 24:15
**decentralized** [1] - 80:2
**decide** [10] - 69:12, 96:11, 109:12, 115:5, 115:9, 120:16, 120:17, 121:12, 122:8, 123:17
**decided** [4] - 125:7, 125:15, 125:16, 134:1
**decision** [2] - 107:21, 126:2
**decisions** [1] - 102:21
**declarant** [1] - 56:7
**declarants** [2] - 73:10, 77:16
**declaration** [21] - 6:6, 6:9, 27:7, 54:13, 54:25, 55:19, 56:3, 56:7, 62:1, 77:12, 80:11, 81:3, 81:4, 82:11, 82:14, 82:15, 82:20, 86:14, 86:19, 86:21, 90:22
**declarations** [4] - 6:1,

90:25, 91:14, 93:14
**decline** [2] - 120:18, 120:21
**declines** [1] - 122:3
**deep** [1] - 40:2
**deeper** [1] - 96:17
**default** [1] - 69:12
**defeat** [1] - 134:17
**defective** [1] - 100:21
**defects** [1] - 90:8
**defendant** [11] - 58:16, 87:1, 98:23, 101:22, 104:22, 121:15, 123:17, 123:18, 124:1, 124:14
**Defendant** [1] - 58:17
**defendant's** [1] - 101:22
**defendants** [16] - 74:24, 96:6, 98:22, 100:5, 104:20, 104:21, 104:22, 104:24, 124:5, 124:6, 124:7, 126:2, 130:8
**Defendants** [1] - 45:21
**defense** [1] - 22:23
**defer** [1] - 23:14
**definitely** [1] - 86:4
**definition** [1] - 84:12
**degree** [2] - 12:22, 43:7
**delay** [4] - 95:2, 125:18, 126:12, 136:1
**delayed** [1] - 56:25
**deliver** [1] - 65:23
**deliveries** [2] - 64:11, 64:16
**delivery** [3] - 63:22, 64:8, 65:1
**demand** [2] - 101:2, 131:21
**demands** [2] - 131:25, 132:2
**demonstrated** [1] - 123:22
**demonstrates** [2] - 124:24, 126:17
**demonstrative** [1] - 58:2
**denial** [1] - 60:19
**denied** [4] - 62:5, 108:14, 114:7, 129:5
**deny** [5] - 60:17, 120:17, 122:9, 134:3
**derive** [1] - 92:15
**describe** [12] - 15:15,

16:9, 32:11, 32:17, 35:16, 36:8, 38:9, 41:20, 62:16, 63:22, 67:5, 135:17
**described** [1] - 37:19
**describing** [1] - 106:20
**description** [1] - 7:19
**descriptive** [2] - 61:5, 129:17
**design** [3] - 8:11, 8:19, 11:15
**designated** [1] - 27:8
**designed** [7] - 8:13, 8:21, 61:3, 61:5, 79:10, 80:1, 129:17
**desires** [1] - 16:1
**despite** [2] - 98:8, 113:18
**destiny** [2] - 106:1, 106:4
**detailed** [1] - 53:23
**details** [2] - 42:18, 86:20
**deteriorated** [1] - 45:5
**determination** [6] - 39:24, 40:17, 44:20, 55:12, 55:17, 95:22
**determinations** [1] - 40:6
**determine** [13] - 14:18, 16:3, 16:19, 35:7, 36:6, 38:5, 55:6, 65:23, 67:14, 68:5, 80:13, 80:15, 122:9
**determined** [1] - 103:25
**deterrent** [2] - 119:15, 119:18
**developed** [2] - 32:14, 81:21
**developer** [1] - 41:23
**developers** [1] - 32:15
**development** [1] - 10:25
**device** [6] - 8:20, 66:24, 67:1, 67:20, 67:23
**devices** [2] - 66:12, 67:21
**devoted** [2] - 92:8, 92:13
**difference** [11] - 11:12, 13:5, 13:8, 28:23, 49:11, 79:22, 104:9, 111:12, 112:8, 112:14, 112:17
**differences** [3] - 15:4,

60:9, 116:13
**different** [35] - 11:7, 31:8, 35:7, 35:8, 37:22, 40:22, 45:20, 45:22, 46:25, 47:2, 47:4, 47:25, 48:2, 48:10, 48:21, 59:15, 59:16, 60:10, 67:13, 67:15, 70:8, 70:9, 76:11, 76:19, 85:17, 98:19, 104:12, 106:18, 115:10, 115:11, 115:12, 116:11, 119:6, 136:23
**differing** [2] - 46:13
**difficult** [3] - 55:15, 93:8, 130:14
**difficulty** [1] - 14:13
**digital** [1] - 30:22
**diligently** [1] - 122:24
**dire** [2] - 10:12, 10:15
**DIRE** [1] - 10:17
**DIRECT** [3] - 7:6, 14:15, 62:17
**direct** [7] - 54:19, 54:24, 73:6, 73:15, 75:8, 88:11, 92:19
**directed** [1] - 94:5
**directing** [2] - 73:20, 73:25
**direction** [1] - 73:8
**directly** [5] - 67:2, 75:12, 75:17, 80:10, 80:16
**directory** [1] - 69:10
**disagree** [1] - 121:24
**disappear** [1] - 109:8
**disclosed** [2] - 42:12, 124:4
**disclosure** [5] - 19:17, 42:13, 89:19, 126:4, 133:24
**discovery** [27] - 6:15, 27:10, 27:17, 56:9, 58:19, 81:8, 90:1, 90:2, 94:15, 95:17, 95:19, 96:2, 99:9, 101:22, 102:12, 104:14, 104:15, 114:12, 123:21, 123:25, 124:19, 124:22, 124:23, 124:25, 129:21, 132:12
**discretionary** [1] - 107:10
**discuss** [1] - 70:8
**discussed** [6] - 42:13, 58:22, 70:16, 71:7,

72:12, 73:9
**discussing** [3] -
22:25, 23:5, 86:13
**discussion** [1] - 15:14
**discussions** [3] -
42:17, 55:18, 55:19
**disingenuous** [1] -
98:9
**dismissed** [4] - 100:3,
100:4, 121:14,
132:18
**display** [2] - 68:25,
129:18
**displayed** [1] - 39:20
**dispositive** [1] - 125:7
**disputes** [5] - 47:8,
47:10, 47:11, 47:13,
69:22
**distillation** [1] -
102:16
**distinction** [2] - 47:25,
73:17
**distribute** [3] - 72:9,
72:10, 72:19
**distributed** [8] -
15:12, 16:5, 32:14,
53:18, 79:19, 79:23,
80:6, 80:12
**distributing** [2] -
74:12, 74:16
**distribution** [3] - 25:4,
72:12, 72:17
**distributions** [1] -
10:24
**District** [15] - 56:4,
59:22, 60:6, 64:23,
99:6, 105:24,
108:22, 115:23,
124:21, 125:19,
130:16, 130:18,
130:22, 130:24,
136:6
**district** [8] - 102:20,
103:23, 111:7,
112:1, 118:12,
127:11, 127:23,
128:22
**distro** [1] - 41:24
**division** [1] - 112:1
**DNS** [4] - 71:14,
71:17, 71:20
**docket** [1] - 105:20
**document** [44] - 17:1,
17:3, 17:9, 17:18,
19:3, 19:5, 20:15,
20:16, 20:17, 21:1,
21:17, 21:18, 21:20,
21:23, 24:22, 24:24,
25:23, 25:24, 26:2,
26:9, 26:15, 26:16,

28:21, 30:20, 31:21,
31:22, 31:24, 31:25,
32:2, 35:15, 35:17,
35:19, 35:20, 36:2,
36:4, 36:22, 37:12,
38:1, 38:3, 52:23,
59:6, 59:8, 60:20
**documentation** [1] -
39:15
**documents** [4] - 18:8,
18:9, 18:11, 35:18
**Dodge** [1] - 119:8
**doe** [1] - 121:15
**Doe** [8] - 45:20, 55:7,
58:16, 75:8, 98:22,
98:23, 123:5, 130:8
**dollar** [1] - 93:19
**dollars** [1] - 97:14
**domain** [1] - 71:15
**done** [16] - 38:23,
67:11, 67:24, 67:25,
74:2, 74:3, 85:3,
85:20, 87:5, 87:10,
101:7, 101:23,
117:10, 122:14,
122:19, 124:9,
129:4, 130:4
**double** [1] - 131:6
**down** [8] - 15:11, 40:3,
51:18, 78:24, 86:24,
92:22, 93:8, 98:5
**download** [20] - 10:23,
15:25, 16:21, 16:22,
28:5, 28:11, 28:12,
28:17, 29:11, 30:25,
33:7, 33:9, 41:18,
41:21, 48:23, 49:5,
51:12, 51:14, 51:15,
73:25, 76:21, 78:19,
82:3, 82:5, 82:8,
82:10, 84:13, 84:23,
85:16
**downloaded** [12] -
18:22, 25:3, 28:4,
49:12, 50:17, 50:25,
51:1, 76:5, 76:8,
78:5, 78:9, 101:5
**downloader** [1] -
49:17
**downloader's** [2] -
16:18, 16:23
**downloaders** [1] -
85:22
**downloading** [8] -
11:4, 16:7, 26:25,
27:22, 41:23, 73:15,
75:11, 85:19
**downloads** [1] - 77:24
**downstairs** [1] -
118:21
**draconian** [1] - 107:18

drawing [1] - 93:14
**drawn** [1] - 52:7
**dream** [1] - 131:22
**drop** [4] - 77:19,
77:23, 78:18, 95:1
**dropped** [1] - 77:21
**due** [2] - 113:20, 136:7
**duly** [2] - 6:23, 62:9
**during** [7] - 17:6,
28:17, 31:5, 51:1,
51:19, 57:13, 123:25
**duties** [2] - 63:12,
63:16

# E

**e-commerce** [7] -
41:1, 41:2, 41:6,
41:10, 69:18, 69:23
**early** [3] - 8:10, 114:11
**easier** [1] - 85:16
**easily** [1] - 115:22
**Eastern** [1] - 56:3
**ECF** [3] - 62:4, 93:1,
109:25
**echoing** [1] - 126:21
**ECN** [1] - 48:15
**eComp** [2] - 7:18, 8:3
**ECOMP** [1] - 8:3
**economy** [1] - 62:14
**editor** [1] - 118:15
**EFF** [6] - 5:9, 63:12,
105:5, 126:21,
126:22, 131:4
**effect** [5] - 48:23,
103:22, 119:1,
119:15, 119:19
**effective** [1] - 133:17
**effectively** [2] - 78:10,
127:1
**effects** [1] - 119:2
**efficient** [1] - 72:8
**effort** [1] - 95:21
**eight** [1] - 66:1
**either** [6] - 22:5, 24:3,
52:10, 56:12, 61:17,
74:1, 79:21, 81:7,
93:20, 95:2, 99:8,
107:22, 110:16,
120:15, 122:6,
123:14, 123:17,
133:5
**Electronic** [3] - 4:17,
6:5, 62:24
**eleven** [1] - 30:5
**elsewhere** [3] -
124:21, 130:17,
131:8
**email** [8] - 14:2, 18:7,

18:11, 87:6, 87:8,
87:9, 87:11, 97:4
**emailed** [1] - 15:20
**emboldened** [1] -
111:2
**embracing** [1] -
127:10
**empirical** [2] - 77:11,
77:22
**employed** [1] - 46:17
**employees** [2] - 92:9,
92:11
**employer** [1] - 17:20
**employment** [2] -
7:16, 7:19
**encourage** [1] - 126:1
**encryption** [1] - 8:19
**encryptors** [1] - 8:22
**end** [8] - 32:3, 33:4,
33:18, 39:19, 40:9,
108:15, 123:23,
137:6
**enforcement** [1] - 94:4
**enforcing** [1] - 127:20
**engage** [4] - 96:14,
101:6, 105:15,
123:23
**engaged** [3] - 101:12,
113:6, 127:6
**engaging** [2] - 119:12,
119:17
**engineering** [1] - 8:12
**engineers** [1] - 12:7
**enhance** [1] - 40:20
**enhanced** [2] - 15:1,
40:21
**enjoy** [1] - 29:20
**enlisting** [1] - 127:1
**enormous** [1] - 74:7
**ensure** [1] - 72:21
**enter** [1] - 38:18
**entered** [1] - 30:13
**entertainment** [1] -
68:22
**entire** [6] - 20:13,
20:21, 21:4, 21:6,
85:14, 132:18
**entitled** [2] - 24:21,
101:1, 138:5
**environment** [2] -
131:18, 132:3
**Envisional** [4] - 19:21,
19:22, 22:4, 22:9
**equivalently** [1] -
65:25
**especially** [3] - 69:8,
72:9, 131:25
**essentially** [6] - 64:17,
68:24, 79:25, 81:22,
85:20, 86:15, 112:9,

123:7
**established** [2] -
66:17, 112:3
**Estimate** [1] - 21:25
**estimate** [6] - 44:5,
67:9, 67:19, 67:22,
68:2, 68:9
**estimated** [2] - 51:12,
51:14
**et** [2] - 4:3, 128:14
**ETA** [1] - 51:7
**evaluate** [1] - 91:25,
95:13, 95:21, 118:14
**evaluating** [1] - 91:22,
106:8
**event** [3] - 57:21,
122:3, 122:13
**evidence** [22] - 9:16,
14:7, 20:11, 22:20,
24:10, 30:14, 30:17,
33:17, 33:24, 37:8,
59:2, 60:18, 64:25,
80:7, 80:8, 80:16,
86:25, 91:17, 96:3,
96:4, 104:17, 124:9
**Evidence** [1] - 14:11
**evidencing** [1] - 58:9
**evidentiary** [2] - 27:9,
93:7
**ex** [5] - 27:15, 94:24,
97:19, 99:9, 100:2
**exact** [4] - 32:20,
110:22, 113:23,
117:17
**exactly** [11] - 11:18,
20:9, 20:15, 46:11,
60:13, 60:14, 61:15,
84:6, 94:10, 129:25,
130:3
**examination** [2] -
20:3, 31:10
**EXAMINATION** [7] -
7:6, 14:15, 41:15,
49:23, 54:17, 62:17,
83:1
**examine** [1] - 35:6
**examined** [4] - 6:24,
13:4, 13:8, 62:10
**example** [28] - 12:20,
13:10, 34:22, 40:25,
43:10, 53:23, 67:14,
68:5, 68:17, 68:20,
72:16, 74:11, 74:16,
81:19, 84:19, 87:6,
88:5, 88:7, 93:24,
98:21, 99:24,
100:14, 125:9,
127:9, 130:9,
130:17, 131:12,
132:20

examples [1] - 83:25
Excel [1] - 97:17
except [5] - 5:6, 6:14, 94:3, 100:16, 128:12
exception [1] - 76:16
exceptions [1] - 34:21
excerpt [3] - 20:12, 20:21, 20:23
excerpting [1] - 76:9
excited [1] - 132:21
exclusively [1] - 79:11
Excuse [1] - 23:20
excuse [8] - 17:8, 63:15, 66:20, 75:9, 75:19, 75:25, 122:23, 135:3
excused [3] - 56:21, 57:5, 88:19
execute [1] - 33:6
exhibit [15] - 13:23, 14:3, 20:22, 24:1, 27:7, 38:21, 50:10, 52:3, 52:7, 52:17, 52:18, 52:25, 58:2, 61:3, 137:15
Exhibit [33] - 14:4, 14:5, 14:7, 16:25, 20:15, 20:20, 20:23, 21:1, 21:12, 21:17, 21:20, 21:21, 21:24, 22:11, 26:2, 26:5, 26:8, 30:13, 30:17, 33:24, 35:16, 36:23, 37:1, 37:4, 37:8, 37:10, 37:25, 48:15, 50:1, 50:9, 52:8, 55:8
Exhibits [2] - 23:21, 24:10
exhibits [2] - 137:13, 137:21
existed [1] - 15:5
expansive [1] - 59:18
expectation [3] - 30:9, 30:11, 46:12
expecting [1] - 91:3
expedited [3] - 56:8, 81:8, 109:5
expeditiously [1] - 125:21
expense [2] - 90:2, 127:21
experience [9] - 8:9, 8:23, 9:1, 9:6, 10:19, 11:4, 12:14, 32:25, 69:1
experiences [1] - 9:10
expert [17] - 9:6, 9:7, 9:25, 10:7, 11:19, 13:1, 14:9, 18:8,

30:6, 34:13, 55:11, 56:15, 62:14, 64:15, 65:12, 65:16, 85:13
expertise [5] - 10:22, 12:14, 12:15, 30:22, 33:12
explain [1] - 20:15
explained [1] - 82:12
explanation [1] - 91:2
explicitly [1] - 11:6
explore [2] - 6:10, 104:3
expressed [2] - 126:22, 126:23
expression [1] - 103:8
extend [1] - 68:19
extensive [1] - 54:7
extent [4] - 11:3, 61:25, 92:16, 120:20
extrajudicial [1] - 132:5

F

Facebook [2] - 68:7, 88:5
facial [1] - 103:8
facilitate [1] - 132:4
facilitates [1] - 73:4
fact [28] - 8:10, 9:4, 21:20, 27:9, 35:6, 43:14, 43:25, 44:7, 59:14, 64:10, 75:14, 76:20, 86:17, 98:8, 98:15, 99:11, 104:22, 105:14, 110:12, 110:21, 112:16, 114:1, 119:4, 119:11, 124:13, 133:10, 133:19
facto [2] - 135:9, 135:10
factor [2] - 9:18, 46:24
factors [4] - 35:3, 40:1, 41:9, 115:10
facts [6] - 44:16, 45:15, 46:14, 59:15, 116:13, 117:1
factual [3] - 48:2, 90:20, 91:9
fail [1] - 82:4
fails [1] - 89:17
failure [1] - 101:19
fair [7] - 86:16, 86:22, 87:16, 91:25, 106:17, 123:15
fairly [1] - 90:25, 91:12, 91:23

fairness [1] - 132:2
faith [15] - 42:24, 43:4, 43:13, 43:15, 43:20, 43:25, 44:5, 44:7, 44:21, 45:10, 47:14, 47:16, 48:4, 48:7, 101:10
fall [1] - 76:23
fallen [1] - 84:15
familiar [5] - 21:17, 26:21, 31:22, 31:24, 72:13
far [8] - 36:14, 36:16, 73:11, 114:5, 122:19, 133:10, 133:11, 133:17
fast [1] - 118:20
faster [1] - 85:16
favor [3] - 113:20, 116:16, 116:17
fax [1] - 97:4
FBI [1] - 94:5
features [2] - 87:7, 87:13
Federal [5] - 14:11, 64:22, 105:10, 105:24, 135:16
federal [1] - 132:7
FedEx [1] - 97:16
fee [1] - 136:10
fees [1] - 136:3
feet [1] - 104:7
few [5] - 40:3, 49:20, 100:2, 102:18, 111:1
field [4] - 9:20, 10:7, 11:9, 75:24
fifth [1] - 118:21
fifty [1] - 98:2
fight [1] - 98:9
fighting [3] - 116:16, 116:18, 116:23
figure [1] - 119:16
figures [1] - 32:20
file [56] - 11:25, 12:2, 12:3, 12:4, 12:6, 12:8, 15:18, 15:25, 16:4, 16:13, 16:21, 26:15, 26:25, 27:23, 29:4, 42:2, 45:21, 49:5, 49:12, 49:15, 49:16, 50:21, 60:11, 64:13, 65:13, 72:7, 76:5, 76:8, 76:21, 76:25, 77:1, 78:9, 78:22, 80:2, 81:18, 84:17, 85:8, 94:22, 96:7, 105:9, 109:23, 110:5, 112:5, 113:6, 115:5, 115:6, 115:7, 115:9, 119:14,

123:4, 123:5, 127:12, 128:21, 131:8
file-sharing [22] - 11:25, 12:2, 12:3, 12:4, 12:8, 42:2, 45:21, 60:11, 64:13, 65:13, 72:7, 80:2, 96:7, 105:9, 112:5, 113:6, 115:6, 115:9, 119:14, 123:4, 123:5, 127:12
filed [16] - 52:1, 56:3, 58:9, 59:3, 60:18, 97:10, 99:20, 99:25, 100:20, 101:3, 121:13, 127:11, 131:1, 131:6, 132:12
files [11] - 15:10, 15:11, 28:4, 42:1, 51:17, 72:9, 72:10, 72:17, 73:25, 75:11, 79:13
filing [2] - 127:21, 129:25
filings [2] - 61:22, 94:17
final [1] - 105:21
finally [2] - 40:6, 121:18
financial [3] - 113:13, 116:24, 135:15
fine [6] - 19:25, 58:4, 62:15, 101:24, 116:25, 117:14
finish [6] - 18:17, 20:3, 23:20, 57:20, 85:7, 97:2
finished [2] - 48:12, 77:24
firm [18] - 7:18, 42:6, 58:9, 59:10, 59:11, 59:13, 61:13, 61:14, 61:15, 61:16, 61:20, 61:21, 61:23, 63:11, 112:20, 113:7, 128:19
first [20] - 6:23, 8:19, 9:19, 10:4, 21:7, 22:8, 23:9, 35:12, 58:12, 59:7, 62:9, 72:9, 75:8, 93:11, 97:4, 101:18, 110:19, 111:10, 121:3
firsthand [2] - 39:9, 39:10
five [4] - 5:4, 9:9, 37:23, 45:9
flavors [1] - 98:20

flight [1] - 18:10
floating [1] - 84:22
floor [1] - 118:21
Florida [9] - 7:11, 35:9, 36:12, 37:15, 116:6, 116:8, 132:11, 132:15, 132:16
focal [1] - 94:16
focus [3] - 55:13, 61:11, 89:23
focused [1] - 111:16
follow [1] - 50:15
followed [1] - 113:8
following [1] - 50:1
follows [2] - 6:25, 62:11
foregoing [1] - 138:4
forensic [4] - 7:24, 30:22, 31:10, 42:7
form [1] - 44:7
forms [1] - 43:25
forth [2] - 42:18, 86:21
forum [2] - 103:22, 128:10
forward [4] - 4:4, 6:20, 89:10, 120:10, 120:11
forwarded [1] - 35:24
foundation [4] - 21:3, 23:1, 27:12, 38:24
Foundation [3] - 4:17, 6:6, 62:25
foundational [1] - 24:4
four [4] - 5:4, 8:14, 51:7, 66:1
fox [5] - 54:3, 104:6, 118:22, 121:1, 133:3
FOX [50] - 4:9, 5:6, 18:6, 54:4, 54:8, 54:18, 54:22, 54:23, 56:5, 56:14, 56:19, 57:17, 89:8, 89:13, 89:22, 89:25, 90:22, 91:7, 91:14, 91:21, 92:6, 92:12, 92:18, 102:11, 102:24, 103:12, 103:18, 103:21, 104:5, 105:17, 106:10, 106:13, 106:19, 107:6, 107:8, 107:12, 107:15, 108:4, 108:10, 109:2, 109:4, 120:25, 121:2, 121:10, 122:2, 122:13, 122:17, 134:20, 134:23,

137:12

**Fox** [6] - 4:9, 5:4, 7:10, 89:13, 135:4, 137:9
**frame** [2] - 19:11, 19:12
**France** [1] - 68:10
**Francisco** [2] - 62:25, 64:23
**frankly** [3] - 47:21, 91:2, 115:11
**fraud** [2] - 69:14, 69:15
**fraudulent** [1] - 69:22
**fraudulently** [1] - 69:25
**French** [1] - 68:11
**Frendfield** [1] - 90:23
**frequently** [1] - 67:24
**Friday** [1] - 14:18
**front** [3] - 50:3, 114:7, 114:17
**Frontier** [3] - 4:17, 6:5, 62:24
**full** [5] - 19:23, 42:13, 62:21, 92:9, 129:11
**full-time** [1] - 92:9
**fully** [2] - 42:12, 47:15
**function** [3] - 28:16, 28:17, 127:2
**functionalities** [1] - 80:6
**future** [2] - 85:16, 124:5

## G

**gain** [1] - 40:24
**game** [4] - 72:18, 72:22, 113:10, 136:4
**games** [1] - 72:19
**gamut** [1] - 105:2
**Gate** [1] - 7:10
**gather** [1] - 80:16
**gathered** [3] - 80:17, 80:20, 130:13
**gathering** [1] - 80:19
**general** [9] - 10:7, 12:15, 41:20, 45:4, 60:8, 81:9, 81:20, 83:10, 86:9
**generally** [7] - 40:12, 40:16, 62:16, 68:7, 74:14, 81:11, 89:9
**generated** [1] - 15:1
**generates** [1] - 107:8
**generating** [1] - 105:18
**genre** [1] - 132:1
**geographic** [1] - 71:23

**geographical** [1] - 34:9
**geolocated** [1] - 128:14
**geolocation** [75] - 6:11, 9:2, 9:3, 10:10, 12:13, 12:18, 12:24, 13:2, 13:5, 13:6, 13:9, 13:10, 13:16, 14:23, 14:24, 14:25, 34:5, 34:6, 34:7, 34:14, 34:18, 35:6, 37:20, 39:24, 40:11, 41:7, 42:4, 42:5, 42:11, 42:16, 43:3, 43:24, 44:3, 44:20, 45:4, 45:10, 45:25, 46:18, 46:21, 47:9, 47:10, 47:11, 47:14, 47:15, 47:17, 47:20, 47:21, 48:6, 53:11, 53:16, 53:22, 58:23, 65:12, 67:4, 67:5, 67:7, 67:16, 67:17, 67:22, 68:4, 68:8, 68:23, 69:6, 69:12, 69:14, 70:5, 70:10, 70:17, 70:19, 71:3, 80:25, 83:9, 83:11, 83:13, 83:20
**geolocational** [3] - 42:24, 54:10, 55:20
**German** [1] - 68:8
**Germany** [2] - 68:7, 68:10
**ghost** [1] - 105:15
**given** [16] - 29:16, 45:23, 51:12, 60:9, 73:2, 73:14, 74:1, 74:9, 74:19, 78:5, 78:25, 118:11, 120:4, 120:7, 131:25, 132:7
**glad** [1] - 104:6
**glancing** [1] - 59:15
**glaringly** [1] - 59:16
**global** [2] - 67:15, 74:8
**goal** [3] - 109:24, 112:20, 112:21
**goods** [5] - 68:13, 69:5, 69:6, 69:20, 70:1
**Google** [4] - 68:7, 88:5, 88:8, 88:10
**GPS** [5] - 12:17, 13:5, 13:9, 67:25, 68:3
**graduated** [1] - 133:11
**grant** [4] - 99:9, 120:17, 122:8, 134:3

**granted** [3] - 59:18, 97:19, 125:1
**gray** [1] - 51:6
**great** [3] - 5:3, 29:18, 97:5
**grew** [1] - 98:7
**ground** [2] - 111:11, 112:7
**grounds** [4] - 10:4, 90:3, 100:19, 100:25
**group** [1] - 92:7
**groups** [2] - 119:23, 119:24
**grow** [1] - 75:14
**grumbling** [1] - 54:9
**guess** [5] - 86:17, 86:20, 87:2, 88:13, 120:18
**guessing** [1] - 86:15
**guideline** [1] - 135:6
**guys** [2] - 57:14, 106:25

## H

**half** [3] - 28:19, 29:7, 51:18
**hand** [4] - 6:21, 13:10, 28:7, 111:4
**handed** [1] - 25:23
**handful** [1] - 58:16
**handfuls** [1] - 103:1
**handle** [1] - 93:16
**handled** [1] - 99:18
**handles** [1] - 59:11
**hands** [2] - 104:18, 129:11
**handy** [1] - 50:1
**Hansmeier** [20] - 27:7, 27:11, 42:6, 42:11, 54:13, 54:25, 55:19, 55:24, 56:1, 56:3, 56:6, 61:20, 61:22, 80:10, 81:5, 81:21, 82:12
**Hansmeier's** [3] - 82:10, 86:13, 86:14
**Hansmeiers** [1] - 55:23
**happy** [2] - 20:1, 118:4
**hard** [2] - 87:13, 103:15
**hardware** [1] - 8:11
**hash** [2] - 79:19, 79:23
**hat** [1] - 105:17
**hate** [1] - 79:8
**Hawaii** [1] - 106:16
**head** [1] - 91:5
**hear** [9] - 14:8, 18:14,

23:9, 29:22, 37:2, 103:5, 106:7, 118:21, 122:20
**heard** [8] - 21:12, 22:23, 25:18, 42:12, 42:17, 46:3, 56:1, 117:2
**hearing** [6] - 13:23, 22:13, 22:17, 22:20, 29:16, 137:8
**hearsay** [1] - 24:1
**heart** [1] - 104:8
**heavily** [1] - 8:10
**held** [8] - 63:1, 107:13, 107:15, 107:17, 110:6, 117:7, 120:22, 130:17
**help** [1] - 60:11
**helpful** [7] - 113:5, 118:14, 119:20, 119:21, 119:24, 121:4, 122:4
**herself** [1] - 76:14
**hesitate** [1] - 29:22
**hewing** [1] - 123:11
**high** [1] - 8:19
**higher** [1] - 59:23
**himself** [1] - 61:19
**hire** [1] - 94:10
**hired** [1] - 19:23
**hiring** [3] - 93:15, 94:8, 94:19
**histories** [1] - 46:8
**history** [4] - 31:8, 31:14, 97:12, 111:4
**hit** [1] - 41:2
**hold** [3] - 17:24, 27:3, 103:1
**holders** [1] - 124:10
**holding** [4] - 16:14, 19:3, 107:4, 136:4
**Holdings** [5] - 4:2, 4:7, 45:9, 52:1, 52:10
**holds** [2] - 79:3, 111:13
**hole** [1] - 96:17
**home** [4] - 35:9, 66:12, 67:17, 88:8
**honest** [2] - 106:9, 129:14
**Honor** [153] - 4:6, 4:9, 4:12, 4:19, 5:2, 5:8, 5:11, 5:16, 5:18, 5:20, 5:22, 6:4, 6:14, 6:19, 7:1, 8:6, 9:24, 10:2, 10:5, 10:16, 13:18, 13:21, 13:24, 14:4, 14:10, 14:12, 17:11, 17:19, 18:2, 18:6, 18:12, 19:15,

19:18, 19:22, 20:4, 20:25, 21:3, 21:12, 22:16, 23:3, 23:14, 23:19, 23:22, 23:24, 24:11, 25:18, 25:21, 26:4, 26:5, 26:13, 26:19, 27:1, 27:6, 27:24, 29:15, 30:15, 30:18, 31:19, 33:11, 33:14, 33:20, 33:25, 34:3, 35:13, 35:22, 35:25, 36:19, 36:20, 36:24, 37:2, 37:5, 37:6, 38:20, 39:5, 41:13, 43:14, 46:1, 48:13, 49:18, 49:20, 50:5, 50:11, 52:20, 53:8, 54:1, 54:4, 54:22, 55:22, 56:5, 57:17, 57:24, 58:1, 58:8, 58:22, 58:25, 59:4, 59:19, 60:25, 61:18, 62:6, 62:13, 65:17, 76:15, 82:24, 88:20, 89:8, 89:22, 89:25, 90:15, 91:7, 91:14, 92:24, 93:13, 95:9, 95:18, 96:13, 96:22, 97:11, 99:12, 99:24, 101:14, 101:21, 102:11, 109:14, 110:2, 114:19, 114:22, 117:21, 120:25, 122:22, 123:3, 123:4, 123:19, 124:2, 125:13, 125:25, 126:9, 126:10, 126:15, 126:17, 127:24, 129:18, 132:9, 132:25, 133:1, 133:12, 133:18, 133:21, 134:19, 134:20, 137:12, 137:18
**Honor's** [4] - 70:11, 94:16, 97:22, 99:4
**hope** [3] - 57:3, 75:24, 126:17
**hopefully** [1] - 103:3
**hoping** [2] - 27:8, 94:15
**hour** [1] - 50:5
**hours** [1] - 51:7
**house** [1] - 92:13
**House** [2] - 4:10, 89:13
**Howell** [1] - 50:16
**HUFFMAN** [60] - 4:12,

5:8, 6:4, 6:10, 6:14, 10:2, 10:4, 10:16, 10:18, 13:18, 18:7, 27:1, 27:6, 35:18, 38:20, 41:13, 41:16, 43:21, 46:15, 47:24, 48:9, 48:13, 58:1, 58:5, 58:7, 60:23, 61:18, 62:6, 62:18, 63:21, 64:7, 65:11, 65:17, 65:18, 70:4, 70:8, 70:14, 78:3, 82:23, 117:21, 117:24, 118:3, 126:9, 126:14, 126:20, 127:7, 127:14, 127:18, 127:24, 128:2, 129:4, 129:7, 129:16, 130:2, 130:4, 130:11, 131:10, 132:9, 132:15, 132:25

**Huffman** [10] - 4:12, 5:6, 17:15, 21:7, 35:25, 47:23, 60:22, 70:2, 90:18, 113:21

**huge** [1] - 129:9

**Hulu** [3] - 68:21, 68:23, 83:9

**human** [1] - 71:18

**hundred** [2] - 98:2

**hundreds** [4] - 97:10, 105:8, 105:18, 127:12

**Hurt** [1] - 97:7

**hurting** [1] - 119:4

**hypothetically** [1] - 83:15

## I

**idea** [7] - 39:11, 44:17, 47:6, 53:15, 60:14, 61:17, 85:24

**ideas** [1] - 115:12

**identifiable** [3] - 18:24, 88:14, 108:17

**identification** [1] - 108:12

**identifications** [1] - 93:25

**identified** [7] - 24:13, 37:14, 38:7, 49:8, 101:5, 101:12, 119:12

**identifier** [1] - 66:5

**identify** [8] - 20:14, 38:12, 55:3, 65:21,

66:3, 66:7, 88:4, 123:8

**identifying** [5] - 17:7, 29:13, 66:8, 88:1, 134:5

**identities** [1] - 126:4

**identity** [1] - 71:22

**ignored** [1] - 137:3

**ignoring** [2] - 114:2, 137:7

**illegally** [1] - 101:5

**Illinois** [7] - 99:6, 116:2, 116:3, 117:18, 130:18, 130:23, 130:24

**Image** [2] - 100:1, 102:21

**imagine** [2] - 87:14, 130:19

**immediately** [2] - 81:13, 120:9

**impact** [2] - 112:6, 131:16

**impacts** [1] - 80:16

**implementation** [1] - 126:25

**implemented** [4] - 79:11, 80:5, 87:9, 94:11

**implementing** [2] - 8:21, 85:23

**important** [6] - 83:20, 108:10, 108:20, 116:1, 126:16, 135:20

**imposed** [1] - 134:10

**impression** [1] - 125:23

**improper** [1] - 27:17

**improperly** [1] - 6:15

**improve** [1] - 86:5

**improved** [2] - 45:5, 45:7

**improving** [1] - 47:9

**impugn** [1] - 116:19

**in-house** [1] - 92:13

**inability** [1] - 27:16

**inaccurate** [2] - 39:9, 84:21

**inactivity** [1] - 101:6

**inappropriate** [1] - 122:10

**Inc** [1] - 45:9

**incentive** [2] - 86:4, 86:10

**include** [2] - 37:13, 74:17

**included** [4] - 19:17, 53:20, 58:17, 61:5

**including** [1] - 92:13

**incomplete** [1] - 16:15

**Incorporated** [1] - 32:15

**incorrect** [1] - 41:8

**increased** [1] - 85:15

**independent** [3] - 7:17, 13:15, 103:4

**index** [1] - 16:6

**indicate** [6] - 33:10, 35:3, 39:16, 46:22, 53:4

**indicated** [3] - 45:24, 48:20, 135:18

**indicates** [4] - 16:6, 22:8, 25:3, 71:10

**indicating** [3] - 16:16, 18:21, 68:9

**indication** [5] - 35:1, 39:14, 71:21, 71:23, 82:15

**indications** [1] - 50:17

**indicator** [1] - 44:21

**individual** [19] - 13:11, 34:23, 36:5, 41:4, 43:4, 44:8, 66:3, 72:2, 74:5, 75:4, 75:5, 75:6, 75:8, 105:6, 105:7, 105:11, 127:11, 131:7, 133:5

**individuals** [3] - 27:11, 44:19, 74:5

**indulge** [1] - 21:11

**indulgence** [1] - 126:14

**industry** [1] - 34:8

**industrywide** [1] - 130:5

**inexact** [1] - 47:10

**infancy** [1] - 93:15

**inform** [1] - 55:24

**informal** [1] - 22:14

**informality** [1] - 29:16

**information** [60] - 12:21, 14:19, 16:3, 16:11, 16:13, 16:16, 16:18, 22:5, 28:5, 28:10, 28:11, 28:17, 29:14, 31:3, 31:4, 31:10, 31:14, 34:11, 34:20, 38:15, 39:12, 39:17, 39:18, 40:10, 40:13, 40:15, 40:16, 40:23, 40:24, 41:4, 47:9, 47:10, 47:14, 53:17, 53:20, 55:6, 70:19, 71:2, 71:4, 73:2, 73:20, 73:21, 73:22, 81:17, 81:19, 85:14, 87:2, 87:11,

87:21, 87:22, 88:11, 88:15, 88:16, 95:15, 108:14, 108:17, 109:8, 117:5, 130:13, 134:5

**informed** [1] - 86:20

**infraction** [1] - 9:15

**infringed** [2] - 87:21, 124:14

**infringement** [9] - 45:22, 98:16, 101:11, 101:20, 104:17, 104:18, 105:11, 115:14, 133:12

**infringers** [1] - 115:16

**infringing** [7] - 101:6, 101:13, 119:4, 119:13, 123:23, 127:6, 130:9

**Infringing** [1] - 21:25

**initiate** [1] - 127:22

**ink** [1] - 129:10

**innocent** [1] - 113:13

**innuendos** [1] - 113:18

**inquire** [1] - 88:23

**inside** [3] - 16:6, 66:15, 68:3

**insofar** [1] - 6:14

**inspect** [1] - 21:10

**installed** [1] - 76:3

**instance** [6] - 8:19, 10:24, 39:16, 115:13, 116:6, 116:14

**instead** [5] - 59:9, 93:22, 100:5, 105:8, 105:10

**Institute** [1] - 8:14

**instructed** [1] - 120:9

**integrity** [1] - 130:12

**intend** [1] - 6:4

**intent** [1] - 124:12

**interest** [7] - 6:11, 16:23, 74:10, 80:14, 113:14, 113:17, 121:3

**interested** [3] - 73:22, 92:25, 109:4

**interesting** [4] - 87:24, 95:11, 104:12, 110:16

**interests** [1] - 15:22

**internal** [4] - 66:18, 66:22, 66:25

**internet** [49] - 8:9, 8:16, 9:25, 10:6, 11:8, 16:5, 31:7, 34:8, 43:5, 44:22,

45:12, 46:23, 55:1, 55:3, 55:5, 63:13, 63:16, 63:17, 63:20, 63:23, 63:25, 64:3, 64:5, 64:8, 64:11, 64:16, 65:2, 65:22, 66:4, 66:16, 66:21, 66:23, 67:2, 67:21, 70:24, 71:10, 71:16, 71:18, 71:19, 71:22, 123:7, 123:9, 124:3, 124:4, 124:7, 124:10

**Internet** [4] - 4:13, 22:1, 71:8

**interpret** [1] - 132:8

**interpreted** [3] - 102:6, 102:7, 102:8

**interrupt** [1] - 57:19

**interrupting** [1] - 29:17

**introduce** [4] - 22:19, 58:2, 73:6, 79:8

**introducing** [3] - 73:5, 73:13, 80:3

**introduction** [3] - 23:2, 23:4, 23:9

**invented** [2] - 72:8, 80:5

**investigation** [2] - 32:1, 123:20

**investigations** [1] - 7:24

**investigator** [1] - 42:8

**investing** [1] - 94:9

**invited** [1] - 133:15

**involve** [4] - 63:13, 65:1, 74:4

**involved** [14] - 7:21, 7:24, 8:11, 8:18, 10:24, 14:17, 28:11, 30:24, 40:1, 45:20, 46:7, 63:16, 78:8, 115:14

**involving** [4] - 7:24, 9:15, 13:9, 58:10

**IP** [110] - 10:10, 12:13, 12:22, 12:24, 13:2, 13:6, 13:11, 13:15, 16:8, 29:8, 29:9, 29:12, 30:4, 30:7, 30:24, 31:12, 31:15, 34:8, 34:10, 34:19, 34:24, 38:12, 38:14, 38:18, 40:6, 40:8, 40:9, 41:3, 42:4, 42:5, 42:10, 43:3, 43:6, 43:24, 44:19, 44:20, 45:3, 47:12, 47:18, 48:5, 48:20, 50:16, 52:4, 52:7,

52:16, 52:25, 53:14, 55:6, 55:12, 58:22, 65:8, 65:10, 65:19, 65:21, 65:24, 66:3, 66:5, 66:11, 66:22, 67:5, 67:7, 67:8, 67:10, 67:15, 67:17, 67:22, 68:4, 71:11, 71:20, 71:24, 80:19, 80:20, 81:2, 81:13, 81:15, 81:23, 81:25, 82:2, 82:9, 88:1, 88:7, 88:8, 88:10, 88:15, 92:19, 93:2, 93:9, 93:25, 96:6, 97:9, 97:14, 100:17, 101:5, 101:11, 104:19, 105:6, 105:9, 109:7, 119:11, 121:16, 123:23, 127:13, 128:13, 128:22, 131:5, 131:11

**IP2** [2] - 38:6, 53:23

**IPs** [1] - 98:1

**ironically** [1] - 17:20

**irritated** [1] - 68:20

**ISP** [16] - 53:12, 53:16, 53:20, 55:3, 66:20, 87:23, 88:4, 92:12, 92:15, 98:21, 105:17, 108:25, 115:23, 115:25, 119:11, 120:18

**ISP's** [2] - 105:4, 120:18

**ISPs** [54] - 5:5, 6:2, 40:12, 59:24, 60:20, 60:21, 60:23, 61:1, 61:2, 87:18, 88:10, 89:3, 89:7, 89:12, 90:6, 90:7, 90:9, 90:11, 90:12, 91:10, 95:5, 95:12, 95:14, 95:16, 95:25, 96:10, 97:24, 101:9, 101:14, 103:13, 104:19, 105:8, 105:12, 108:14, 109:6, 110:4, 111:5, 111:12, 111:19, 113:12, 115:4, 115:7, 116:2, 116:3, 119:9, 120:2, 120:19, 122:5, 125:2, 131:4, 132:18, 133:7, 134:4, 135:9

**ISPs'** [1] - 118:6

**issue** [44] - 20:2, 42:4,

58:24, 59:5, 59:25, 86:7, 86:12, 88:2, 92:20, 97:9, 101:4, 104:8, 105:3, 108:4, 108:10, 109:1, 109:7, 110:11, 111:16, 111:20, 111:25, 112:14, 113:8, 114:6, 115:7, 115:22, 117:6, 117:8, 118:13, 119:12, 120:14, 121:6, 121:24, 125:7, 125:11, 126:16, 128:24, 128:25, 131:8, 133:18, 134:7, 134:10, 135:2, 135:4

**issued** [5] - 97:20, 100:7, 130:19, 130:24, 131:2

**issues** [10] - 7:23, 11:15, 24:5, 44:15, 109:11, 113:22, 113:23, 115:8, 128:20, 129:3

**items** [1] - 38:4

**itself** [4] - 11:2, 26:2, 31:7, 31:13

# J

**January** [3] - 22:1, 54:14, 56:4

**John** [9] - 4:6, 4:19, 5:2, 5:3, 55:7, 55:12, 58:10, 116:23, 123:5

**join** [3] - 60:25, 82:4, 133:16

**joinder** [8] - 100:21, 102:2, 105:5, 111:15, 111:24, 123:12, 128:25, 135:19

**joined** [1] - 98:18

**joining** [3] - 60:24, 74:10, 81:14

**journalists** [1] - 84:20

**Judge** [17] - 23:11, 41:11, 50:10, 50:16, 56:22, 93:11, 99:25, 100:4, 100:11, 104:11, 111:4, 114:15, 114:17, 114:18, 115:17, 121:13, 137:7

**judge** [21] - 61:12, 93:24, 98:5, 111:2, 111:5, 116:15, 116:17, 117:10,

117:19, 118:4, 118:5, 118:8, 132:6, 136:18, 136:19, 136:22, 136:23, 136:24, 136:25, 137:1

**judge's** [2] - 114:2, 136:21

**judges** [13] - 44:25, 59:18, 61:3, 99:8, 102:7, 111:8, 113:19, 113:22, 113:24, 114:7, 124:20, 132:12

**judges'** [1] - 60:10

**judgments** [1] - 105:21

**judicial** [1] - 62:14

**jump** [1] - 76:22

**jumping** [1] - 102:14

**jurisdiction** [17] - 58:23, 99:21, 100:22, 101:1, 102:1, 102:2, 102:5, 102:9, 102:10, 104:25, 105:6, 111:14, 111:24, 112:10, 112:23, 123:12, 128:24

**jurisdictional** [2] - 123:21, 124:24

**jurisdictions** [1] - 94:21

**justified** [1] - 124:23

# K

**K-Beech** [1] - 100:14

**Kaneshiro** [1] - 138:3

**KANESHIRO** [1] - 138:9

**Kaneshiro-Miller** [1] - 138:3

**KANESHIRO-MILLER** [1] - 138:9

**Kansas** [1] - 43:10

**Kay** [2] - 114:17, 114:18

**KBs** [1] - 50:18

**keep** [14] - 4:23, 10:21, 11:7, 29:17, 41:4, 77:7, 77:8, 94:23, 94:25, 114:2, 116:18, 137:2, 137:5, 137:7

**keeping** [2] - 10:22, 11:9

**keeps** [1] - 66:14

**key** [2] - 72:23, 101:7

**kick** [1] - 111:2

**kind** [11] - 12:11, 31:10, 39:17, 71:2, 71:4, 71:23, 85:15, 97:23, 103:25, 110:16, 130:25

**kinds** [6] - 11:16, 15:2, 31:8, 34:25, 46:10, 87:10

**Kingdom** [1] - 69:3

**knowing** [1] - 82:20

**knowledge** [11] - 9:1, 10:8, 10:9, 14:19, 27:13, 39:9, 39:10, 44:1, 45:13, 46:14, 52:6

**knowledgeable** [1] - 8:25

**known** [5] - 7:18, 25:1, 42:7, 75:3, 79:19

**knows** [3] - 55:1, 83:9, 84:6

# L

**labeled** [1] - 16:25

**lack** [5] - 14:24, 38:24, 100:21, 115:15, 118:12

**lacking** [1] - 125:2

**laid** [2] - 27:12, 124:21

**landing** [2] - 133:14, 135:6

**language** [3] - 68:6, 74:12, 83:17

**large** [6] - 18:21, 41:1, 42:1, 72:9, 103:1, 113:15

**largely** [1] - 103:25

**largest** [1] - 32:21

**last** [13] - 14:18, 18:7, 53:7, 80:18, 86:12, 99:17, 104:17, 113:21, 114:17, 117:4, 123:2, 132:10, 136:11

**lastly** [2] - 30:20, 39:23

**laughing** [1] - 110:20

**law** [19] - 59:10, 59:12, 61:14, 61:16, 61:23, 94:3, 107:1, 108:4, 108:9, 111:23, 111:24, 112:20, 113:19, 116:7, 124:19, 124:21, 125:6, 132:7

**Law** [7] - 42:7, 58:9, 61:13, 61:16, 61:20,

110:23, 130:23

**lawsuit** [8] - 58:17, 74:20, 74:2, 74:25, 75:2, 105:7, 131:2, 131:7

**lawsuits** [10] - 105:9, 105:12, 105:15, 127:11, 127:12, 127:21, 128:16, 129:25, 131:5, 131:8

**lawyer** [3] - 48:3, 107:12, 109:10

**lawyers** [6] - 43:23, 48:2, 92:13, 93:19, 127:22, 131:14

**leachers** [1] - 15:13

**lead** [2] - 12:7, 96:3

**leading** [2] - 27:24, 29:15

**learning** [1] - 110:25

**lease** [1] - 15:2

**least** [18] - 24:4, 31:12, 32:25, 33:1, 80:4, 81:6, 81:13, 90:9, 91:13, 92:8, 92:12, 97:22, 118:12, 123:2, 128:14, 128:23, 131:1, 133:22

**leave** [6] - 28:20, 30:21, 59:20, 85:7, 113:15, 121:6

**leaving** [1] - 137:20

**lectern** [1] - 102:14

**lecture** [1] - 106:2

**led** [1] - 8:12

**leeway** [2] - 29:18, 33:14

**legal** [8] - 33:12, 43:14, 61:13, 93:20, 107:1, 116:4, 124:16, 134:12

**legally** [1] - 93:21

**legislation** [2] - 128:1, 131:23

**legitimate** [3] - 42:1, 69:21, 134:12

**length** [1] - 51:11

**Lenux** [1] - 41:18

**less** [3] - 44:21, 75:14, 75:16

**letting** [2] - 27:25, 65:22

**level** [8] - 8:14, 10:9, 31:16, 60:6, 80:8, 84:18, 84:22

**Lexis** [1] - 102:25

**license** [7] - 15:2, 32:3, 33:4, 33:7, 33:18, 34:24, 72:23

**licensed** [6] - 32:6, 68:18, 68:21, 68:25, 69:3, 72:21
**licenses** [1] - 68:18
**licensing** [1] - 68:16
**likely** [23] - 42:25, 43:5, 44:8, 44:21, 44:22, 45:24, 46:22, 54:11, 55:8, 55:12, 55:14, 55:16, 56:12, 67:10, 70:24, 75:14, 75:16, 88:12, 90:3, 108:15, 131:12, 131:17, 133:11
**limine** [1] - 59:2
**limit** [2] - 62:2, 90:1
**limitation** [1] - 116:12
**Limited** [1] - 22:4
**limited** [3] - 60:11, 72:10, 112:5
**limits** [2] - 87:4, 87:10
**line** [4] - 8:22, 18:8, 47:8, 135:15
**Linux** [9] - 10:24, 25:4, 33:2, 33:3, 41:22, 63:7, 72:12, 74:16, 83:24
**Linuxcare** [1] - 63:6
**list** [15] - 30:24, 41:5, 48:20, 53:19, 59:17, 70:15, 70:17, 74:22, 80:20, 81:5, 81:6, 81:7
**listed** [3] - 51:17, 52:3, 55:7
**lists** [1] - 91:3
**litany** [1] - 132:21
**litigate** [1] - 105:1
**litigated** [1] - 105:22
**litigation** [6] - 58:19, 77:16, 85:4, 109:24, 113:6, 119:5
**live** [3] - 7:10, 42:25, 109:11
**LLC** [1] - 4:2
**loaded** [1] - 16:2
**loads** [1] - 15:22
**local** [2] - 15:25, 69:11
**locate** [1] - 12:22
**located** [11] - 43:5, 44:22, 45:11, 46:23, 55:4, 55:9, 55:13, 55:14, 55:16, 96:1, 115:25
**location** [30] - 9:5, 9:18, 12:15, 12:16, 12:17, 13:5, 13:6, 34:9, 34:11, 34:15, 34:16, 35:4, 37:15, 38:6, 40:17, 44:5,

44:8, 44:18, 45:24, 47:18, 53:23, 66:12, 67:8, 67:13, 67:14, 67:18, 67:19, 67:23, 70:23
**locational** [1] - 13:9
**locations** [2] - 36:7, 48:6
**Locker** [1] - 97:8
**log** [2] - 31:3, 31:4
**logged** [4] - 30:25, 31:14, 31:15, 88:7
**logs** [2] - 31:8, 88:9
**look** [27] - 14:22, 15:3, 18:3, 22:18, 34:10, 38:16, 50:2, 51:25, 52:3, 52:18, 52:25, 57:3, 71:6, 74:16, 77:18, 90:16, 97:4, 97:9, 98:23, 98:24, 103:2, 105:10, 121:22, 126:18, 127:2, 136:4, 136:6
**look-ups** [3] - 97:9, 105:10, 127:2
**looked** [2] - 85:1, 99:18
**looking** [20] - 20:9, 32:7, 52:8, 89:9, 102:11, 105:19, 115:8, 128:3, 133:12
**looks** [1] - 27:22
**lookup** [2] - 55:2, 80:25, 93:2
**loose** [1] - 46:1
**lose** [2] - 113:25, 135:14
**losing** [2] - 11:15
**lost** [2] - 92:21, 113:23
**love** [1] - 120:8
**lunch** [3] - 56:13, 57:1, 57:5
**Luncheon** [1] - 57:6

# M

**ma'am** [3] - 8:6, 25:16, 48:17
**machines** [2] - 16:7, 29:10
**Macintosh** [2] - 25:1, 33:2
**magistrate** [1] - 114:18
**mail** [1] - 87:6
**main** [1] - 89:23
**major** [2] - 9:18, 116:3
**majority** [1] - 32:19
**managed** [1] - 86:16

**management** [1] - 53:19
**managers** [1] - 41:5
**mandatory** [1] - 89:2
**manifestation** [1] - 126:24
**manner** [1] - 123:15
**mapping** [3] - 67:8, 71:16, 71:17
**marching** [1] - 122:5
**mark** [1] - 20:21
**marked** [7] - 13:22, 20:21, 21:1, 21:17, 31:21, 37:25, 137:14
**market** [2] - 32:17, 32:19
**Maryland** [2] - 38:7, 99:8
**masked** [1] - 40:7
**mass** [2] - 123:5, 133:6
**massive** [2] - 94:19, 132:4
**master** [1] - 115:15
**material** [4] - 18:23, 35:23, 85:22, 127:6
**materially** [2] - 125:8, 126:3
**materials** [1] - 133:22
**matter** [9] - 10:22, 11:8, 89:20, 108:5, 109:11, 112:16, 114:12, 116:24, 138:5
**matters** [7] - 9:11, 9:13, 56:23, 64:15, 65:8, 65:10, 106:2
**MCG** [1] - 55:6
**mean** [23] - 28:8, 31:8, 41:20, 47:18, 50:19, 51:19, 57:19, 75:10, 75:11, 75:13, 76:2, 77:20, 78:14, 79:4, 84:21, 95:15, 100:9, 101:9, 103:7, 107:25, 129:9, 130:7, 134:14
**meaning** [1] - 29:2
**means** [8] - 32:3, 61:13, 61:15, 61:17, 77:22, 124:15, 127:19, 129:23
**meant** [2] - 70:20, 119:22
**measure** [3] - 70:5, 77:13, 85:19
**measured** [1] - 86:5
**measuring** [1] - 85:25
**mechanics** [1] - 121:2
**mechanism** [1] - 80:5

**management** ... (continued)

**mechanisms** [4] - 11:11, 12:18, 116:4, 116:11
**meet** [4] - 106:23, 111:20, 112:22, 118:16
**meets** [1] - 127:15
**megabytes** [1] - 18:9
**members** [1] - 74:20
**memorandum** [2] - 130:5, 133:8
**mention** [2] - 125:4, 125:14
**mentioned** [5] - 77:12, 83:9, 83:25, 132:16, 135:8
**merchant** [2] - 69:23, 69:25
**mere** [2] - 59:23, 132:6
**merely** [1] - 127:12
**meritorious** [2] - 95:14, 95:23
**merits** [9] - 95:7, 95:12, 95:21, 96:11, 123:14, 124:11, 124:12
**messages** [1] - 87:7
**met** [2] - 112:18, 134:13
**method** [2] - 55:17, 133:14
**methods** [2] - 44:4, 133:9
**metonymies** [1] - 75:25
**metonymy** [1] - 75:24
**Mexico** [1] - 106:15
**Michigan** [1] - 99:7
**microphone** [2] - 7:4, 16:24, 89:11
**might** [32] - 19:15, 23:8, 23:12, 33:7, 40:25, 45:22, 46:9, 55:23, 60:3, 66:7, 68:12, 68:25, 69:12, 69:18, 74:11, 74:13, 78:19, 78:23, 79:19, 85:2, 85:17, 85:25, 96:3, 109:1, 113:8, 123:24, 127:25, 128:2, 128:3, 131:7, 131:24
**miles** [2] - 36:19, 89:19
**Miller** [1] - 138:3
**MILLER** [1] - 138:9
**million** [1] - 135:12
**mind** [2] - 135:24, 137:1
**mindful** [1] - 54:4

**MindMax** [1] - 39:16
**minute** [3] - 98:3, 104:4, 130:21
**minutes** [7] - 51:8, 57:1, 57:4, 59:17, 135:1, 135:3
**miscellaneous** [1] - 131:8
**mislead** [1] - 83:11
**missing** [3] - 36:21, 48:11, 56:10
**misstated** [1] - 45:19
**Mitchell** [1] - 4:16
**mobile** [7] - 13:5, 13:10, 67:11, 67:13, 67:14, 67:20, 67:23, 68:1
**mode** [6] - 79:17, 79:18, 79:19, 79:23, 79:24, 80:12
**modern** [3] - 79:16, 79:24, 80:7
**modicum** [1] - 112:22
**modified** [2] - 81:21, 82:19
**modify** [1] - 89:17
**moment** [10] - 17:24, 20:2, 20:24, 30:1, 35:13, 42:4, 60:13, 67:4, 135:8, 137:4
**Monday** [1] - 117:22
**monetary** [1] - 117:14
**money** [5] - 97:13, 113:15, 114:4, 135:13, 135:14
**monitoring** [1] - 80:11
**month** [8] - 19:11, 19:12, 92:17, 93:3, 114:3, 135:11, 135:14
**months** [3] - 47:3, 75:6, 136:1
**moon** [1] - 111:2
**moot** [5] - 109:1, 110:17, 134:1, 134:7, 134:10
**Moriarty** [1] - 90:23
**morning** [3] - 4:6, 4:8, 4:9, 4:12, 4:15, 4:16, 4:19, 14:14, 49:25, 56:23, 59:4, 83:3, 126:13
**most** [18] - 15:19, 17:6, 32:21, 34:21, 55:8, 55:14, 55:16, 56:12, 58:16, 75:18, 77:23, 88:11, 88:12, 91:5, 94:2, 105:21, 112:22, 116:3
**mostly** [1] - 116:17

**motion** [19] - 4:25, 59:2, 60:17, 61:9, 62:4, 81:8, 89:7, 89:9, 89:23, 91:11, 92:20, 111:20, 111:21, 117:22, 120:17, 120:18, 122:8, 122:9, 134:3
**Motion** [1] - 133:7
**motions** [7] - 22:19, 61:10, 108:13, 114:3, 124:17, 132:17, 134:3
**mouth** [1] - 85:12
**move** [11] - 19:25, 23:3, 23:9, 25:19, 27:2, 70:6, 73:8, 119:7, 120:10, 120:11, 134:20
**moved** [3] - 21:14, 89:14, 93:23
**movie** [3] - 72:17, 85:7, 85:14
**moving** [11] - 23:1, 23:18, 23:21, 36:25, 37:3, 67:4, 72:5, 89:4, 89:14, 90:4
**MR** [290] - 4:6, 4:9, 4:12, 4:16, 4:19, 5:2, 5:6, 5:8, 5:11, 5:16, 5:18, 5:20, 5:22, 5:25, 6:4, 6:10, 6:14, 6:19, 7:1, 7:7, 8:7, 9:24, 10:2, 10:4, 10:16, 10:18, 13:18, 13:21, 13:24, 14:1, 14:4, 14:10, 14:12, 14:16, 17:11, 17:12, 17:14, 17:19, 17:20, 17:23, 17:25, 18:2, 18:6, 18:7, 18:12, 18:16, 18:18, 19:15, 19:18, 19:19, 19:22, 20:4, 20:19, 20:24, 21:6, 21:11, 21:15, 21:16, 22:16, 22:21, 22:24, 23:3, 23:7, 23:11, 23:13, 23:16, 23:19, 23:22, 23:24, 24:1, 24:11, 24:12, 25:18, 25:21, 25:22, 26:4, 26:7, 26:19, 26:20, 27:1, 27:6, 27:20, 27:24, 28:6, 29:6, 29:15, 29:25, 30:13, 30:15, 30:18, 30:19, 31:17, 31:19, 31:20, 32:18, 33:11, 33:16, 33:20, 33:21, 33:25, 34:3, 34:4,

35:18, 35:19, 35:22, 35:25, 36:1, 36:20, 36:24, 37:2, 37:5, 37:6, 37:9, 38:20, 39:1, 39:5, 39:22, 41:11, 41:13, 41:16, 43:14, 43:21, 46:1, 46:15, 47:24, 48:9, 48:13, 49:20, 49:24, 50:5, 50:8, 50:11, 50:14, 52:20, 52:22, 53:10, 54:1, 54:4, 54:8, 54:18, 54:21, 54:22, 54:23, 55:22, 56:5, 56:14, 56:19, 57:11, 57:17, 57:19, 57:24, 58:1, 58:5, 58:7, 59:4, 59:7, 60:23, 60:25, 61:2, 61:12, 61:18, 62:6, 62:13, 62:18, 63:21, 64:7, 65:11, 65:15, 65:18, 70:4, 70:8, 70:14, 78:3, 82:23, 83:2, 89:8, 89:13, 89:22, 89:25, 90:22, 91:7, 91:14, 91:21, 92:6, 92:12, 92:18, 92:24, 93:5, 93:8, 94:10, 95:9, 95:18, 96:9, 96:13, 96:22, 96:24, 97:2, 100:23, 101:14, 101:21, 102:3, 102:6, 102:11, 102:24, 103:12, 103:18, 103:21, 104:5, 105:17, 106:10, 106:13, 106:19, 107:6, 107:8, 107:12, 107:15, 108:4, 108:10, 109:2, 109:4, 109:14, 110:2, 110:8, 110:12, 111:1, 111:18, 112:9, 112:13, 113:1, 113:4, 113:11, 114:9, 114:11, 114:14, 114:19, 114:22, 114:24, 115:2, 115:10, 115:25, 116:11, 117:21, 117:24, 118:3, 118:4, 118:9, 118:24, 119:22, 120:6, 120:25, 121:2, 121:10, 122:2, 122:13, 122:17, 122:22,

123:3, 123:19, 124:2, 124:7, 125:4, 125:13, 125:25, 126:9, 126:14, 126:20, 127:7, 127:14, 127:18, 127:24, 128:2, 129:4, 129:7, 129:16, 130:2, 130:4, 130:11, 131:10, 132:9, 132:15, 132:25, 133:1, 134:18, 134:20, 134:23, 135:1, 136:14, 136:16, 137:12, 137:18
**multi** [1] - 121:15
**multi-doc** [1] - 121:15
**multiple** [5] - 16:17, 58:10, 66:7, 73:1, 92:3
**murders** [1] - 9:17
**must** [3] - 11:16, 28:15, 31:4
**myriad** [1] - 123:24

**N**

**nah** [1] - 137:7
**name** [13] - 7:8, 7:10, 8:1, 32:13, 38:6, 62:21, 62:22, 71:15, 71:19, 123:17, 123:18, 123:25
**named** [9] - 58:17, 59:20, 96:6, 104:20, 104:23, 105:7, 115:20, 119:19
**names** [6] - 4:23, 71:16, 71:20, 71:21, 124:3, 127:4
**narrow** [1] - 40:16
**NAT** [2] - 66:14, 66:22
**National** [2] - 8:14, 8:20
**nationwide** [1] - 126:25
**nature** [3] - 12:13, 64:24, 112:25
**naught** [2] - 121:25, 134:9
**NBC** [3] - 17:4, 19:23, 22:9
**NBC's** [1] - 17:25
**necessarily** [12] - 31:13, 61:4, 73:14, 75:2, 75:7, 75:12, 81:25, 108:8,

113:11, 113:12, 128:24, 129:17
**necessary** [5] - 60:2, 60:10, 74:21, 79:21, 112:19
**need** [15] - 5:14, 10:6, 18:6, 50:2, 50:9, 52:18, 94:18, 104:18, 107:20, 118:8, 128:5, 130:18, 135:2, 137:14, 137:16
**needed** [1] - 94:18
**needing** [1] - 101:6
**needs** [3] - 16:21, 112:11, 122:24
**network** [14] - 28:10, 66:6, 66:7, 66:10, 66:13, 66:14, 66:18, 66:24, 66:25, 72:11, 78:20, 87:4, 87:5
**network's** [1] - 40:13
**networks** [2] - 15:21, 130:10
**Neunte** [1] - 93:12
**never** [8] - 46:2, 56:1, 104:22, 107:12, 110:15, 111:4, 119:19, 130:11
**new** [2] - 7:22, 119:25
**New** [1] - 36:10
**newer** [1] - 115:13
**next** [1] - 47:3
**night** [2] - 18:8, 117:4
**nightmare** [1] - 99:16
**nominal** [3] - 135:5, 135:24, 137:4
**non** [17] - 4:20, 18:25, 24:14, 24:17, 24:20, 46:2, 84:19, 95:12, 96:17, 106:25, 109:22, 110:4, 110:9, 111:14, 117:5, 135:20, 135:21
**non-attorney** [1] - 46:2
**non-cable** [1] - 96:17
**non-copyrighted** [4] - 18:25, 24:14, 24:17, 24:20
**non-parties** [9] - 95:12, 106:25, 109:22, 110:4, 110:9, 111:14, 117:5, 135:20, 135:21
**non-party** [1] - 4:20
**non-peer-to-peer** [1] - 84:19

**none** [1] - 133:9
**normal** [1] - 67:18
**Northern** [4] - 99:6, 130:18, 130:22, 130:24
**note** [1] - 56:2
**notebook** [1] - 129:10
**noted** [2] - 50:20, 103:8
**notes** [1] - 117:4
**nothing** [10] - 6:13, 6:24, 42:22, 51:20, 51:21, 51:22, 62:10, 101:23, 106:6, 109:10
**notice** [21] - 89:9, 96:18, 96:23, 97:5, 97:15, 99:22, 109:7, 119:6, 119:10, 119:11, 119:18, 119:20, 119:23, 119:24, 120:2, 120:4, 120:8, 120:20, 120:24, 133:23
**noticed** [2] - 83:19, 99:19
**notices** [1] - 133:13
**notifying** [1] - 94:13
**notion** [1] - 128:13
**Nu** [2] - 100:1, 102:21
**nuance** [1] - 129:8
**number** [48] - 8:18, 9:17, 10:4, 11:7, 12:5, 15:12, 15:18, 16:20, 19:16, 24:15, 24:21, 25:23, 28:8, 28:9, 28:22, 28:24, 29:2, 29:18, 30:7, 30:10, 31:21, 36:22, 39:13, 40:1, 40:22, 48:15, 62:5, 65:21, 65:24, 67:10, 74:7, 74:19, 88:22, 94:5, 95:16, 97:23, 105:12, 109:25, 110:22, 113:15, 113:19, 115:4, 121:24, 128:10, 130:4, 130:8, 136:10, 136:13
**Numbers** [1] - 71:8
**numbers** [5] - 29:8, 29:9, 29:13, 66:1, 119:7
**numerous** [1] - 61:22

# O

**object** [8] - 10:2, 27:1, 30:15, 33:21, 37:6, 38:22, 59:9, 59:12
**objected** [2] - 103:10, 108:1
**objection** [10] - 22:23, 23:23, 23:25, 27:5, 27:24, 29:15, 32:18, 33:22, 39:5, 43:14
**objectionable** [1] - 29:21
**objections** [4] - 20:6, 23:10, 29:18, 38:21
**observation** [1] - 88:13
**observations** [1] - 77:22
**observe** [2] - 77:14, 81:23
**observed** [2] - 36:8, 82:6
**observing** [1] - 77:13
**obtain** [7] - 15:17, 15:18, 27:10, 34:18, 87:1, 87:21, 100:16
**obtained** [5] - 31:11, 52:9, 55:5, 81:5, 81:6
**obtaining** [1] - 53:17
**obvious** [3] - 59:14, 59:20, 80:15
**obviously** [4] - 44:14, 83:10, 116:3, 120:11
**occupation** [1] - 7:12
**occurred** [3] - 25:12, 51:15, 115:17
**occurring** [1] - 53:5
**OF** [1] - 138:1
**offer** [4] - 49:16, 58:5, 58:24, 65:11
**offered** [1] - 68:13
**offering** [1] - 49:12
**officer** [1] - 55:25
**OFFICIAL** [1] - 138:1
**often** [1] - 71:22
**once** [6] - 15:22, 16:2, 16:11, 85:7, 110:21, 111:2
**One** [1] - 5:17
**one** [104] - 4:11, 5:16, 9:15, 12:3, 12:7, 12:8, 13:10, 15:19, 16:3, 17:13, 17:24, 18:6, 19:11, 19:12, 19:20, 19:23, 20:21, 20:24, 21:20, 24:18, 24:19, 24:20, 26:24,

30:1, 35:9, 35:10, 35:13, 35:19, 36:21, 37:13, 37:14, 38:5, 38:23, 39:3, 39:4, 40:25, 42:1, 42:19, 44:16, 44:23, 45:22, 46:24, 47:2, 49:15, 52:8, 53:7, 53:16, 55:1, 55:10, 56:11, 68:5, 68:17, 73:5, 73:7, 73:13, 75:13, 75:17, 75:20, 76:16, 80:17, 83:6, 85:18, 88:4, 92:4, 92:8, 92:12, 93:8, 93:13, 93:21, 98:22, 99:6, 99:17, 99:21, 100:3, 101:6, 101:21, 101:22, 104:17, 106:23, 109:21, 110:24, 111:13, 112:11, 115:13, 115:15, 115:16, 115:21, 116:14, 116:17, 116:23, 117:6, 118:24, 122:5, 122:23, 127:24, 130:11, 132:18, 132:20, 136:11
**one-month** [2] - 19:11, 19:12
**one-to-one** [2] - 12:3, 12:8
**ones** [7] - 19:10, 38:21, 50:19, 60:22, 88:12, 100:3, 137:16
**ongoing** [4] - 95:19, 118:25, 129:24, 130:10
**online** [7] - 16:13, 29:3, 31:25, 49:2, 49:3, 49:11, 49:15
**open** [9] - 42:1, 52:24, 74:14, 76:7, 76:12, 77:3, 77:8, 104:16, 137:8
**operates** [1] - 15:16
**operating** [10] - 10:25, 11:5, 31:7, 31:9, 31:16, 33:3, 41:18, 41:21, 72:13, 74:17
**operation** [4] - 11:3, 79:17, 79:18, 79:24
**operators** [1] - 96:16
**opinion** [18] - 34:13, 42:23, 43:2, 43:12, 45:6, 45:7, 55:10, 55:15, 104:12, 111:6, 111:8, 111:9,

111:12, 112:8, 112:15, 112:17, 121:4, 135:9
**opinions** [2] - 55:20, 104:10
**opportunity** [10] - 21:10, 22:22, 60:5, 106:4, 107:20, 109:23, 110:5, 110:10, 120:14, 126:18
**opposed** [3] - 72:2, 119:21, 127:12
**opposing** [8] - 13:25, 14:1, 17:10, 21:5, 23:10, 35:24, 57:21, 116:19
**option** [2] - 38:17, 78:25
**oral** [2] - 6:2, 61:24
**order** [27] - 28:16, 46:10, 73:23, 78:19, 85:20, 86:5, 95:3, 96:19, 96:21, 97:5, 98:6, 98:11, 98:14, 100:2, 107:9, 114:16, 117:11, 117:12, 120:8, 120:10, 120:21, 120:22, 122:4, 122:7, 136:21, 137:3, 137:21
**ordered** [2] - 93:24, 108:22, 120:7
**orders** [10] - 59:18, 94:15, 94:23, 94:24, 97:19, 99:9, 99:15, 114:2, 118:5, 125:21
**ordinary** [1] - 81:22
**organization** [1] - 123:6
**organized** [1] - 35:14
**original** [2] - 32:15, 56:8
**originally** [4] - 72:10, 79:10, 80:1
**originate** [1] - 83:14
**originated** [1] - 128:23
**otherwise** [1] - 82:21
**ought** [1] - 29:21
**out-of-state** [1] - 116:9
**outbound** [1] - 66:15
**outcome** [2] - 45:2, 132:23
**outcomes** [1] - 129:18
**outlined** [1] - 41:25
**outside** [3] - 98:20, 107:9, 107:11
**outweighs** [1] - 90:3

**overall** [1] - 74:23
**overruled** [10] - 24:7, 27:18, 28:2, 30:16, 33:22, 37:7, 38:25, 39:6, 43:16, 46:4
**oversee** [1] - 106:17
**overview** [2] - 34:6, 65:19
**overwhelming** [3] - 58:21, 113:18, 113:19
**own** [11] - 10:12, 32:25, 40:12, 57:3, 61:16, 67:14, 105:25, 106:4, 115:19, 118:11, 129:12
**owned** [1] - 61:15
**owner** [3] - 69:21, 87:20, 128:18
**owners** [6] - 105:14, 123:9, 124:3, 127:20, 128:19, 129:24

# P

**p.m** [5] - 57:6, 123:1, 137:23
**packet** [3] - 64:11, 64:16, 74:1
**packets** [2] - 11:16, 64:8
**page** [12] - 18:20, 19:15, 21:21, 22:11, 24:21, 28:21, 52:24, 57:15, 93:11, 110:1, 111:10
**pages** [7] - 19:16, 19:17, 35:21, 35:22, 37:25, 121:5, 121:10
**paid** [2] - 22:6, 113:14
**palatable** [1] - 107:23
**paper** [2] - 126:23, 129:10
**papers** [8] - 60:14, 88:24, 89:14, 90:4, 90:6, 93:1, 125:3, 125:10
**Paradigm** [1] - 12:5
**paradigmatic** [1] - 125:9
**paragraph** [3] - 22:8, 54:19, 54:24
**parameters** [1] - 122:4
**parcel** [1] - 134:11
**pardon** [5] - 9:22, 36:15, 43:7, 44:12, 97:25

**parent** [2] - 17:23, 17:25
**parentheses** [1] - 28:22
**parse** [1] - 43:19
**part** [28] - 7:19, 8:8, 13:12, 24:4, 26:14, 27:15, 28:16, 29:10, 30:9, 31:25, 49:4, 49:13, 49:14, 50:15, 53:19, 77:25, 78:13, 79:4, 85:21, 86:3, 91:9, 105:21, 108:22, 125:24, 130:14, 134:9, 134:11
**parte** [5] - 27:15, 94:24, 97:19, 99:9, 100:2
**participant** [2] - 81:12, 81:15
**participants** [6] - 75:2, 81:14, 81:16, 81:24, 82:1, 82:6
**participate** [1] - 86:2
**participated** [1] - 100:18
**participating** [1] - 30:10
**participation** [3] - 74:15, 75:15, 78:11
**particular** [38] - 10:8, 13:19, 16:14, 18:20, 25:2, 32:5, 32:12, 39:8, 41:24, 42:22, 44:18, 45:24, 46:21, 48:5, 50:23, 50:25, 51:20, 68:19, 69:7, 74:10, 74:11, 74:13, 74:19, 76:8, 76:21, 76:22, 76:24, 76:25, 79:13, 80:4, 81:22, 85:20, 85:22, 128:11, 128:18, 128:22
**particularly** [1] - 70:11
**parties** [28] - 60:15, 88:3, 88:16, 91:3, 95:12, 95:15, 96:1, 103:3, 105:25, 106:3, 106:8, 106:25, 107:19, 109:22, 110:4, 110:9, 111:14, 114:12, 117:2, 117:5, 117:8, 120:24, 122:10, 122:13, 128:25, 135:20, 135:21
**parts** [5] - 16:4, 28:12,

29:4, 49:12, 49:16
**party** [7] - 4:20, 40:14, 72:9, 86:25, 95:13, 130:5
**passed** [1] - 132:2
**passes** [1] - 75:14
**past** [4] - 84:2, 105:22, 108:5, 123:10
**patents** [1] - 7:23
**patiently** [1] - 122:20
**Patricia** [1] - 138:3
**PATRICIA** [1] - 138:9
**Paul** [1] - 55:24
**pay** [4] - 131:15, 135:11, 136:19
**payment** [1] - 70:1
**PC** [3] - 25:2, 26:10, 33:1
**peculiarity** [1] - 128:16
**peer** [20] - 12:11, 16:12, 16:14, 16:15, 64:13, 65:12, 72:7, 80:2, 80:8, 84:8, 84:19
**peer-to-peer** [7] - 12:11, 64:13, 65:12, 72:7, 80:2, 84:8, 84:19
**peers** [13] - 15:13, 15:14, 15:16, 16:10, 16:17, 16:22, 30:2, 55:7, 73:5, 73:6, 73:13, 80:3
**pending** [3] - 22:19, 61:9, 61:10
**people** [53] - 15:2, 15:21, 17:17, 18:4, 29:13, 40:12, 40:15, 48:19, 53:22, 60:4, 68:19, 74:15, 74:17, 75:16, 75:18, 76:10, 76:11, 76:22, 77:3, 77:7, 77:8, 77:13, 77:18, 77:19, 77:23, 77:25, 79:13, 79:25, 80:5, 82:2, 84:2, 84:5, 84:9, 84:23, 85:2, 85:3, 86:3, 92:13, 93:16, 93:18, 94:8, 98:18, 100:16, 104:14, 115:16, 115:20, 119:2, 119:5, 119:15, 126:2, 130:13, 130:15, 135:13
**people's** [1] - 75:15
**per** [7] - 92:12, 92:17, 93:3, 93:19, 97:14, 136:15

**percent** [10] - 18:25, 24:15, 47:12, 47:16, 47:17, 47:20, 47:21, 48:7, 56:11, 56:12
**percentage** [3] - 24:14, 74:21, 74:23
**percentages** [1] - 18:23
**perfect** [2] - 133:10
**perform** [1] - 28:16
**performed** [3] - 8:16, 13:4, 20:10
**performing** [1] - 96:2
**performs** [1] - 86:18
**perhaps** [5] - 54:10, 76:11, 86:21, 122:6, 127:24
**period** [6] - 17:6, 17:7, 19:7, 51:19, 78:22, 111:7
**periods** [1] - 66:2
**permissive** [1] - 89:2
**permit** [1] - 126:10
**person** [16] - 9:24, 29:14, 30:3, 89:18, 89:20, 92:1, 92:4, 115:18, 119:17, 119:19, 123:22, 124:13, 124:23, 131:12, 131:13, 131:17
**person's** [1] - 34:24
**personal** [13] - 15:25, 58:23, 100:21, 102:2, 102:10, 104:24, 105:6, 111:14, 111:24, 112:10, 112:22, 123:11, 128:24
**personally** [4] - 20:9, 88:1, 88:14, 108:17
**persons** [1] - 92:4
**perspective** [8] - 20:6, 59:21, 95:25, 96:5, 104:9, 104:13, 105:25, 106:6
**perspectives** [1] - 106:18
**pertaining** [1] - 64:15
**pertinence** [1] - 58:10
**pertinent** [6] - 44:15, 58:11, 58:14, 58:23, 60:6, 70:11
**Peter** [1] - 42:11, 54:13, 55:24, 56:1, 56:3, 56:6, 86:13
**phone** [4] - 12:16, 68:3, 94:1, 119:7
**phones** [4] - 13:10, 67:12, 67:13, 67:14

**physical** [4] - 67:8, 67:9, 67:18, 70:23
**picture** [1] - 79:9
**Picture** [1] - 133:7
**piece** [3] - 15:24, 78:5, 104:17
**pieces** [5] - 15:11, 16:13, 16:15, 16:16
**pin** [1] - 93:8
**piracy** [1] - 129:24
**pirate** [1] - 119:24
**place** [8] - 35:8, 36:7, 36:9, 74:13, 74:14, 103:15, 110:19, 130:21
**placements** [1] - 36:10
**places** [2] - 31:9, 119:6
**placing** [1] - 34:8
**plain** [1] - 100:25
**plaintiff** [21] - 4:7, 27:10, 43:23, 45:9, 47:1, 48:1, 93:19, 101:10, 103:9, 103:18, 103:20, 106:24, 107:25, 108:16, 123:16, 123:21, 124:9, 125:18, 126:4, 131:24, 137:15
**Plaintiff's** [15] - 14:7, 20:14, 20:20, 21:1, 26:2, 26:5, 26:8, 30:17, 33:24, 35:16, 36:23, 37:1, 37:4, 37:8, 48:15
**plaintiff's** [11] - 4:25, 10:14, 14:5, 20:22, 24:10, 56:15, 62:4, 77:16, 103:21, 108:23, 109:10
**plaintiffs** [5] - 74:25, 94:17, 109:4, 124:4, 127:1
**plaintiffs'** [1] - 131:13
**plan** [4] - 6:2, 122:11, 126:25, 127:15
**planned** [1] - 56:25
**Plant** [7] - 7:11, 35:9, 35:12, 36:9, 36:17, 36:18, 37:15
**platform** [1] - 26:10
**play** [3] - 115:24, 136:3
**pleader** [1] - 101:1
**pleading** [2] - 26:14, 26:16
**pleasant** [1] - 4:11
**pled** [1] - 112:11

**plenty** [1] - 122:16
**plug** [1] - 53:15
**plus** [3] - 75:6, 77:9
**podium** [3] - 4:4, 7:2, 7:3
**point** [39] - 20:8, 38:18, 40:9, 48:8, 48:10, 48:11, 49:1, 56:10, 56:13, 56:14, 61:8, 70:3, 70:12, 75:4, 75:5, 75:7, 77:1, 80:18, 87:3, 94:16, 99:17, 101:15, 104:1, 110:20, 110:23, 112:15, 123:11, 123:12, 124:8, 124:16, 125:5, 129:22, 130:20, 133:3, 133:23, 136:12, 136:17, 136:20, 136:21
**pointed** [1] - 126:10
**points** [3] - 49:3, 83:8, 102:18
**ponder** [1] - 118:18
**pondering** [1] - 118:17
**porn** [1] - 95:20
**pornography** [2] - 18:23, 94:4
**portion** [2] - 17:4, 49:1
**posited** [1] - 105:5
**position** [7] - 62:23, 63:1, 68:2, 89:6, 106:12, 120:24, 128:11
**positioning** [1] - 67:15
**positions** [2] - 48:1, 106:8
**possibility** [1] - 67:22
**possible** [6] - 41:6, 74:10, 81:18, 82:4, 85:6, 136:3
**possibly** [1] - 57:20
**posture** [1] - 104:13
**potential** [3] - 11:13, 27:8, 80:7
**potentially** [1] - 131:17
**practical** [2] - 103:22, 108:5
**practice** [3] - 20:13, 72:14, 79:24
**pre** [1] - 102:12
**pre-Rule** [1] - 102:12
**preceding** [1] - 38:22
**precise** [2] - 68:2, 101:25
**precisely** [1] - 38:9

**predates** [1] - 85:24
**predecessor** [3] - 58:9, 61:13, 61:21
**predict** [2] - 39:3, 39:8
**premature** [2] - 123:12, 124:18
**premised** [1] - 123:13
**premises** [1] - 67:17
**Prenda** [9] - 42:7, 58:9, 61:13, 61:16, 61:20, 99:25, 110:23, 128:19, 130:23
**prepare** [1] - 19:23
**prepared** [4] - 22:3, 22:4, 22:6, 24:2
**preparing** [1] - 35:5
**presence** [2] - 75:15, 116:3
**present** [5] - 5:14, 5:15, 6:2, 6:4, 60:3, 61:25, 68:6
**presented** [1] - 69:7
**preserved** [1] - 133:22
**preserving** [1] - 109:8
**presided** [1] - 119:14
**presumably** [3] - 63:7, 74:25, 77:25
**presume** [1] - 20:7
**pretty** [3] - 59:20, 95:24, 103:2
**prevails** [1] - 103:21
**prevention** [2] - 69:14, 69:15
**primarily** [2] - 11:11, 74:14
**printing** [1] - 14:14
**printout** [1] - 18:10
**private** [3] - 15:21, 67:1, 70:16
**privileged** [1] - 89:19
**problem** [6] - 97:18, 98:7, 101:16, 110:13, 113:12, 130:25
**problematic** [1] - 19:19
**problems** [1] - 11:14
**procedural** [2] - 90:8, 104:13
**procedurally** [1] - 100:20
**procedures** [2] - 132:15, 132:16
**proceed** [10] - 18:15, 24:8, 25:17, 26:6, 28:2, 31:17, 31:18, 41:14, 54:3, 123:14
**proceeded** [2] - 59:19, 108:5

**proceeding** [8] - 6:15, 24:3, 52:24, 105:22, 112:3, 124:18, 132:12, 132:19

**proceedings** [4] - 58:14, 108:13, 108:22, 138:5

**PROCEEDINGS** [1] - 4:1

**Proceedings** [1] - 137:23

**process** [12] - 14:25, 16:7, 16:9, 28:5, 28:18, 41:25, 94:13, 113:13, 134:8, 134:15, 136:20, 136:25

**processes** [1] - 100:15

**produce** [4] - 46:12, 92:2, 95:15, 108:14

**produced** [3] - 133:23, 134:5, 134:18

**producers** [2] - 133:8, 133:15

**producing** [2] - 133:20, 134:16

**product** [3] - 8:11, 32:6, 32:7

**products** [3] - 8:18, 12:6, 14:20

**profession** [1] - 75:24

**professional** [1] - 118:1

**proffer** [2] - 9:24, 10:2

**program** [2] - 28:13, 84:16

**programmed** [1] - 64:10

**programming** [2] - 69:1, 69:4

**prong** [3] - 89:2, 89:3, 89:4

**prongs** [1] - 89:1

**proof** [1] - 85:3

**proper** [1] - 127:9

**properly** [2] - 73:23, 137:14

**proposal** [1] - 59:8

**proposed** [2] - 90:2, 93:1

**proprietary** [1] - 82:17

**propriety** [1] - 125:16

**prosecute** [1] - 127:22

**protect** [3] - 128:3, 128:5, 135:15

**protected** [1] - 89:20

**protocol** [32] - 8:22, 8:24, 8:25, 10:21, 11:2, 11:6, 11:14,

11:17, 11:20, 11:23, 15:9, 15:10, 15:15, 32:16, 55:1, 55:5, 67:21, 71:16, 71:18, 72:5, 72:7, 73:1, 79:5, 79:10, 87:4, 87:5, 87:6, 87:9, 87:12, 87:13, 87:15

**protocols** [13] - 8:9, 8:13, 8:17, 8:21, 10:20, 10:21, 10:23, 11:7, 11:12, 15:5, 64:3, 64:6, 64:16

**proven** [1] - 100:16

**provide** [13] - 17:15, 19:24, 21:2, 21:7, 34:6, 35:2, 40:11, 40:13, 69:5, 71:4, 71:21, 118:5, 119:23

**provided** [10] - 11:19, 11:22, 12:9, 12:23, 14:1, 21:6, 40:16, 40:22, 41:10, 108:21

**provider** [9] - 32:4, 41:10, 41:22, 66:21, 67:3, 71:3, 71:11, 71:22, 81:1

**providers** [1] - 71:19, 96:17

**provides** [3] - 40:10, 40:21

**providing** [4] - 21:8, 28:10, 28:11, 29:4

**provision** [1] - 89:15

**proviso** [1] - 108:20

**proxy** [3] - 83:12, 83:15, 83:18

**public** [2] - 66:16, 71:6

**publicly** [2] - 55:2, 70:22

**published** [4] - 15:19, 22:1, 41:23, 102:25

**publishes** [1] - 39:17

**pull** [2] - 114:16, 128:5

**punished** [1] - 136:1

**purchase** [2] - 41:3, 69:20

**purpose** [9] - 20:7, 20:8, 58:18, 58:20, 82:19, 110:8, 116:1, 117:20, 129:20

**purposes** [6] - 61:6, 65:22, 69:15, 77:15, 77:19, 116:6

**pursuant** [1] - 123:20

**pursues** [1] - 124:9

**pushed** [1] - 129:2

**put** [13] - 20:13, 43:8, 43:10, 46:9, 60:5,

60:21, 85:12, 97:17, 97:23, 99:13, 119:15, 129:13, 137:19

**putting** [5] - 20:6, 20:11, 60:20, 94:3, 112:24

**puzzle** [1] - 97:1

**puzzled** [1] - 47:8

## Q

**quadruple** [1] - 131:6

**qualifications** [1] - 10:13

**qualified** [3] - 9:7, 13:1, 13:19

**quality** [1] - 41:9

**quarter** [1] - 57:2

**quash** [10] - 61:10, 89:4, 89:17, 89:23, 91:11, 108:13, 111:21, 120:18, 122:9, 134:4

**quashed** [7] - 89:2, 90:14, 94:15, 94:19, 99:14, 108:11, 132:19

**quashing** [2] - 98:3, 99:10

**questionable** [1] - 43:7

**questioning** [1] - 60:1

**questions** [18] - 10:13, 33:16, 34:1, 41:11, 41:12, 49:20, 54:6, 56:18, 56:20, 82:23, 87:17, 88:18, 103:23, 106:23, 109:15, 109:17, 123:11, 125:22

**quick** [3] - 65:19, 117:6, 118:24

**quickly** [6] - 77:20, 77:21, 77:24, 83:8, 125:17, 125:18

**quite** [7] - 57:20, 77:15, 115:11, 125:10, 125:20, 130:9, 134:6

**quo** [1] - 113:17

**quote** [2] - 54:25, 90:8

**Quova** [1] - 81:1

## R

**RAA** [1] - 133:7

**radius** [2] - 115:8, 115:24

**raise** [4] - 6:21, 111:14, 129:22, 135:22

**raised** [8] - 104:7, 105:1, 109:15, 115:4, 128:20, 129:1, 135:4, 135:17

**ran** [1] - 43:10

**random** [1] - 103:25

**range** [3] - 40:18, 71:11, 87:14

**rare** [1] - 34:21

**rates** [1] - 51:13

**rather** [5] - 66:5, 66:8, 84:21, 124:19, 125:18

**ratio** [3] - 85:15, 85:23, 85:25

**ratios** [1] - 86:5

**ratted** [2] - 97:25, 98:2

**re** [1] - 18:8

**reach** [2] - 112:20

**read** [9] - 16:11, 19:10, 28:21, 47:19, 86:19, 95:11, 100:24, 121:11, 125:3

**readable** [1] - 71:18

**reading** [2] - 19:10, 51:8

**ready** [1] - 70:6

**real** [7] - 105:3, 111:10, 117:1, 117:6, 130:25, 137:8

**realize** [1] - 35:13

**realized** [1] - 115:18

**reallocate** [1] - 66:11

**really** [21] - 29:21, 48:8, 61:10, 76:21, 96:4, 96:25, 104:7, 105:15, 106:11, 106:23, 107:20, 111:25, 115:16, 116:18, 117:4, 120:23, 125:11, 135:7, 135:25, 136:2, 136:6

**reason** [10] - 59:1, 82:18, 86:9, 90:13, 94:5, 97:21, 104:25, 107:19, 117:4, 117:19

**reasonable** [4] - 43:8, 86:23, 89:17, 97:13

**reasonably** [2] - 93:2, 124:23

**reasoned** [1] - 87:2

**reasoning** [1] - 118:14

**reasons** [4] - 27:16, 58:11, 121:25,

123:24

**rebuttal** [2] - 57:21, 57:23

**receive** [1] - 31:13

**received** [3] - 6:1, 18:7, 41:24

**receiver** [1] - 68:3

**receiving** [2] - 12:19, 16:18

**recently** [1] - 15:6

**Recess** [1] - 123:1

**recess** [1] - 57:6

**recognize** [12] - 17:1, 24:22, 25:24, 26:8, 26:9, 26:23, 36:2, 37:10, 38:1, 91:15, 107:8

**recognized** [1] - 131:19

**recognizing** [1] - 133:9

**recollection** [1] - 19:14

**recommend** [2] - 107:18, 107:23

**record** [25] - 4:5, 7:9, 17:25, 20:7, 20:14, 26:2, 26:13, 33:12, 56:2, 60:2, 60:5, 61:12, 62:2, 62:3, 62:4, 62:21, 70:4, 70:19, 81:19, 81:23, 90:21, 91:16, 91:24, 122:7, 138:4

**recording** [1] - 88:14

**records** [4] - 71:6, 88:4, 88:6, 88:8

**recur** [1] - 128:4

**recurring** [1] - 128:7

**refer** [3] - 48:19, 57:14, 121:4

**reference** [1] - 64:2

**references** [3] - 70:18, 70:21, 70:22

**referred** [4] - 8:23, 50:10, 85:23, 115:15

**referring** [2] - 85:18, 86:14

**refers** [1] - 102:2

**refiled** [3] - 100:4, 121:14, 121:16

**reflect** [1] - 61:3

**reflected** [2] - 61:21, 128:8

**reflects** [1] - 29:2

**regard** [3] - 80:4, 93:7, 124:11

**regarding** [1] - 114:20

**region** [3] - 40:18, 43:8, 71:23

**regions** [1] - 12:20
**registration** [1] - 71:10
**Registry** [1] - 71:7
**related** [7] - 7:23, 8:16, 14:19, 28:5, 59:6, 64:5, 64:25
**relating** [3] - 9:17, 65:10, 85:4
**relationship** [2] - 61:14, 116:9
**relatively** [5] - 15:6, 72:8, 77:20, 77:23, 128:9
**relax** [1] - 29:20
**relevance** [5] - 10:7, 24:2, 32:11, 60:11, 129:14
**relevancy** [1] - 93:20
**relevant** [4] - 61:9, 93:21, 96:3, 96:4
**reliability** [1] - 55:20
**reliable** [1] - 82:21
**relief** [1] - 101:2
**relies** [1] - 73:17
**relying** [2] - 90:12, 95:5
**remain** [1] - 85:13
**remained** [1] - 78:22
**remaining** [2] - 18:23, 101:7
**remember** [8] - 19:10, 27:21, 50:9, 76:3, 81:3, 82:12, 82:13, 110:22
**remembers** [1] - 66:16
**removed** [1] - 75:16
**render** [1] - 44:19
**repeatedly** [1] - 130:17
**rephrase** [1] - 85:8
**replacing** [1] - 59:8
**replied** [1] - 14:20
**reply** [3] - 99:24, 121:5, 121:7
**report** [8] - 20:12, 20:13, 21:4, 21:6, 22:3, 22:6, 22:7, 84:20
**Report** [1] - 21:25
**REPORTER** [1] - 138:1
**reporter** [3] - 4:22, 7:4, 122:24
**reporting** [1] - 19:8
**represent** [3] - 89:12, 92:7, 123:7
**representation** [1] - 47:19
**representing** [4] -

43:23, 52:10, 90:12, 135:10
**represents** [6] - 26:23, 30:10, 50:22, 130:7, 130:8, 133:16
**request** [2] - 114:10, 122:3, 125:1
**requested** [2] - 18:13, 93:10
**requesting** [1] - 103:17
**requests** [5] - 16:13, 93:3, 94:5, 95:17, 103:10
**require** [3] - 47:14, 121:20, 125:6
**required** [4] - 33:6, 33:10, 73:23, 112:15, 129:20, 131:24
**requirement** [3] - 31:4, 112:16, 112:19
**requirements** [5] - 106:24, 107:2, 108:1, 121:23, 134:13
**requires** [7] - 89:16, 89:18, 89:19, 96:23, 100:24, 125:1, 133:14
**requiring** [1] - 90:1
**requisite** [1] - 89:4
**research** [1] - 77:12
**reside** [2] - 18:11, 128:10
**residential** [2] - 66:23, 67:18
**residents** [2] - 116:8, 116:9
**resides** [1] - 131:12
**resistance** [1] - 98:8
**resolution** [3] - 24:5, 24:6, 133:25
**resolve** [1] - 45:24
**resources** [4] - 72:11, 78:20, 86:2, 94:9
**respect** [21] - 6:11, 10:5, 10:9, 10:10, 10:19, 11:23, 11:25, 12:13, 12:24, 13:2, 13:4, 13:11, 38:23, 55:20, 72:2, 104:11, 113:20, 128:11, 131:16, 136:7, 136:21
**respectfully** [2] - 111:12, 137:6
**respond** [7] - 16:16, 38:15, 46:4, 69:2, 93:2, 108:2, 118:2

**responding** [2] - 91:19, 92:14
**response** [1] - 39:9
**responsibilities** [3] - 7:20, 63:12, 63:16
**responsibility** [1] - 73:12
**responsible** [1] - 66:18
**rest** [1] - 120:21
**restate** [1] - 43:1
**restaurant** [1] - 69:13
**restaurants** [1] - 69:11
**Reston** [2] - 36:11, 37:16
**restricted** [1] - 74:8
**result** [7] - 38:15, 41:7, 41:8, 42:24, 43:3, 44:25, 69:20
**resulting** [1] - 105:21
**results** [6] - 36:5, 36:8, 38:16, 46:13, 131:11
**resume** [2] - 57:2, 57:4
**retain** [2] - 66:21, 73:3
**retrievable** [1] - 31:1
**return** [2] - 34:11, 83:13
**revealed** [1] - 123:25
**revenue** [2] - 92:15, 92:21
**reverse** [5] - 55:2, 71:14, 71:17, 71:20
**review** [6] - 60:7, 60:12, 96:10, 100:13, 111:9, 134:17
**reviewed** [1] - 31:25
**reviewing** [1] - 18:20
**reviews** [1] - 69:11
**revoked** [3] - 94:14, 98:5, 99:15
**revoking** [1] - 99:10
**reward** [2] - 85:20, 95:1
**right-hand** [1] - 28:7
**rights** [4] - 124:8, 126:3, 127:20
**rise** [1] - 29:23
**road** [1] - 86:24
**rock** [1] - 103:15
**role** [2] - 115:24
**rolling** [4] - 94:7, 97:3, 98:1, 133:20
**roommate** [1] - 88:9
**route** [1] - 118:20
**router** [2] - 66:14, 66:15
**routers** [2] - 65:23,

72:2
**routes** [1] - 72:1
**rubric** [1] - 101:19
**Rule** [22] - 14:11, 89:1, 89:8, 89:14, 89:16, 90:1, 90:14, 98:25, 100:24, 101:3, 101:8, 101:15, 102:1, 102:9, 102:12, 112:12, 115:8, 115:23, 117:2, 124:19, 125:6, 127:8
**rule** [7] - 101:18, 103:4, 103:11, 103:16, 113:7, 115:24
**ruled** [5] - 61:4, 116:17, 117:21, 136:18
**rules** [4] - 109:25, 113:9, 116:15, 132:7
**rulings** [2] - 58:12, 128:17
**rumbling** [1] - 50:6
**run** [2] - 39:2, 80:23
**runaways** [1] - 94:4
**running** [6] - 24:25, 28:13, 28:16, 50:24, 76:13, 79:12
**runs** [1] - 15:24

**S**

**S-C-H-O-E-N** [1] - 62:22
**S-M-O-O-T** [1] - 5:23
**sample** [1] - 38:23
**San** [2] - 62:25, 64:23
**sat** [2] - 117:24, 132:11
**satisfied** [1] - 108:2
**satisfies** [1] - 101:8
**satisfy** [2] - 111:22, 128:20
**save** [2] - 81:17, 81:19
**saw** [1] - 132:21
**sawed** [1] - 98:11
**SBC** [1] - 4:13
**scarier** [1] - 131:9
**schedule** [1] - 109:5
**scheduling** [1] - 106:2
**Schoen** [14] - 4:18, 6:5, 62:1, 62:7, 62:14, 62:19, 62:22, 65:11, 65:20, 82:24, 83:3, 83:5, 83:6, 87:19
**SCHOEN** [1] - 62:8

**scratching** [1] - 91:5
**screen** [20] - 24:25, 25:2, 25:6, 25:7, 25:9, 26:10, 26:21, 26:23, 26:24, 28:14, 28:19, 29:7, 30:3, 30:8, 30:10, 33:8, 48:16, 51:5, 52:7, 100:17
**scrutinizing** [1] - 95:12
**Sean** [1] - 90:23
**search** [4] - 34:23, 37:19, 40:5, 69:13
**searches** [1] - 39:2
**seated** [4] - 4:22, 10:14, 62:12, 109:19
**seating** [1] - 4:22
**seats** [1] - 23:12
**Seattle** [2] - 131:11, 131:12
**second** [11] - 27:4, 45:3, 75:19, 101:17, 105:24, 109:16, 109:20, 117:10, 117:11, 117:12, 122:23
**secondarily** [1] - 89:25
**secondly** [2] - 10:7, 128:7
**seconds** [1] - 133:2
**secrets** [1] - 9:14
**sector** [1] - 9:20
**security** [1] - 119:15
**Security** [1] - 8:20
**see** [23] - 26:24, 33:9, 50:18, 51:6, 51:18, 51:24, 53:1, 53:2, 54:21, 57:25, 81:13, 83:22, 90:25, 97:5, 105:17, 105:19, 105:20, 106:5, 106:17, 110:4, 110:13, 116:21, 136:9
**seed** [1] - 78:10
**seeders** [4] - 15:14, 49:2, 49:3, 51:20
**seeds** [10] - 28:8, 28:21, 28:22, 28:24, 29:1, 30:8, 48:16, 48:24, 49:10, 51:7
**seeing** [1] - 92:25
**seeking** [4] - 104:14, 124:13, 124:14, 124:23
**seeks** [1] - 27:10
**seem** [6] - 69:2, 77:19, 77:22, 100:10, 128:4

**sees** [1] - 41:2
**SEIVER** [52] - 4:19, 5:2, 17:12, 17:19, 17:25, 19:15, 19:19, 20:4, 21:11, 21:15, 23:24, 24:1, 25:18, 27:24, 29:15, 30:15, 32:18, 33:11, 33:21, 37:6, 39:5, 49:20, 49:24, 50:5, 50:8, 50:11, 50:14, 52:20, 52:22, 53:10, 54:1, 60:25, 61:2, 92:24, 93:5, 93:8, 94:10, 95:9, 95:18, 96:9, 96:13, 96:22, 96:24, 97:2, 100:23, 101:14, 101:21, 102:3, 102:6, 114:22, 133:1, 134:18
**Seiver** [7] - 4:19, 5:2, 5:3, 92:23, 103:14, 113:20, 130:16
**seize** [2] - 106:4
**selects** [1] - 79:5
**sell** [2] - 41:5, 72:19
**send** [6] - 17:13, 65:23, 87:6, 97:15, 119:9, 119:10
**sending** [1] - 87:8
**senior** [2] - 62:24, 63:12
**sense** [5] - 20:17, 42:21, 99:19, 120:23, 135:16
**sent** [1] - 17:14
**sentiments** [1] - 126:21
**separate** [1] - 35:18
**separated** [1] - 66:1
**series** [2] - 66:1, 128:21
**serious** [1] - 9:15
**seriously** [1] - 118:15
**served** [2] - 64:15, 74:19
**server** [1] - 83:16
**servers** [3] - 32:16, 79:11, 83:12
**service** [15] - 34:18, 34:19, 38:6, 39:19, 39:25, 46:8, 66:21, 67:3, 71:11, 71:19, 71:22, 80:25, 88:5
**service's** [1] - 35:4
**Services** [2] - 4:13, 4:14
**services** [26] - 11:22, 12:9, 12:23, 35:2,

35:6, 35:7, 36:6, 37:13, 37:20, 37:22, 38:5, 38:11, 38:12, 40:11, 53:19, 53:21, 53:23, 55:21, 69:5, 69:6, 69:20, 70:1, 88:6, 88:10, 88:14
**session** [4] - 50:23, 51:1, 51:3, 51:4
**SESSION** [1] - 57:8
**set** [3] - 76:24, 86:21, 117:22
**SETH** [2] - 62:8, 62:22
**Seth** [4] - 4:18, 6:5, 62:6, 62:22
**sets** [1] - 101:20
**settle** [1] - 106:5
**settled** [1] - 123:15
**settlement** [4] - 106:7, 106:14, 106:17, 124:14, 131:15, 131:25
**settlements** [3] - 100:16, 124:10, 132:5
**settling** [1] - 106:9
**seven** [5] - 35:7, 35:22, 36:9, 37:23, 98:19
**sever** [1] - 98:17
**several** [8] - 19:10, 35:8, 53:17, 58:11, 70:17, 71:3, 92:8, 92:12
**severely** [1] - 29:21
**shaken** [1] - 98:5
**shall** [1] - 108:21
**share** [8] - 15:10, 17:17, 17:19, 18:5, 20:8, 32:17, 32:20, 118:10
**shared** [6] - 15:21, 17:9, 21:4, 76:11, 77:3, 78:22
**sharing** [26] - 11:25, 12:2, 12:3, 12:4, 12:8, 29:13, 30:3, 42:2, 45:21, 60:11, 64:13, 65:13, 72:7, 72:17, 77:2, 80:2, 96:7, 105:9, 112:5, 113:6, 115:6, 115:9, 119:14, 123:4, 123:5, 127:12
**sheet** [1] - 48:21
**shopping** [1] - 103:22
**short** [2] - 57:1, 100:25
**shorten** [1] - 42:9
**shot** [9] - 26:21,

26:23, 26:24, 29:7, 30:3, 30:8, 48:16, 51:5, 52:7
**show** [16] - 16:24, 16:25, 24:21, 27:9, 30:20, 35:15, 36:21, 37:24, 47:17, 48:10, 50:9, 52:13, 52:15, 88:8, 116:8, 118:5
**showing** [9] - 10:5, 21:17, 31:21, 59:17, 68:19, 88:6, 101:1, 131:20, 131:24
**shown** [4] - 13:25, 30:12, 53:4, 58:6
**shows** [4] - 28:3, 50:25, 58:15, 100:17
**side** [3] - 28:7, 79:22, 94:3
**sides** [2] - 60:2, 102:25
**signature** [1] - 97:17
**significance** [1] - 58:24
**silence** [2] - 132:11, 132:21
**similar** [3] - 9:3, 15:22, 77:15
**simple** [5] - 87:6, 110:12, 111:11, 117:1, 117:5
**simpler** [1] - 107:3
**simply** [8] - 77:21, 79:20, 112:21, 114:1, 117:7, 127:3, 127:20, 128:21
**simultaneously** [2] - 16:17, 74:18
**single** [9] - 25:3, 66:9, 66:11, 91:19, 98:23, 121:15, 131:4, 135:11, 136:18
**sit** [1] - 92:22
**site** [14] - 41:6, 41:22, 68:7, 68:8, 68:21, 68:22, 68:23, 69:9, 69:10, 69:11, 69:21, 83:16, 84:20, 133:14
**sites** [5] - 39:14, 39:15, 68:17, 69:18
**sitting** [2] - 76:8, 84:10
**situation** [4] - 102:19, 104:1, 128:15, 131:21
**six** [3] - 98:19, 133:11, 136:1
**six-step** [1] - 133:11
**skepticism** [2] - 102:17, 103:5

**skills** [1] - 11:9
**skipping** [1] - 42:4
**sky** [1] - 84:15
**sleight** [1] - 111:4
**slowing** [1] - 78:24
**small** [3] - 18:23, 117:14, 128:10
**Smoot** [19] - 5:22, 6:19, 6:20, 7:8, 7:10, 14:17, 19:2, 24:13, 25:6, 26:22, 27:21, 37:10, 39:13, 41:17, 49:25, 50:15, 53:7, 57:23
**SMOOT** [1] - 6:22
**sneaking** [1] - 120:3
**so-called** [2] - 67:1, 80:12
**soft** [1] - 135:6
**software** [32] - 8:12, 15:24, 16:19, 42:1, 64:10, 72:13, 73:18, 73:19, 73:24, 74:2, 74:3, 76:2, 76:24, 78:15, 78:17, 78:25, 79:2, 79:12, 81:18, 81:21, 82:16, 82:17, 82:19, 82:21, 83:18, 84:3, 84:16, 86:14, 86:15, 86:16, 87:9, 87:11
**sold** [2] - 32:6, 69:24
**sole** [1] - 27:9
**someone** [15] - 27:22, 28:13, 41:2, 52:10, 54:11, 69:9, 69:24, 76:2, 78:21, 82:4, 85:25, 87:9, 115:14, 115:16
**sometime** [1] - 61:18
**sometimes** [2] - 15:1, 128:8
**somewhat** [1] - 99:16
**somewhere** [6] - 42:25, 43:5, 84:12, 84:14, 84:24, 100:17
**soon** [1] - 78:18
**sorry** [12] - 5:22, 17:12, 32:18, 56:10, 70:20, 85:8, 102:13, 110:2, 110:20, 112:20, 117:24, 132:16
**sort** [11] - 75:25, 76:22, 78:12, 87:14, 104:7, 126:21, 128:4, 132:2, 133:6, 135:5, 135:6
**sought** [4] - 6:15, 101:2, 101:22,

121:16
**source** [4] - 17:9, 20:10, 42:1, 88:11
**sources** [2] - 40:22, 51:2
**Southern** [1] - 130:16
**space** [1] - 40:13
**sparked** [1] - 115:5
**speaking** [4] - 9:6, 23:20, 83:15, 89:5
**special** [4] - 79:12, 96:7, 96:8, 123:5
**specific** [7] - 34:7, 34:12, 40:19, 81:9, 89:15, 118:16
**specifically** [6] - 10:19, 14:23, 15:4, 17:5, 21:21, 121:5
**specious** [1] - 135:18
**speed** [3] - 8:19, 59:23, 125:22
**spend** [1] - 70:2
**spending** [1] - 126:12
**spent** [2] - 80:22, 92:10
**spilled** [1] - 129:10
**split** [6] - 102:20, 111:6, 111:8, 111:9, 118:11, 124:20
**spoken** [1] - 74:13
**sponsored** [1] - 22:6
**St** [1] - 117:19
**stable** [1] - 67:18
**staff** [4] - 62:24, 63:2, 63:13, 92:13
**stage** [7] - 60:10, 96:5, 105:22, 108:6, 112:3, 112:10, 112:23
**stamp** [1] - 81:20
**stand** [1] - 6:21
**standard** [4] - 102:12, 111:22, 112:18, 124:18
**Standards** [1] - 8:14
**standing** [9] - 110:13, 110:14, 110:15, 111:5, 111:14, 111:23, 121:6, 135:22
**standpoint** [1] - 11:1
**start** [8] - 5:13, 6:17, 22:25, 53:14, 69:12, 81:23, 113:16, 120:11
**started** [3] - 97:21, 98:7, 112:19
**starts** [1] - 16:22
**state** [18] - 4:4, 7:8, 13:7, 22:3, 23:25,

33:11, 53:12, 55:4, 62:21, 80:10, 98:25, 101:19, 112:21, 115:20, 116:5, 116:7, 116:9, 117:15
**State** [3] - 106:16, 132:15, 132:16
**state's** [1] - 9:16
**statement** [8] - 18:19, 54:13, 82:16, 82:18, 91:1, 93:4, 93:7, 100:25
**statements** [2] - 91:1, 100:14
**states** [4] - 54:25, 59:11, 59:13, 116:5
**statistics** [1] - 28:4
**status** [1] - 113:17
**statutory** [1] - 98:12
**stay** [9] - 75:18, 85:2, 86:4, 86:10, 108:21, 108:24, 134:9, 134:21, 134:24
**stayed** [1] - 85:4
**staying** [1] - 133:22
**STEELE** [118] - 4:6, 5:16, 5:18, 5:20, 5:22, 5:25, 6:19, 7:1, 7:7, 8:7, 9:24, 13:21, 13:24, 14:1, 14:4, 14:10, 14:12, 14:16, 17:11, 17:14, 17:20, 17:23, 18:2, 18:12, 18:16, 18:18, 19:18, 19:22, 20:19, 20:24, 21:6, 21:16, 22:16, 22:21, 22:24, 23:3, 23:7, 23:11, 23:13, 23:16, 23:19, 23:22, 24:11, 24:12, 25:21, 25:22, 26:4, 26:7, 26:19, 26:20, 27:20, 28:6, 29:6, 29:25, 30:13, 30:18, 30:19, 31:17, 31:19, 31:20, 33:16, 33:20, 33:25, 34:3, 34:4, 35:19, 35:22, 35:25, 36:1, 36:20, 36:24, 37:2, 37:5, 37:9, 39:1, 39:22, 41:11, 43:14, 46:1, 54:21, 55:22, 57:11, 57:19, 57:24, 59:4, 59:7, 61:12, 62:13, 65:15, 83:2, 110:2, 110:8, 110:12, 111:1, 111:18, 112:9, 112:13, 113:1, 113:4, 113:11,

114:9, 114:11, 114:14, 114:19, 114:24, 115:2, 115:10, 115:25, 116:11, 118:4, 118:9, 118:24, 119:22, 120:6, 135:1, 136:14, 136:16, 137:18
**Steele** [25] - 4:6, 18:7, 20:5, 22:13, 25:11, 25:17, 29:24, 42:6, 57:10, 58:6, 59:1, 61:19, 61:20, 61:22, 82:25, 93:18, 93:24, 97:9, 101:23, 109:20, 118:23, 127:3, 132:17, 133:16, 137:13
**Steele's** [2] - 132:22, 134:7
**step** [4] - 4:4, 6:20, 102:15, 133:11
**Steve** [3] - 5:18, 5:19, 26:22
**Steven** [2] - 6:19, 7:10
**STEVEN** [1] - 6:22
**stick** [1] - 94:6
**stickers** [2] - 137:15, 137:19
**still** [10] - 16:21, 48:7, 79:16, 82:6, 117:24, 122:2, 128:23, 129:2, 131:8, 134:16
**stipulate** [2] - 62:13, 109:5
**stipulated** [1] - 65:14
**stolen** [1] - 69:19
**sTOLTZ** [1] - 123:3
**STOLTZ** [10] - 4:16, 5:11, 109:14, 122:22, 123:19, 124:2, 124:7, 125:4, 125:13, 125:25
**Stoltz** [7] - 4:16, 5:9, 5:18, 5:20, 5:21, 122:20, 123:2
**stomach** [2] - 50:6, 54:8
**stop** [4] - 116:16, 116:23, 133:11, 137:1
**stored** [1] - 31:1
**story** [2] - 18:12, 18:14
**streaming** [1] - 68:22
**strenuously** [2] - 103:10, 108:1
**stuck** [1] - 99:3
**studied** [10] - 10:21,

11:3, 11:6, 11:10, 11:11, 11:17, 13:14, 65:4, 65:6, 65:10
**studies** [1] - 85:1
**studios** [1] - 133:8
**study** [15] - 13:4, 13:12, 13:15, 17:4, 17:21, 19:4, 19:8, 19:19, 19:20, 19:23, 20:22, 32:24, 38:22, 84:25, 85:3
**stuff** [2] - 85:16, 117:22
**style** [1] - 73:11
**subject** [1] - 134:5
**subjects** [1] - 89:20
**submission** [1] - 27:15
**submit** [8] - 13:18, 23:11, 58:8, 91:3, 122:14, 123:13, 124:3, 124:16
**submitted** [10] - 6:6, 27:14, 56:7, 81:1, 88:25, 90:18, 91:18, 125:2, 137:14
**subpoena** [28] - 87:22, 89:2, 89:17, 90:14, 91:12, 91:19, 92:1, 92:2, 92:4, 94:25, 95:24, 96:19, 100:6, 100:7, 108:24, 111:21, 111:22, 115:7, 115:22, 120:20, 120:21, 130:19, 130:22, 130:24, 131:2, 131:9, 134:6, 134:16
**subpoenaing** [1] - 96:2
**subpoenas** [17] - 92:14, 93:9, 96:12, 97:3, 97:6, 97:20, 98:4, 99:10, 99:13, 99:14, 99:21, 105:12, 105:18, 108:11, 123:8, 127:8, 132:19
**subscribe** [1] - 34:25
**subscriber** [9] - 13:11, 35:1, 66:23, 87:22, 92:16, 98:12, 106:14, 130:20, 136:3
**subscribers** [10] - 39:17, 96:18, 98:4, 99:22, 113:15, 120:20, 120:24, 133:13, 135:10, 135:12

**subsequently** [2] - 78:7, 80:5
**subset** [1] - 74:23
**substantial** [8] - 90:10, 90:13, 90:21, 91:9, 91:21, 92:9, 111:11, 112:7
**successful** [1] - 82:7
**successfully** [3] - 82:2, 82:5, 82:10
**suddenly** [1] - 83:17
**sue** [2] - 75:1, 128:9
**sued** [4] - 74:22, 130:20, 131:14, 131:15
**sufficient** [1] - 44:4
**sufficiently** [4] - 86:1, 95:14, 101:20, 104:16
**suggest** [2] - 77:22, 137:6
**suggesting** [1] - 27:25
**suggestion** [1] - 121:18
**suggestions** [1] - 122:12
**suit** [4] - 119:25, 123:17, 128:21, 133:6
**suits** [3] - 129:5, 129:17, 133:5
**summarize** [1] - 80:1
**summary** [3] - 58:2, 58:8, 60:20
**summation** [1] - 15:7
**supplement** [1] - 124:24
**supplemental** [1] - 122:7
**supplementary** [1] - 99:5
**supplementing** [1] - 62:2
**supplied** [1] - 40:4
**support** [6] - 9:16, 79:17, 79:18, 90:20, 91:9, 93:7
**suppose** [1] - 120:19
**supposed** [2] - 98:10, 117:9
**sur** [1] - 99:24
**sur-reply** [1] - 99:24
**surest** [2] - 121:19, 121:25
**surprise** [2] - 44:6, 45:8
**surprising** [5] - 44:9, 44:10, 45:12, 45:13, 45:14
**surrounding** [2] -

44:16, 46:14
**survey** [3] - 35:7, 37:14, 38:18
**surveys** [1] - 39:2
**suspicion** [1] - 120:3
**swarm** [52] - 48:20, 48:21, 48:22, 48:24, 48:25, 49:6, 49:8, 73:2, 74:4, 74:10, 74:12, 74:20, 74:23, 75:2, 75:4, 75:5, 75:15, 75:18, 75:22, 76:11, 76:20, 76:22, 76:23, 77:20, 77:21, 77:23, 78:1, 78:6, 78:8, 78:10, 78:11, 78:13, 78:18, 78:22, 80:4, 81:6, 81:7, 81:12, 81:14, 81:16, 81:23, 81:24, 82:1, 82:3, 82:4, 82:5, 82:7, 85:4, 85:7, 86:7
**swarms** [48] - 48:19, 74:8, 74:14, 74:16, 77:14, 77:15, 80:11, 85:2
**Sweden** [1] - 83:16
**Swedish** [1] - 83:17
**sworn** [2] - 6:23, 62:9
**syllable** [1] - 83:6
**sympathetic** [1] - 106:12
**synchronization** [1] - 11:15
**system** [19] - 10:25, 31:7, 31:9, 31:16, 33:3, 34:15, 34:16, 41:18, 41:21, 65:3, 67:15, 71:15, 74:17, 84:8, 87:1, 105:10, 119:16, 135:16
**Systems** [1] - 124:22
**systems** [12] - 9:5, 11:5, 12:16, 12:17, 13:9, 14:20, 64:13, 65:13, 78:11, 78:14, 84:19

**T**

**tabbed** [1] - 54:19
**table** [6] - 16:6, 17:17, 18:4, 79:19, 79:23, 121:6
**tailor** [1] - 69:6
**Tampa** [3] - 36:11, 36:14, 36:16
**technical** [7] - 11:1,

14:13, 14:22, 15:13,
21:25, 40:3, 79:9
**technically** [1] - 87:20
**technician** [1] - 63:13
**techniques** [4] - 9:3,
13:16, 77:14, 77:16
**technologies** [14] -
46:7, 46:16, 46:18,
46:19, 63:14, 63:17,
63:18, 63:24, 64:1,
64:5, 70:9, 73:8
**technologist** [2] -
62:24, 63:2
**technology** [46] -
7:13, 7:14, 7:21,
7:22, 7:23, 7:25, 9:2,
9:18, 9:20, 10:6,
10:9, 13:9, 42:5,
42:11, 42:16, 42:24,
43:3, 43:24, 44:24,
45:1, 45:4, 45:10,
45:25, 46:7, 46:9,
46:21, 47:4, 47:6,
48:19, 52:10, 53:11,
53:16, 63:5, 63:20,
65:5, 65:6, 65:12,
66:6, 66:13, 67:5,
67:7, 68:4, 68:9,
68:23, 69:6, 70:18
**telecommunications**
[3] - 8:11, 9:25, 10:6
**telephone** [2] - 64:25,
65:3
**ten** [3] - 63:2, 92:4,
122:11
**tend** [2] - 88:4, 128:13
**tender** [1] - 14:2
**tens** [5] - 105:9,
105:11, 127:13,
127:21, 130:13
**tension** [1] - 23:13
**term** [5] - 34:7, 72:6,
76:10, 102:1, 115:15
**terms** [14] - 12:19,
15:13, 45:23, 46:21,
63:22, 68:16, 69:9,
77:1, 95:23, 107:18,
107:23, 111:19,
118:16, 130:8
**territories** [1] - 68:20
**test** [3] - 85:23, 85:25,
132:3
**tested** [3] - 36:7,
37:23, 38:4
**testified** [9] - 6:24,
9:4, 9:14, 12:16,
13:1, 62:10, 64:18,
64:22, 64:23
**testify** [4] - 9:7, 9:11,
27:12, 64:20

**testifying** [1] - 9:6
**testimony** [12] - 6:3,
9:4, 11:19, 14:8,
29:20, 30:6, 35:5,
52:6, 61:24, 62:1,
64:24, 81:4
**testing** [2] - 36:5,
53:24
**tests** [1] - 80:23
**Texas** [8] - 99:7, 99:9,
100:5, 100:8,
115:18, 116:1,
121:14, 130:17
**text** [1] - 81:18
**THE** [314] - 4:2, 4:8,
4:11, 4:15, 4:21, 5:3,
5:7, 5:9, 5:12, 5:17,
5:19, 5:21, 5:24, 6:1,
6:8, 6:13, 6:17, 6:20,
7:3, 8:1, 8:3, 8:5,
8:6, 10:3, 10:11,
13:20, 13:22, 13:25,
14:3, 14:5, 14:8,
14:11, 17:8, 17:17,
17:22, 18:4, 18:14,
18:17, 18:19, 19:2,
19:4, 19:7, 19:9,
19:12, 19:14, 20:5,
20:20, 21:4, 21:9,
21:13, 22:13, 22:17,
22:22, 22:25, 23:5,
23:8, 23:12, 23:15,
23:17, 23:20, 23:23,
23:25, 24:7, 25:5,
25:7, 25:9, 25:11,
25:13, 25:14, 25:15,
25:16, 25:17, 25:20,
26:1, 26:6, 26:18,
27:3, 27:18, 28:2,
28:3, 28:20, 28:24,
29:2, 29:4, 29:5,
29:16, 30:16, 30:21,
30:23, 30:24, 31:2,
31:6, 31:12, 31:18,
32:19, 32:22, 32:24,
33:15, 33:18, 33:22,
34:1, 35:21, 35:23,
36:14, 36:15, 36:16,
36:17, 36:18, 36:19,
36:23, 36:25, 37:3,
37:7, 38:9, 38:11,
38:25, 39:6, 39:7,
39:13, 39:15, 39:21,
41:12, 41:14, 43:16,
43:19, 46:4, 46:5,
47:7, 48:3, 48:11,
48:14, 48:17, 48:18,
48:22, 48:24, 49:1,
49:6, 49:7, 49:10,
49:18, 49:19, 49:22,

50:4, 50:6, 50:12,
50:13, 52:21, 53:9,
54:3, 54:6, 54:16,
56:2, 56:10, 56:17,
56:20, 56:22, 56:23,
57:9, 57:12, 57:18,
57:23, 57:25, 58:4,
58:6, 59:1, 59:6,
59:21, 61:1, 61:8,
61:17, 61:24, 62:12,
62:15, 63:20, 63:23,
64:2, 64:4, 64:5,
65:14, 65:16, 70:2,
70:7, 70:13, 75:19,
75:23, 76:5, 76:15,
76:18, 76:19, 77:6,
77:11, 79:1, 79:8,
79:14, 79:16, 82:25,
87:18, 87:24, 88:17,
88:20, 88:21, 89:10,
89:16, 89:23, 90:5,
90:15, 90:20, 90:25,
91:8, 91:20, 91:22,
92:11, 92:15, 92:22,
92:25, 93:6, 94:8,
95:4, 95:10, 95:19,
96:10, 96:21, 96:23,
96:25, 100:19,
100:24, 101:17,
101:25, 102:4,
102:8, 102:23,
103:7, 103:13,
103:20, 104:3,
104:6, 105:23,
106:11, 106:18,
106:21, 107:7,
107:11, 107:14,
107:25, 108:8,
108:18, 109:3,
109:13, 109:16,
110:3, 110:10,
110:25, 111:16,
111:19, 112:11,
112:24, 113:2,
113:5, 114:6,
114:10, 114:13,
114:18, 114:23,
115:1, 115:3,
115:22, 116:10,
117:23, 118:1,
118:8, 118:10,
119:9, 120:5,
120:13, 121:1,
121:9, 121:22,
122:8, 122:15,
122:19, 122:23,
123:2, 123:16,
123:20, 124:6,
125:3, 125:10,
125:20, 126:6,
126:11, 126:19,

127:5, 127:10,
127:17, 127:19,
128:1, 128:16,
129:6, 129:9,
129:22, 130:3,
130:7, 131:1, 132:6,
132:14, 132:24,
134:2, 134:22,
134:25, 136:13,
136:15, 137:10,
137:13, 137:20
**theft** [1] - 9:14
**themselves** [2] - 73:7,
121:20
**thereby** [1] - 78:9
**thereof** [1] - 14:24
**they've** [5] - 38:14,
58:21, 60:5, 113:21,
113:22
**thinking** [3] - 70:10,
79:19, 129:23
**thinks** [3] - 118:6,
118:10, 121:12
**third** [7] - 40:14,
95:15, 114:12,
117:1, 117:7, 117:8
**thoughtful** [2] -
104:10, 104:12
**thousand** [4] - 98:1,
98:22, 98:24, 104:7
**thousands** [9] - 27:11,
74:4, 74:5, 97:8,
105:9, 105:11,
127:13, 127:21,
130:13
**three** [5] - 35:18,
37:24, 133:2, 135:1,
135:3
**throughout** [1] - 16:5
**throw** [1] - 121:20
**thrown** [2] - 133:13,
135:23
**tie** [1] - 92:19
**tightly** [1] - 76:21
**timing** [2] - 93:23,
97:14
**title** [2] - 21:23, 21:25
**titled** [4] - 25:23, 26:3,
35:15, 36:22
**today** [15] - 6:3, 12:19,
27:8, 35:5, 47:5,
47:12, 53:4, 59:3,
60:18, 66:6, 80:19,
94:10, 97:22,
116:20, 137:14
**together** [3] - 46:10,
88:15, 129:13
**tomorrow** [1] - 94:23
**took** [2] - 56:23,
129:13

**tool** [5] - 47:11, 47:20,
47:21, 48:6, 52:11
**tools** [2] - 47:15,
47:17
**top** [5] - 17:5, 18:22,
24:14, 30:9, 51:6
**topics** [2] - 6:11,
84:22
**Tor** [1] - 83:19
**torrent** [17] - 15:17,
15:22, 15:23, 16:2,
16:3, 24:19, 24:20,
25:3, 28:25, 41:23,
41:25, 49:9, 49:13,
49:14, 79:13, 85:2
**torrents** [8] - 17:6,
18:22, 18:24, 24:14,
24:16, 79:18
**total** [2] - 130:8,
136:16
**trace** [1] - 72:1
**tracing** [1] - 46:10
**track** [4] - 4:23, 66:14,
94:23, 118:20
**tracked** [1] - 24:14
**tracker** [13] - 72:25,
73:2, 73:4, 76:24,
78:4, 78:6, 78:7,
79:2, 79:3, 79:12,
81:15
**trackering** [1] - 80:8
**trackerless** [2] -
79:18, 80:12
**trackers** [8] - 73:12,
76:25, 79:6, 79:11,
79:22, 79:25, 85:18,
86:3
**tracking** [1] - 80:3
**traditional** [1] - 73:11
**traditionally** [1] - 66:8
**traffic** [10] - 9:15,
63:13, 63:17, 63:20,
63:23, 63:25, 65:23,
66:11, 73:16
**train** [1] - 94:11
**transcript** [1] - 138:4
**transcripts** [1] - 118:5
**transfer** [2] - 12:6,
87:6
**transfers** [1] - 73:5
**translating** [1] - 66:14
**translation** [3] - 66:6,
66:13, 66:24
**travel** [1] - 89:18
**Tremaine** [1] - 4:20
**trial** [3] - 22:15, 86:24,
106:3
**trials** [1] - 106:2
**tried** [2] - 94:25,
128:15

**trouble** [2] - 69:19, 135:19
**troubling** [1] - 131:10
**true** [6] - 84:4, 86:8, 87:12, 110:19, 124:2, 129:20
**truth** [6] - 6:23, 6:24, 62:9, 62:10
**try** [6] - 43:17, 68:21, 83:8, 102:15, 103:10, 110:23
**trying** [10] - 19:9, 43:19, 43:20, 45:19, 47:2, 47:24, 48:10, 69:1, 83:21, 85:12
**turn** [5] - 88:16, 103:24, 106:21, 124:17, 135:2
**turned** [2] - 69:24, 79:3
**turns** [1] - 108:16
**two** [14] - 5:15, 8:14, 13:19, 16:4, 36:9, 45:20, 47:3, 55:23, 85:17, 89:1, 110:24, 116:21, 117:15, 135:3
**type** [10] - 12:2, 38:13, 39:18, 42:20, 44:24, 115:13, 124:23, 125:1, 128:7, 131:21
**types** [2] - 95:17, 115:11
**typical** [5] - 26:24, 27:22, 28:3, 73:24, 77:23
**typically** [16] - 15:11, 22:17, 28:15, 31:15, 33:6, 53:18, 66:20, 66:21, 67:11, 67:17, 67:19, 67:24, 68:10, 74:8, 74:17
**typing** [1] - 122:24

## U

**U.S.C** [2] - 96:18, 106:22
**Ubuntu** [1] - 25:4
**ultimate** [1] - 32:5
**ultimately** [2] - 69:20, 120:16
**uncontested** [2] - 102:18, 103:3
**under** [22] - 14:11, 28:20, 28:21, 35:8, 48:24, 49:10, 50:17, 53:22, 89:1, 89:4, 89:14, 90:14, 96:16,

98:11, 101:18, 106:22, 106:24, 108:19, 112:11, 117:16
**undergoing** [1] - 123:22
**underlying** [7] - 10:13, 95:8, 95:13, 95:22, 96:11, 117:1, 124:11
**underneath** [4] - 28:8, 29:8, 30:4, 30:8
**underpinnings** [1] - 11:2
**understood** [3] - 57:23, 64:2, 107:19
**undisputed** [1] - 103:9
**undue** [13] - 6:13, 6:16, 58:12, 89:20, 89:24, 90:5, 90:7, 91:12, 91:23, 93:20, 93:22, 95:7, 95:23
**unfortunate** [1] - 69:23
**unified** [1] - 103:4
**uniform** [4] - 103:11, 103:16, 113:7
**uniformity** [1] - 109:25
**unique** [3] - 44:18, 44:23, 116:7
**United** [1] - 69:2
**Universal** [1] - 22:9
**unknown** [2] - 18:24, 119:3
**unless** [11] - 22:25, 31:14, 46:11, 78:12, 105:13, 108:22, 110:5, 110:6, 118:22, 134:9, 134:18
**unlimited** [1] - 87:14
**unrelated** [1] - 59:2, 60:18
**unusual** [3] - 5:24, 102:19, 103:2
**up** [37] - 10:21, 10:22, 11:7, 11:9, 27:9, 34:10, 35:10, 49:12, 50:1, 50:15, 56:24, 59:5, 68:8, 68:11, 88:2, 93:19, 93:25, 94:1, 95:3, 100:17, 103:1, 104:8, 105:15, 106:23, 111:10, 113:22, 114:7, 115:2, 115:12, 117:22, 118:25, 119:15, 122:11, 131:23, 135:13, 136:8, 137:3
**upload** [1] - 73:25,

76:20
**uploaded** [5] - 51:17, 51:20, 51:21, 51:22, 78:5
**uploaders** [1] - 85:22
**uploading** [3] - 73:15, 75:11, 85:19
**ups** [3] - 97:9, 105:10, 127:2
**upstairs** [1] - 118:21
**upstream** [1] - 67:2
**urging** [1] - 91:11
**usage** [2] - 22:10, 73:1
**uscourts.gov** [1] - 71:16
**user** [35] - 11:4, 15:17, 15:22, 32:3, 32:5, 33:4, 33:6, 33:18, 34:23, 39:19, 40:9, 66:4, 66:6, 69:7, 73:14, 73:17, 73:21, 73:22, 73:25, 75:21, 76:1, 76:2, 76:6, 76:13, 77:1, 77:4, 78:7, 78:9, 78:23, 79:4, 79:7, 81:22, 84:6, 88:7
**user's** [2] - 11:1, 74:1
**users** [25] - 15:10, 15:20, 16:8, 29:3, 30:10, 30:11, 73:1, 74:5, 74:7, 75:20, 78:19, 78:20, 78:25, 83:18, 84:7, 84:13, 85:20, 85:21, 86:9, 88:4, 88:5, 101:11, 123:7, 124:4, 124:7
**uses** [7] - 34:17, 42:11, 42:14, 42:16, 47:15, 72:18, 83:25
**usual** [1] - 126:24
**utmost** [1] - 104:11
**uTorrent** [10] - 25:1, 25:15, 32:1, 32:8, 32:9, 32:12, 32:17, 32:19, 33:5, 33:18

## V

**valid** [1] - 101:4
**value** [1] - 131:20
**Valve** [3] - 72:18, 83:24
**varies** [1] - 39:25
**various** [9] - 15:2, 16:9, 28:4, 35:6, 36:6, 46:6, 46:7, 61:6, 118:6
**vary** [1] - 78:4

**vehicle** [1] - 12:17
**venue** [8] - 58:24, 102:9, 105:6, 111:25, 112:2, 112:9, 112:22, 128:20
**verified** [1] - 101:4
**Verizon** [3] - 4:10, 89:13, 90:24
**version** [2] - 22:2, 76:25
**versus** [6] - 4:3, 43:20, 45:23, 49:13, 92:1, 100:5
**via** [3] - 14:1, 64:8, 72:13
**video** [6] - 68:21, 69:1, 69:3, 72:18, 72:19, 72:22
**view** [14] - 60:1, 60:8, 69:3, 90:8, 101:7, 103:21, 104:14, 104:20, 109:1, 120:14, 126:16, 127:10, 131:3, 131:9
**viewed** [3] - 46:22, 58:13, 80:19
**viewing** [1] - 80:22
**views** [3] - 60:10, 104:19, 118:11
**violation** [1] - 98:13
**Virginia** [2] - 36:11, 37:16
**virtue** [1] - 100:17
**visible** [1] - 67:2
**visitor** [1] - 68:6
**void** [3] - 122:6, 135:8, 137:9
**voir** [2] - 10:12, 10:15
**VOIR** [1] - 10:17
**voluminous** [2] - 91:16, 91:24
**voluntarily** [2] - 78:12, 121:14
**volunteer** [1] - 107:17

## W

**wait** [3] - 98:3, 114:3, 130:21
**waiting** [1] - 122:20
**waived** [1] - 104:24
**walk** [1] - 135:21
**Washington** [6] - 35:10, 36:11, 38:8, 106:16, 131:11, 131:13
**water** [1] - 114:14
**ways** [7] - 11:16,

15:18, 15:19, 53:17, 70:17, 83:11, 118:1
**wearing** [1] - 105:17
**web** [2] - 63:11, 83:17
**website** [2] - 41:2, 68:5
**websites** [5] - 15:19, 69:5, 72:2, 119:23, 119:25
**week** [3] - 94:2, 114:17, 136:11
**weeks** [2] - 116:21, 117:15
**welcome** [1] - 118:15
**Westlaw** [1] - 102:25
**whatnot** [3] - 83:12, 97:15, 113:16
**whichever** [1] - 92:5
**whim** [1] - 94:21
**whip** [1] - 98:11
**whip-sawed** [1] - 98:11
**white** [2] - 113:2, 113:3
**whole** [13] - 6:23, 41:21, 47:8, 62:9, 79:1, 96:25, 97:21, 105:2, 109:20, 115:19, 128:20, 133:14, 134:8
**wide** [1] - 104:15
**widely** [2] - 32:21, 46:13
**widespread** [2] - 129:24, 130:9
**Wild** [3] - 93:13, 102:21, 106:19
**Wilkins** [5] - 100:1, 100:4, 100:11, 104:11, 121:13
**Wilkins'** [1] - 115:17
**win** [1] - 116:20
**wisdom** [1] - 23:11
**wish** [1] - 61:25
**witness** [28] - 4:17, 5:13, 5:16, 5:17, 5:18, 6:5, 6:18, 6:21, 11:19, 13:18, 13:20, 14:8, 20:15, 21:2, 21:8, 24:2, 27:8, 27:13, 28:1, 29:19, 34:2, 49:21, 50:11, 54:12, 55:25, 64:15, 90:23, 91:3
**WITNESS** [45] - 8:3, 8:6, 18:17, 18:19, 19:4, 19:9, 19:14, 25:7, 25:11, 25:14, 25:16, 28:3, 28:24, 29:4, 30:23, 31:2,

31:12, 32:19, 32:24,
36:15, 36:17, 36:19,
38:11, 39:7, 39:15,
43:19, 46:5, 48:17,
48:22, 49:1, 49:7,
49:18, 50:13, 56:22,
64:2, 64:5, 75:23,
76:15, 76:19, 77:11,
79:8, 79:16, 87:24,
88:20, 90:15

**witnesses** [10] - 5:15,
6:2, 29:19, 57:10,
57:11, 57:13, 57:14,
57:16, 73:10, 91:4

**word** [10] - 28:8, 29:8,
30:4, 30:7, 30:8,
50:17, 64:4, 97:25,
102:4, 102:9

**Word** [1] - 76:14

**words** [4] - 38:13,
78:8, 85:12, 124:25

**works** [6] - 11:1,
14:24, 79:5, 84:7,
128:3, 128:5

**world** [6] - 67:9,
74:15, 74:18,
127:10, 131:3, 131:9

**Wright** [1] - 4:20

**wristwatches** [1] -
57:3

**write** [2] - 81:18,
120:14

**writing** [1] - 121:3

**written** [4] - 65:4,
65:6, 65:25, 82:19

**wrote** [2] - 76:2,
104:12

# Y

**year** [4] - 61:19, 92:17,
136:1, 136:2

**years** [4] - 7:15, 15:7,
45:5, 63:3

**Yelp** [1] - 69:10

**York** [1] - 36:10

**yourself** [2] - 25:15,
53:24

# Z

**zero** [1] - 51:8